# UNITED STATES DISTRICT COURT

_____ NORTHERN _____   DISTRICT OF   ____ ILLINOIS, EASTERN DIVISION ____

UNITED STATES OF AMERICA

v.

ISAIAH HICKS a/k/a "CUZ," "BIG CUZ,"
"ROCK," and "CHILL ROCK"
and the defendants on the attached list

**MAGISTRATE JUDGE ASHMAN**
**CRIMINAL COMPLAINT**

**CASE NUMBER:**

# 08CR  401

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Beginning in or about ___ April, 2007 ___ and continuing until the present, in __ Cook ___ county, in the _____ Northern ___ District of _____ Illinois _____ defendant(s) did,

conspire with each other and with others known and unknown to the United States knowingly and intentionally to possess with intent to distribute and to distribute controlled substances, namely, 50 grams or more of mixtures containing cocaine base in the form of crack cocaine, and 5 kilograms or more of mixtures containing cocaine, both Schedule II Narcotic Drug Controlled Substances, in violation of Title 21, United States Code, Section 841(a)(1),

in violation of Title ___ 21 ___ United States Code, Sections 846 and Title 18, United States Code, Section 2. _____.

I further state that I am a _____ Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives _ and that this complaint is based on the following facts:

See attached affidavit.

**FILED**

**MAY 2 0 2008**

Continued on the attached sheet and made a part hereof:  _X_ Yes   ___ No

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

_Jeffrey P. Schulmeyer # 3342_
Signature of Complainant

Sworn to before me and subscribed in my presence,

__ May 20, 2008 _____   at   __ Chicago, Illinois _____
Date                                                    City and State

__ MARTIN C. ASHMAN, U.S. Magistrate Judge __
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

1. ISAIAH HICKS a/k/a "CUZ", "BIG CUZ", "ROCK", and "CHILL ROCK"
2. KEVIN MASUCA a/k/a "NOOK"
3. IVORY WATSON a/k/a "BIRD"
4. AHMAD WILLIAMS a/k/a "AG" and "G-BALL"
5. DANIEL COPRICH a/k/a "D-BLOCK"
6. UBEX LOPEZ a/k/a "LITTLE MAN"
7. SANFORD TOWNSEND, JR. a/k/a "NOOK" and "4-5"
8. VINCENT STRAUGHTER a/k/a "VINO" and "DSKI"
9. COREY WILLIAMS a/k/a "FOUR"
10. JAMAL WASHINGTON a/k/a "LITTLE CUZ" and "MAL"
11. GLENN ISLAND a/k/a "BABY DOUGH"
12. TAMEKA GRANT a/k/a "LATONY CLAYTON", "SHEMIKA MASON", LATOYA YOUNG", "BRANDY JONES", "SHERRY DAVIS", "KINISHA MASON", "MIKA", and "MEKA"
13. JOHNNIE LAVELL YOUNG a/k/a "VILLE" and "VELL"
14. JOSHUA MCELROY a/k/a "BOSS HOG"
15. CLIFTON HARALSON
16. DWAYNE GARRETT a/k/a "WAYNE"
17. PATRICK JONES a/k/a "HOG"
18. SCOTT O'NEAL
19. ANDREA THOMAS a/k/a "DAPHNE THOMAS"
20. MICHAEL A. GONZALEZ
21. ROMELL HOLLINGSWORTH a/k/a "GROSSO"
22. DESHAUN GERMANY a/k/a "DEONTE", "4-5'S COUSIN", "BIG SIN" and "SIN"
23. JOE LONG a/k/a "BABY JOE" and "BJ"
24. CHRISTOPHER GAVIN a/k/a "LITTLE CHRIS"
25. KEVIN GORDON a/k/a "BIG BIRD"
26. LATASHA WILLIAMS a/k/a "TASHA B"
27. ETHEL J. HAROLD
28. MAXINE RUFFETTI

COUNTY OF COOK                    )
                                 )          SS          **UNDER SEAL**
STATE OF ILLINOIS                )

## AFFIDAVIT

I, Jeffrey Shoenburger, Special Agent, United States Department of Justice Bureau of Alcohol,

Tobacco, Firearms and Explosives ("ATF"), being duly sworn, state as follows:

## I.      INTRODUCTION

### A.      AGENT BACKGROUND AND EXPERIENCE

1.    I, Jeffrey Shoenburger, am a Special Agent for the United States Department of Justice

Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and have been so employed

since August of 1992.  I have attended classes, seminars, and discussions sponsored by ATF,

including classes relating to illegal firearms trafficking and/or unlawful possession of firearms.

As part of my job responsibilities, I primarily investigate crimes involving firearms, narcotics,

and street gangs. In connection with my official ATF duties, I have investigated weapons

violations, including violations of Title 18, United States Code, Sections 922 and 924, as well as

violations of other laws used to combat criminal street gangs, including but not limited to, Title

21, United States Code, Sections 841, 843 and 846.  I am authorized to make arrests for these

violations.  I have worked in several investigations involving various types of electronic

surveillance, including court-authorized interception of wire communications.  I also have

experience in the debriefing of defendants, witnesses, informants, as well as others with

knowledge of the distribution and transportation of controlled substances and the street gangs

who participate in these illegal activities.

2.    As a result of my personal participation in this investigation, and my review of: (a)

consensually-monitored telephone conversations; (b) reports prepared by, and information

1

obtained from, other federal, state, and local law enforcement agents and officers; (c) criminal history records; (d) records and data from telephone companies; (e) information obtained from witnesses, including confidential sources, and (f) the content of intercepted wire communications authorized by order of this Court, I am familiar with all aspects of this investigation.

## B.    PURPOSE OF THE AFFIDAVIT

3.    This affidavit sets forth probable cause in support of a Criminal Complaint alleging that the following individuals violated Title 21, United States Code, Section 846 (conspiracy to distribute and possess with intent to distribute controlled substances, namely, in excess of 5 kilograms of cocaine and in excess of 50 grams cocaine base in the form of crack cocaine), and Title 18, United States Code, Section 2:

    a.    ISAIAH HICKS a/k/a "CUZ", "BIG CUZ", "ROCK", and "CHILL ROCK"

    b.    KEVIN MASUCA a/k/a "NOOK"

    c.    IVORY WATSON a/k/a "BIRD"

    d.    AHMAD WILLIAMS a/k/a "AG" and "G-BALL"

    e.    DANIEL COPRICH a/k/a "D-BLOCK"

    f.    UBEX LOPEZ a/k/a "LITTLE MAN"

    g.    SANFORD TOWNSEND, JR. a/k/a "NOOK" and "4-5"

    h.    VINCENT STRAUGHTER a/k/a "VINO" and "DSKI"

    i.    COREY WILLIAMS a/k/a "FOUR"

    j.    JAMAL WASHINGTON a/k/a "LITTLE CUZ" and "MAL"

    k.    GLENN ISLAND a/k/a "BABY DOUGH"

    l.    TAMEKA GRANT a/k/a "LATONY CLAYTON", "SHEMIKA MASON", LATOYA YOUNG", "BRANDY JONES", "SHERRY DAVIS", "KINISHA MASON", "MIKA", and "MEKA"

m.    JOHNNIE LAVELL YOUNG a/k/a "VILLE" and "VELL"

n.    JOSHUA MCELROY a/k/a "BOSS HOG"

o.    CLIFTON HARALSON

p.    DWAYNE GARRETT a/k/a "WAYNE"

q.    PATRICK JONES a/k/a "HOG"

r.    SCOTT O'NEAL

s.    ANDREA THOMAS a/k/a DAPHNE

t.    MICHAEL A. GONZALEZ

u.    ROMELL HOLLINGSWORTH a/k/a "GROSSO"

v.    DESHAUN GERMANY a/k/a "DEONTE", "4-5'S COUSIN", "BIG SIN" and "SIN"

w.    JOE LONG a/k/a "BABY JOE" and "BJ"

x.    CHRISTOPHER GAVIN a/k/a "LITTLE CHRIS"

y.    KEVIN GORDON a/k/a "BIG BIRD"

z.    LATASHA WILLIAMS a/k/a "TASHA B"

aa.    ETHEL J. HAROLD a/k/a "JEANNETTE"

bb.    MAXINE RUFFETTI

4.    This Affidavit is also made for the purpose of establishing probable cause in support of warrants to search the premises listed below ("Search Sites #A-G"), which are further described below, and to seize evidence relating to the commission of offenses, in violation of Title 21, United States Code, Sections 841(a)(1) and 846:

(A)    5358 S. Hoyne Ave., Chicago, Illinois

(B)    5437 S. Hoyne Ave., Chicago, Illinois

(C)    15231 Lincoln Ave., Harvey, Illinois

(D)  8024 S. Honore St., 1st Floor, Chicago, Illinois

(E)  6419 S. May St., Apt 2, Chicago, Illinois

(F)  8145 S. Lorel Ave., Burbank, Illinois

(G)  6152 S. Albany Ave., Chicago, Illinois

5.    This Affidavit is also made for the purpose of establishing probable cause in support of warrants to seize the vehicles listed below ("Subject Vehicles #A-C"), which are described below:

(A) **1998 Jaguar XK 8**, VIN: SAJGX2247WC027422, registered to ISAIAH HICKS, 5358 S. Hoyne Ave., Chicago, Illinois;

(B) **2000 Cadillac Deville**, VIN: 1G6KD54YXYU312523, registered to DANIEL COPRICH, 4206 Applewood Lane, Chicago, Illinois;

(C) **2002 Chevrolet Tahoe**, VIN: 1GNEK13Z22R204336, registered to Individual A and Individual B, 3512 W. Columbus Ave., Chicago, Illinois;

6.    This Affidavit is submitted for the limited purpose of:  (1) establishing probable cause to believe that the defendants committed the above-listed violations; (2) establishing probable cause to believe that evidence of the aforementioned violations will be found in certain residences involved in the conduct alleged herein; and (3) establishing probable cause to believe that the vehicles identified above represent property was used to facilitate the violations herein alleged and that there is probable cause to believe that these vehicles will be subject to forfeiture, should the defendants be convicted for these offenses.  Therefore, this affidavit contains only a summary of relevant facts.  I have not included each and every fact known to me concerning the entities, individuals, and events described herein.

7.    Since approximately April 2007, agents of the Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") have been investigating ISAIAH HICKS and others involved in drug trafficking in the Chicago area.  I have participated in this investigation.  The

statements contained in this Affidavit are based in part on: (a) my personal participation in this investigation; (b) consensually-monitored conversations; (c) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers; (d) criminal history records; (e) records and data from telephone companies; (f) information obtained from witnesses, including confidential sources; (g) the content of intercepted wire communications authorized by order of this Court; and (h) the training and experience of myself and other law enforcement agents.  I have also reviewed the following, among other reports: laboratory analysis reports; intelligence reports of telephone record, pen register, and trap and trace analyses; and audiotapes of consensually-recorded conversations.  To the extent that intercepted and recorded communications are summarized below, those summaries do not include references to all of the topics covered during the course of the conversation that was intercepted.[1]  In addition, summaries do not include references to all statements made by the speakers on the topics that are described.  As a result of my personal participation in this investigation, I am familiar with this investigation.  On the basis of this familiarity, as well as my training and experience, the experience of other law enforcement officers, and on the basis of other information that I have reviewed and determined to be reliable, I allege the following:

### C.  OVERVIEW OF THE INVESTIGATION

8.     Since in or around April 2007, ATF and other law enforcement agencies have gathered information from various sources concerning the crack cocaine, heroin and firearms trafficking of the Gangster Disciple Street Gang (GD's) in the Chicago Metropolitan area and elsewhere in

---

[1]   While the investigative team has listened to the recordings made pursuant to this investigation and attempted to transcribe them accurately, to the extent quotations from these conversations are included herein, these are preliminary, and not final transcriptions.  Based on my training and experience, the context and content of the recorded conversations, and in the context of this investigation, I have included parentheticals, where appropriate, to explain coded language and terms used by narcotics traffickers.

the United States. In particular, ATF in Chicago, Illinois, has been involved in ongoing investigations of Gangsters Disciples drug traffickers who operate their organization in the Chicago area. The investigation identified ISAIAH HICKS as a major cocaine distributor in the Chicago area.

9.    Many of the individuals described below are members of the Damenville Gangster Disciples, a subset of the Gangster Disciple Nation. The Damenville GD's are made up of GD gang members who live and sell narcotics in the area surrounding Damen, with the boundaries roughly identified as Western on the west, Ashland on the East, and 48th street on the North and 59th on the south. This set is dominated by the "5-4 Crew" which is made up of GD gang members that base their operations in and around W. 54th Street near S. Hoyne Avenue in Chicago, Illinois.

*Information From Confidential Informants Concerning HICKS And Certain Members Of His Narcotics Trafficking Operation*

10.    On December 14, 2007, a confidential informant (CI-2)[2] provided information to Special Agents of the ATF and DEA. CI-2 has been charged federally with criminal drug conspiracy and CI-2 is currently cooperating with local and federal law enforcement in the hope of receiving a recommendation for a reduced sentence. CI-2 has twenty-five arrests, including fourteen for narcotics charges, and five convictions, of which three are for narcotics charges. The information provided by CI-2 has been independently corroborated through information provided by other CIs, pen register information, law enforcement records, and surveillance. CI-2 has agreed to testify in this and other matters. Based on the foregoing facts, CI-2 is believed to be credible and reliable.

---

[2]    Hereinafter, to protect the identity of all confidential informants, each CI will be referred to in the male gender, regardless of the actual gender of the CI.

11.    CI-2 stated that he is from the area near 51st and Honore and 51st and Wood in Chicago, Illinois.  CI-2 explained that he has been a Gangster Disciple ("GD") gang member since he was 13 or 14 years old, and has been selling narcotics in the above described location since approximately the same age, up until his 2006 arrests.  When asked about persons he knows as high level drug dealers from that area, CI-2 stated that he knows of a man from the area of 53rd and Damen and 53rd and Hoyne, although he did not know the man's name.  CI-2 described this man as being a black male in his 30s, "all swolled [swelled] up," with braids and a lazy or damaged eye.  This description is consistent with HICKS' physical appearance.  CI-2 viewed a photo of ISAIAH HICKS and identified HICKS as the drug dealer he had previously described.

12.    CI-2 further stated that he was aware that HICKS had been released from the Illinois Department of Corrections (IDOC) in about 2005, and had recruited an organization to sell crack cocaine and heroin for him.  Specifically, CI-2 explained that HICKS had eight to nine 17- to 19 year-old GD gang members selling bags of crack cocaine and heroin for him at several drug spots.  CI-2 described these drug spots as being located at 51st Place and Damen, and at James Street and Damen in Chicago, Illinois.  CI-2 also explained that HICKS had several older GDs working for him who sold "weight" [quantities of narcotics of 63 grams or more] and helped run the drug spots.  CI-2 was also shown a map of this area, and identified the area where HICKS' drug spots were located.  CI-2 explained that during the summer, drug sales typically occur outside on the street, and that during the winter, the drug sales take place inside various houses. CI-2  also described the clientele of these drug spots as Hispanic "hypes" (drug users).

13.    When asked how he knew this information, CI-2 explained that he would often hang out at these drug spots when he was not selling drugs at his own spot because his good friend

"Maine" was a GD gang member who worked for HICKS before being murdered in early 2007 in that same area. On the basis of law enforcement records, I believe the person CI-2 referred to as "Maine" is a particular individual who was killed in a homicide on March 23, 2007.

14.    With regard to HICKS, CI-2 was asked if he had any other information regarding HICKS' drug sales. CI-2 stated that he was aware that HICKS was into working out, and often worked out at the field house of a local park located from 50th to 49th, Wood to Wolcott, Chicago, Illinois. This is consistent with several comments made to the U/C by COREY WILLIAMS during recorded narcotics transactions to the effect that his "Big Cuz" was always working out and enjoyed physical fitness activities. In addition, it is consistent with the fact that, when HICKS had been previously stopped by CPD officers, he had volunteered his profession or employment as "working out."

15.    CI-2 also stated that he had spoken with many members of HICKS' crew in the few months prior to September 2007 and had learned that, at first, they were not making a lot of money, but that now they were all doing really well, and that HICKS had bought several fancy cars.

16.    After viewing photographs from the Illinois Secretary of State database, CI-2 identified several members of HICKS' narcotics trafficking organization:

a.    CI-2 identified JAMAL WASHINGTON, whom he stated is also known as "Mal", as a gang member and worker who sells heroin and crack cocaine for HICKS. CI-2 stated that WASHINGTON would often come to CI-2's block to gamble and play cards with him.

b.    CI-2 identified DANIEL COPRICH as a GD gang member and worker who sells "weight" quantities of crack cocaine for HICKS in the area of 54th and Damen.

c.    CI-2 identified SANFORD TOWNSEND, JR. as a GD gang member and worker

8

who sells bags of crack cocaine and heroin for HICKS at drug spots on 51st Place and James Street.

### Controlled Purchases of Narcotics

17.    From in or around April 2007 through in or around December 2007, an ATF undercover agent (hereinafter "the U/C") completed nine controlled purchases of crack cocaine totaling over 500 grams with COREY WILLIAMS (which are detailed below in ¶¶ 152 - 176). Pen register and telephone toll records showed that, during the course of seven of the cocaine transactions conducted with WILLIAMS, phone calls were placed, either to or from (773) 617-5400, a telephone used by ISAIAH HICKS (hereinafter "Target Phone 1"). During the course of two of those transactions, phone calls were placed either to or from (773) 440-6853, a cellular telephone used by ISAIAH HICKS (hereinafter "Target Phone 2"). In addition, during the course of those transactions, WILLIAMS made statements which implicated HICKS as his supplier. The transactions took place in or around the area of 54th Place and Hoyne Ave. in Chicago, Illinois, which is near the residence at 5358 S. Hoyne Ave -- a residence associated with HICKS through his parole and arrest records.

18.    On February 28, 2008, the U/C conducted a tenth controlled purchase of crack cocaine with COREY WILLIAMS during which wire communications were intercepted on both Target Phone 1 and Target Phone 2. Those wire communications indicate that WILLIAMS arranged to purchase a 63 gram quantity of crack cocaine from HICKS which WILLIAMS then sold to the U/C.

### Interception of Wire Communications

19.    The investigation employed Title III wiretap interceptions, confidential sources, surveillance, and undercover purchases of controlled substances, among other investigative

techniques. Pursuant to court orders issued by the United States District Court for the Northern District of Illinois, the following are the cellular telephones that were intercepted:

a.  Target Phone 1:  Telephone numbers (773) 617-5400, (773) 457-0806, (773) 457-0806, IMSI 316010034292496, used by ISAIAH HICKS.  Interception of Target Phone 1 was initiated on January 25, 2008 and is scheduled to terminate on May 22, 2008;

b.  Target Phone 2:  Telephone number (773) 440-6853, ESN 01906379255, used by ISAIAH HICKS.  Interception of Target Phone 2 was initiated on February 25, 2008 and is scheduled to terminate on May 22, 2008.

c.  Target Phone 4:  (773) 440-2161, ESN 02214329999, used by KEVIN MASUCA. Interception of Target Phone 4 was initiated on March 25, 2008 and is scheduled to terminate on May 22, 2008.

20.  During the course of this investigation and the court-authorized interceptions described above, monitoring agents and I, as well as other investigators, became aware of certain slang terms and code words being used by the participants in the conversations.  The terms were analyzed to their meaning through the content and context of the intercepted communications as well as the knowledge and experience of the law enforcement agents involved in the investigation. The following is a list of these terms and their meaning as I have interpreted them in the recorded conversations in this case.  Some of the words listed below have additional meanings that are not listed and may be used to mean other things when used by other individuals. The following list is not meant to be all-inclusive of all the slang terms or code words used by the persons intercepted:

a.  <u>8-ball</u>:  one-eighth of an ounce of narcotics

b.  <u>The "4"</u>:  the block on W. 54th Street between S. Hoyne Ave. and S. Seeley Ave.

c.  Basketball:  8-ball quantity (1/8 ounce) of narcotics

d.  Bizzle:  8-ball quantity (1/8 ounce) of narcotics

e.  Bumped (getting bumped):  arrested

f.  Bust a move:  sell or buy narcotics, do a narcotics deal

g.  Double nickels:  Garfield Blvd.

h.  Fam:    a term used to describe a family member, close associate or friend

i.  Goddamnit:  gun

j.  Halsted:  63 gram quantity of narcotics

k.  Holler:  talk, typically to sell or buy narcotics

l.  Lick: narcotics, guns or drug spot

m.  "O":  ounce of narcotics

n.  Onion:  ounce of narcotics

o.  Pipe:  gun

p.  Sawbucks:  $10.00 quantity of narcotics

q.  A stack:  $1,000

r.  Trey:  63-gram quantity of narcotics

s.  Thumper:  gun

t.  One of you:  63 gram quantity of narcotics

u.  Zip:  ounce of narcotics

In addition, based on the context of the investigation, HICKS and the other members of his organization also create code words by combining the first letter of the actual term combined with the "izzle" as the suffix. For example, the term "scizzle" is used to refer to a "scale" based on the letters "sc", as the first two letters of the word, combined with "izzle."

21.    Based on intercepted wire communications, analysis of telephone records, and surveillance, ATF agents learned that ISAIAH HICKS is the organizer and leader of a narcotics trafficking organization with its base of operations in the Englewood neighborhood of Chicago, Illinois, centered around the neighborhood block bordered by W. 54th Street on the north, Garfield Blvd. to the south, S. Hoyne Avenue to the west and S. Seeley Ave. to the east in Chicago, Illinois.  As the leader of the organization, HICKS procures large quantities of powder cocaine, which he and his associates process into crack cocaine for distribution and sale at the street level.  HICKS is estimated to purchase and process approximately one to two kilos of powder cocaine every month.  HICKS employs several runners who he either pays directly to serve customers, or who he provides narcotics to on credit.  HICKS also utilizes several distributors who purchase "weight" quantities of narcotics, usually on credit terms.

***Individuals Charged***

22.    The following is a summary of the roles played by the charged individuals:

a.    **ISAIAH HICKS** (a/k/a "Cuz," "Big Cuz," "Rock," and "Chill Rock") is the leader of the narcotics trafficking organization.  HICKS has direct contact with his important customers over at least two cellular telephones.  HICKS fields the requests for narcotics from the customers and then instructs his runners on where and to whom to deliver the narcotics.  HICKS is discussed throughout this affidavit.

b.    **KEVIN MASUCA** (a/k/a "Zook") is HICKS' "second in command" and main runner.  MASUCA makes deliveries to customers at HICKS' direction.  MASUCA is a manager within the organization who is responsible for maintaining a stash of narcotics as well as cash proceeds at his residence at 5437 S. Hoyne Ave. in Chicago, Illinois.  MASUCA also maintains accounting records of monies owed by customers and workers.  MASUCA has been intercepted

12

in numerous calls with HICKS discussing transactions and has also been surveilled meeting with many of HICKS' customers to consummate the transactions. MASUCA also distributes narcotics to HICKS' other runners and directs them on where and how to conduct transactions.

c. **IVORY WATSON** (a/k/a "Bird)") is one of HICKS' runners. HICKS pays WATSON to serve customers at HICKS' direction and HICKS supplies crack cocaine to WATSON that he sells to his own customers. WATSON typically serves customers requiring smaller quantities of crack cocaine such as an 8-ball quantity or less.

d. **AHMAD WILLIAMS** (a/k/a "AG" and "G-ball") is one of HICKS' runners. Similar to the arrangement with WATSON, HICKS pays WILLIAMS to serve customers at HICKS' direction and also supplies WILLIAMS with narcotics to sell on his own.

e. **DANIEL COPRICH** (a/k/a "D-Block") is a distributor who purchases "weight" quantities of crack cocaine from HICKS and also brokers deals for HICKS with suppliers of powder cocaine. On March 5, 2008, COPRICH was stopped by law enforcement officers following a meeting with HICKS and, during that encounter, law enforcement officers seized $1250 in United States Currency from COPRICH.

f. **UBEX LOPEZ** (a/k/a "Little Man") is one of HICKS' suppliers of powder cocaine.

g. **SANFORD TOWNSEND, JR.** (a/k/a "4-5" and "Nook") is a broker that arranges sales of narcotics for HICKS.

h. **VINCENT STRAUGHTER** (a/k/a "Vino" and "DSki") is a distributor who purchases "weight" quantities of crack cocaine from HICKS.

i. **COREY WILLIAMS** (a/k/a "Four") is a broker who arranges for transactions with HICKS. WILLIAMS was directly involved in ten controlled buys of crack cocaine completed by the ATF U/C agent during the course of this investigation.

13

j.    **JAMAL WASHINGTON** (a/k/a "Little Cuz" and "Mal") is one of HICKS' runners and also serves as a broker who arranges sales for HICKS.  Washington was directly involved in three controlled purchases of crack cocaine made by the U/C between April and December 2007.

k.    **GLENN ISLAND** is a distributor who purchases "weight" quantities of crack cocaine from HICKS.

l.    **TAMEKA GRANT** (a/k/a "Mika" and "Meka") is a distributor who purchases "weight" quantities of crack cocaine from HICKS.

m.    **JOHNNIE LAVELL YOUNG** (a/k/a "VILLE" and "VELL") is distributor who purchases "weight" quantities of crack cocaine from HICKS.  On March 1, 2008, following a transaction with HICKS, Illinois State Police officers stopped YOUNG and recovered 83 grams of crack cocaine, among other narcotics.

n.    **JOSHUA MCELROY** (a/k/a "Boss Hog") is distributor who purchases "weight" quantities of crack cocaine from HICKS.

o.    **CLIFTON HARALSON** is a runner who was directly involved in the July 25, 2007 controlled buy of crack cocaine completed by the ATF U/C agent.

p.    **DWAYNE GARRETT** (a/k/a "WAYNE") is a distributor who purchased a "9 ounce" quantity of crack cocaine from HICKS.  On March 3, 2008, following a narcotics transaction arranged with HICKS and conducted directly with MASUCA, law enforcement officers stopped the car GARRETT was driving and recovered 241.4 grams of crack cocaine.

q.    **PATRICK JONES** (a/k/a "Hog") is an associate of DWAYNE GARRETT who participated in a transaction GARRETT had arranged with HICKS and conducted with MASUCA and who attempted to flee and discard the crack cocaine that was recovered.

r.    **SCOTT O'NEAL** is a distributor who purchases "weight" quantities of crack

14

cocaine from HICKS.

     s.   **ANDREA THOMAS** (a/k/a "Daphne Thomas") is a runner for SCOTT O'NEAL who was involved in two surveilled transactions that had been arranged by O'NEAL with HICKS.

     t.   **MICHAEL GONZALEZ** is a runner for UBEX LOPEZ and was involved in the March 13, 2008 delivery of powder cocaine to HICKS on behalf of LOPEZ.

     u.   **ROMELL HOLLINGSWORTH** (a/k/a "Grosso") is a distributor who purchases "weight" quantities of crack cocaine from HICKS.

     v.   **DESHAUN GERMANY** (a/k/a "Deonte", "4-5's Cousin", "Big Sin" and "Sin") is a distributor who purchases "weight" quantities of crack cocaine from HICKS.

     w.   **JOE LONG** (a/k/a "Baby Joe" and "BJ") is a distributor who purchases "weight" quantities of crack cocaine from HICKS.

     x.   **CHRISTOPHER GAVIN** is a distributor who purchases "weight" quantities of crack cocaine from HICKS.

     y.   **KEVIN GORDON** (a/k/a "Big Bird") is a runner/worker for HICKS.

     z.   **LATASHA WILLIAMS** (a/k/a "Tasha B") is one of HICKS' workers. In addition to selling narcotics for HICKS, LATASHA WILLIAMS also helps HICKS process powder cocaine to crack cocaine, and allows the use of her residence for this purpose.

     aa.   **ETHEL J. HAROLD** (a/k/a "Jeannette") is a distributor who purchases "weight" quantities of crack cocaine from HICKS.

     bb.   **MAXINE RUFFETTI** is a distributor who purchases "weight" quantities of crack cocaine from HICKS.

## II.   PROBABLE CAUSE TO SUPPORT THE COMPLAINT AND ARREST WARRANTS

## INDEX OF REFERENCES TO VARIOUS DEFENDANTS

23.    The following is a list of those individuals in the criminal complaint and for whom arrest warrants are sought and the specific paragraphs of this affidavit relating to those individuals:

| Defendant | Paragraphs |
|-----------|------------|
| ISAIAH HICKS a/k/a/ "CUZ", "BIG CUZ", "ROCK", and "CHILL ROCK" | 26 – 76, and thereafter throughout the affidavit |
| KEVIN MASUCA a/k/a "ZOOK" | 26 – 27, 56 – 57, 75, 76(b), 76(f),77 – 82, and thereafter throughout the affidavit |
| IVORY WATSON a/k/a "BIRD" | 61 – 63, 70 – 73, 76(c), 76(e), 81(a), 83 – 95, 96(b), 104, 114, 140(a) , 206, 257, 267(b), 272, 290 |
| AHMAD WILLIAMS a/k/a "AG" and "G-BALL" | 59, 73, 81(a), 96 – 109, 184 |
| DANIEL COPRICH a/k/a "D-BLOCK" | 26 – 27, 80, 110 – 123, 317 – 318, 323, 358 – 359, 361, 372, 379(a), 381 - 383 |
| UBEX LOPEZ a/k/a "LITTLE MAN" | 28 – 33, 35, 38, 41 – 42, 124 – 139, 369, 388 - 394 |
| SANFORD TOWNSEND, JR. a/k/a "4-5" and "NOOK" | 44, 47, 76(f), 140 – 142, 316 |
| VINCENT STRAUGHTER a/k/a "VINO" | 80, 81, 143 – 151, 248, 372 |
| COREY WILLIAMS a/k/a "FOUR" | 152 – 181, 233, 235, 356 |
| JAMAL WASHINGTON a/k/a "LITTLE CUZ" and "MAL" | 61, 76(a), 155 – 157, 169, 182 – 185, 379(b), 397 |
| GLENN ISLAND | 76(d), 80, 186 – 193, 372 |
| TAMEKA GRANT, a/k/a "LATONY CLAYTON", "SHEMIKA MASON", "LATOYA YOUNG", "BRANDY JONES", "SHERRY DAVIS", "KINISHA MASON", "MIKA" and "MEKA" | 80, 89 – 91, 194 – 206, 212 |
| JOHNNIE LAVELL YOUNG a/k/a "VILLE" and "VELL" | 198, 207 – 218 |
| JOSHUA MCELROY a/k/a "BOSS HOG" | 81(a), 219 – 232, 368, 372, 385 - 386 |
| CLIFTON HARALSON | 162 – 163, 233 - 236 |
| DWAYNE GARRETT a/k/a "WAYNE" | 237 - 249 |
| PATRICK JONES a/k/a "HOG" | 237 - 249 |

| SCOTT O'NEAL | 250 - 260 |
| ANDREA THOMAS a/k/a "DAPHNE THOMAS" | 250 - 260 |
| MICHAEL A. GONZALEZ | 34 – 38, 261 |
| ROMELL HOLLINGSWORTH a/k/a "GROSSO" | 262 - 266 |
| DESHAUN GERMANY a/k/a "DEONTE", "4-5'S COUSIN", "BIG SIN", and "SIN" | 81(a), 84, 267 – 272, 368 |
| JOE LONG a/k/a "BABY JOE" and "BJ" | 273 - 284 |
| CHRISTOPHER GAVIN | 285 – 305 |
| KEVIN GORDON a/k/a "BIG BIRD" | 306 - 314 |
| LATASHA WILLIAMS a/k/a "TASHA B" | 58 – 60, 62 – 64, 66, 315 – 332, 350, 396 - 397 |
| ETHEL J. HAROLD | 333 - 344 |
| MAXINE RUFFETTI | 309, 334, 343 - 348 |

## ISAIAH HICKS

24.   ISAIAH HICKS a/k/a "Cuz," "Big Cuz," "Rock," and "Chill Rock" is the leader and

organizer of a group of individuals that distributes narcotics in the Englewood area on the south

side of Chicago, Illinois.  HICKS negotiates with suppliers and obtains powder cocaine in kilo

quantities.  HICKS processes the powder cocaine into crack cocaine.  HICKS determines which

members of his organization should be given a supply of crack to sell and how much they should

distribute.  HICKS fields calls from customers for requests for narcotics, then instructs his

workers or runners on where, when, to whom, and for what price they should deliver narcotics.

HICKS often "fronts" narcotics to certain distributors – in other words, he provides narcotics to

them on credit terms.  HICKS manages the proceeds of the narcotics trafficking.

25.   During the course of the investigation, several wire communications were intercepted

which indicate that HICKS was using Target Phone 1 and Target Phone 2 to facilitate the

narcotics trafficking.

### (1) HICKS OBTAINS LARGE QUANTITIES OF COCAINE

*February 26, 2008 Call Involving DANIEL COPRICH*

26.    On February 26, 2008, at approximately 8:10 p.m., HICKS, who was using Target

Phone 1, placed a called to an individual who was subsequently identified as DANIEL

COPRICH (see ¶ 118 below), who was using 773-895-2086 (call #15202), during which HICKS

stated that he was at a restaurant called Gyro's. COPRICH told HICKS that "he" [a seller of

powder cocaine] went down to "20-700", but may go down to where we want. HICKS replied

that he didn't want to miss it and that he needed that "motherfucker." HICKS told COPRICH

that ZOOK [MASUCA] didn't have a car and asked COPRICH if "he" could deliver "it" to the

"5-4" [54th Street area]. COPRICH said that he would see. HICKS said that he had to go on and

get "it" because some people had called and were "talking about some fuckn' money and that be

7 days." HICKS said he was "straight", but he'd "rather be safe than sorry, cause you never

know what might happen." HICKS said "you never know, a wave might come through this

bitch and then people will be like gimme, gimme, gimme, so he would need to "stay strapped."

In this call, I believe HICKS is discussing the purchase of a kilogram quantity of cocaine that

COPRICH is arranging. COPRICH informed HICKS that the current asking price was $20,700,

but that the seller might go down in price. HICKS explained that he needed to get the cocaine

because he had some people that were going to be asking him for narcotics.

27.    On February 27, 2008, at approximately 4:26 p.m., COPRICH called HICKS on Target

Phone 1 (call # 15307) and HICKS asked him if he thought "dude" [the seller] will bring "that" [

the cocaine] to 54th. COPRICH said he'll see. At approximately 4:29 pm., COPRICH called

HICKS on Target Phone 1 (call # 15311) to discuss the deal for "21-5" [$21,500]. HICKS told

COPRICH that MASUCA had the money. At approximately 5:24 p.m., HICKS, who was using

Target Phone 1, called KEVIN MASUCA a/k/a "ZOOK"[3] on Target Phone 4 (call # 15325) and told him to "get the 21-5[$21,500] ready for Dan [COPRICH] is going to get you and you fittn to bust a move right fast" [complete the purchase of the kilogram of powder cocaine].  At approximately 6:05 p.m., COPRICH called HICKS on Target Phone 1 (call # 15348).  HICKS asked COPRICH if "he had a feeling" that he is talking about "the double deuce" [the price of the kilogram of cocaine would be $22,000].  HICKS added that he "hopes so."  HICKS asked COPRICH if he was at the crib, and COPRICH said he had just gotten through dropping Zook [MASUCA] off.  At approximately 6:07 p.m., MASUCA called HICKS on Target Phone 1 (call # 15350) and said "we good."  HICKS said, "I know, he just called me."  HICKS asked MASUCA if "it" was good.  MASUCA said yeah.  Based on the content of these calls, I believe MASUCA and COPRICH obtained a kilogram of powder cocaine on behalf of HICKS.

*March 11 and 13, 2008 Transaction*

28.    On March 11, 2008, at approximately 1:59 p.m., LOPEZ[4] called HICKS on Target Phone 1 (call # 17034) and asked if he was "good with 21 cents."  HICKS said "remember, I said I was short one."  In this call, I believe LOPEZ and HICKS were discussing whether HICKS had $21,000 to purchase a kilo quantity of cocaine, and HICKS was informing LOPEZ that he only had $20,000.

29.    At approximately 2:11 p.m., LOPEZ called HICKS on Target Phone 1 (call # 17035) and said he would be there in two minutes.  HICKS, who was using Target Phone 1, then called MASUCA on Target Phone 4 (call # 17036) and told him that LOPEZ would be there in two minutes.  At approximately 2:16 p.m., LOPEZ called HICKS on Target Phone 1 (call # 17038) and said he was "on the block."  HICKS, who was using Target Phone 1, then called MASUCA

---

[3]  A discussion of the identification of MASUCA is outlined below in ¶ 78.
[4]  A discussion of the identification of LOPEZ is outlined below in ¶ 139.

on Target Phone 4 (call #17039) and told him "he's out there right now so be out there for him."

At approximately 2:18 p.m., LOPEZ called HICKS on Target Phone 1 (call # 17040) and said

HICKS' man was not yet out there. At approximately 2:19 p.m., HICKS, using Target Phone 1,

called MASUCA on Target Phone 4 (call #17041), and told him LOPEZ was outside right now

in a black SUV. MASUCA said that he could see him.

30.    That same day, at approximately 4:06 p.m., MASUCA, using Target Phone 4, called

HICKS on Target Phone 1 (call #17062), and asked how long "Cuz" was going to be. At

approximately 4:29 p.m., LOPEZ called HICKS on Target Phone 1 (call # 17071) and HICKS

complained that LOPEZ takes "too damn long." HICKS then said he would contact MASUCA.

At approximately 4:30 p.m., HICKS, using Target Phone 1, called MASUCA on Target Phone 4

(call #17072), and told him that LOPEZ was ready. At approximately 4:30 p.m., HICKS, using

Target Phone 1, called LOPEZ (call # 17073) who told him that "everything got cancelled until

the morning." At approximately 4:56 p.m., MASUCA, using Target Phone 4, called HICKS on

Target Phone 1 (call #17080), and HICKS told MASUCA that LOPEZ was going to "pull up

tomorrow morning."

31.    In this series of calls, I believe HICKS and LOPEZ have agreed to a transaction

whereby HICKS is to purchase a kilogram quantity of cocaine in exchange for $20,000.

MASUCA delivered the money to LOPEZ who was to return with the narcotics, but who then

called and said the delivery would have to be put off until the next day.

32.    On March 12, 2008, at approximately 6:08 p.m., LOPEZ called HICKS on Target

Phone 1 (call #17216), and asked if HICKS was ready and said he would be there in around 30

minutes.

33.    At approximately 7:29 p.m., LOPEZ called HICKS on Target Phone 1 (call # 17250)

and complained that he had been trying to contact HICKS and had been unable to reach him and told HICKS that HICKS knows the guy who is bringing "it" [the powder cocaine].  LOPEZ said that the person who is bringing "it" has HICKS' phone number and will call when he gets there.  At approximately 7:30 p.m., HICKS, using Target Phone 1, called LOPEZ (call # 17252) and told him to hold off and that he would call him back.  HICKS agreed to wait until the morning.  LOPEZ told HICKS that "it" is "parked, it ain't going nowhere."  HICKS told LOPEZ to "put it up then till the morning."  In this series of calls, I believe HICKS and LOPEZ agreed that LOPEZ should have the kilogram quantity of cocaine delivered to HICKS the next day.

34.    On March 13, 2008, at approximately 4:01 p.m., HICKS, who was using Target Phone 1, spoke to a male who referred to himself as "Little Guy's guy" (call # 17292) and was later identified as Michael GONZALEZ (See ¶ 36 below) and asked, "is your man ready?"  HICKS said he would call to make sure.  At approximately 4:01 p.m., HICKS, using Target Phone 1, called MASUCA on Target Phone 4 (call #17293), and asked if he was at the "crib" and MASUCA replied that he was.  At approximately 4:02 p.m., HICKS, using Target Phone 1, called GONZALEZ (call # 17294) and told him MASUCA was ready.  At approximately 4:30 p.m., GONZALEZ called HICKS on Target Phone 1 (call #17301), and told him to have MASUCA out and ready.  At approximately 4:31 p.m., HICKS, using Target Phone 1, called GONZALEZ (call # 17302) and asked what color car he was driving, to which GONZALEZ replied, "the white one, he'll know."  At approximately 4:31 p.m., HICKS, who was using Target Phone 1, called MASUCA on Target Phone 4 (call #17303), and told him to come outside right now.  At the same time, surveillance agents observed MASUCA walk into the middle of S. Hoyne Ave. about opposite his residence[5] located at 5437 S. Hoyne, Chicago, Illinois [SEARCH

---

[5]  The residence at 5437 S. Hoyne Ave. Chicago, Illinois has been identified as MASUCA's

SITE B]. HICKS, who was using Target Phone 1, called MASUCA on Target Phone 4 (call # 17304) to advise that it would be a white car.

35.    At approximately 4:33 p.m. that same day, MASUCA, who was using Target Phone 4, called HICKS on Target Phone 1 (call #17305), and asked where "Little Man's guy" is. HICKS, who was using Target Phone 1, called GONZALEZ (call # 17307) who said he was turning right now and HICKS asked if he saw MASUCA. GONZALEZ said he was turning right now. HICKS, using Target Phone 1, called MASUCA on Target Phone 4 (call #17308), and told him that the delivery man is right there and asked if MASUCA could see him. MASUCA said no, that he was standing in the middle of the street. HICKS told MASUCA not to move. At approximately 4:33 p.m., surveillance agents observed a white Chevrolet Trail Blazer drive to the mouth of the alley near 5437 S. Hoyne, and MASUCA approached the car and got into the backseat. Agents observed a passenger hand MASUCA an object in a bag. MASUCA then got out of the car and walked back into the residence at 5437 S. Hoyne [SEARCH SITE B]. Law enforcement officers continued mobile surveillance of the white Chevrolet Trail Blazer. Based on this information and the context of the investigation, I believe GONZALEZ, on behalf of UBEZ LOPEZ, distributed approximately one kilogram quantity of cocaine to MASUCA.

36.    At approximately 4:40 p.m., that same day, agents conducted a traffic stop of the vehicle and identified the driver as MICHAEL A. GONZALEZ. In addition, agents who conducted the traffic stop listened to intercepted calls during which HICKS spoke with the person who identified himself as "Little Man's guy" and identified Michael GONZALEZ as that

---

residence based on the fact that Target Phone 4, a cellular telephone known to be used by MASUCA is subscribed to INDIVIDUAL Z at that address. According to Illinois Secretary of State records, MASUCA lists that address as his residence. In addition, According to CPD records, MASUCA was arrested for domestic battery in an incident in which INDIVIDUAL Z was listed as the victim which occurred at this address.

individual.

37.  At approximately 4:49 p.m., HICKS, who was using Target Phone 1, called MASUCA on Target Phone 4 (call #17310), and asked "what's up with that thing?"  HICKS asked MASUCA if he "got it?"  MASUCA replied "yeah."  At approximately 5:05 p.m. GONZALEZ called HICKS on Target Phone 1 (call #17315), and asked HICKS if he confirmed with MASUCA that he got it, and HICKS replied that he did.

38.  At approximately 7:35 p.m., LOPEZ called HICKS on Target Phone 1 (call # 17386) and asked HICKS where he was because he wanted to meet up with him.  HICKS said he was "on the 4" [on 54th St.].  LOPEZ told HICKS that HICKS had him "tweaking over here, boy." [he was nervous].  HICKS asked why.  LOPEZ explained that when "fam" [GONZALEZ] "dropped off the rims" [dropped off the narcotics] "they" [the police] pulled him over about 3 or 4 blocks away.  LOPEZ added "and they were big big boys, Fam."  LOPEZ said he wanted to meet face-to-face to talk about it.  LOPEZ suggested that HICKS change his "horn" [phone]. HICKS agreed to meet.

### (2) HICKS PROCESSES POWDER COCAINE INTO CRACK COCAINE

#### January 28, 2008 Calls Related to Processing Cocaine

39.  On January 28, 2008, at approximately 12:03 p.m., HICKS, who was using Target Phone 1 (call # 11474), received a call from an unidentified male caller who told HICKS that he had "2 left" and wanted to know if HICKS wanted to come get them.  HICKS said that he did and said he would be there in about 30 minutes.  The caller stated that they were "from the same people, maybe 2, looks different but nicer" and asked HICKS if he wanted them.  HICKS asked if "it looked like it ain't been fucked with right?"  The caller told HICKS that they were from the same place as last time and only 4 came in and that 2 were already gone.  HICKS complained

23

that the caller was supposed to give them all to him, but the caller explained that the other guy

"already dropped his loot" and told HICKS that he could come and get "these 2." [the caller is

explaining that, although HICKS wanted to buy all of the kilos, another buyer came with money

before HICKS, so the caller only had two kilos available for HICKS to purchase]. HICKS said

he would.

40.    At approximately 11:30 a.m., a surveillance agent entered Lance's Gym located at 3636

South Iron Street, Chicago, Illinois, and observed Isaiah HICKS and an unknown black male

working out in the gym. At approximately 12:20 p.m., a surveillance agent observed HICKS and

the unknown black male exit the gym via the side door and enter a silver Pontiac G6 bearing

Illinois license plate number G905475 with an Enterprise Rental car sticker on the rear bumper.

HICKS entered the front driver's side and an unknown male entered the front passenger side of

the vehicle. Surveillance agents followed HICKS to the area of 51st Street and Damen. Agents

observed the silver Pontiac G6 on the south side of the street directly across from the Universal

Fruit and Meat store located at 1940 West 51st Street, #925-2149. A surveillance agent observed

HICKS exit the vehicle walk directly north across the street towards the store. A short time later,

agents terminated surveillance of HICKS.

41.    On January 28, 2008, at approximately 12:22 p.m., LOPEZ called HICKS on Target

Phone 1 (call # 11479). During this call, LOPEZ used the code word "woody" [ready]. HICKS

asked "what's the ticket?" [referring to the price for 2 kilograms of cocaine]. LOPEZ said he

was by 22nd and Cal [meaning, he would charge $22,000.00 per kilogram of cocaine]. HICKS

said in your face man. LOPEZ said that he felt bogus for getting HICKS "geeked up" and then

not being able to come through. LOPEZ said that he would be going over there to see them at 3

p.m. and to round up what HICKS can because it is going to be once a week [meaning that

24

LOPEZ would be able to supply kilograms to HICKS every week]. HICKS said okay. LOPEZ

told HICKS to get everything in order so they can do this quick. HICKS said all right and

confirmed with Lopez that he said once a week. LOPEZ said that as long as he is with these

people, that he would not go past 22nd and California [$22,000.00/kilogram] while everyone is

going to be going to 25th [$25,000.00/kilogram]. HICKS said "hell yeah; all a mother fucker got

to do is keep me straight" [provide a reliable source of supply]. LOPEZ said his guy his word

was valuable and LOPEZ told his guy [the supplier] that as long as the guy keeps it at 21 years

old [$21,000.00/kilogram], we Woody [LOPEZ would be ready to supply HICKS at $22,000 per

kilogram]. HICKS said all right.

42.    On January 28, 2008, at approximately 12:25 p.m., LOPEZ called HICKS on Target

Phone 1 (call # 11483).  HICKS told LOPEZ that he was coming down Ashland Avenue.

LOPEZ asked HICKS "in what?" HICKS answered in a gray G6, Pontiac. Hicks said he would

be pulling up. LOPEZ asked HICKS about five minutes or less. HICKS said all he needed was

five minutes. LOPEZ said to slide the gate open, the gates are going to be open. HICKS said all

right.  Based on the above calls, I believe HICKS purchased 2 kilograms of powder cocaine from

LOPEZ.

43.    At approximately 2:14 p.m., a surveillance agent located the silver Pontiac G6

reflecting Illinois license plate G905475 parked on the west side of Carpenter between 6020 and

6022 South Carpenter.

44.    On January 28, 2008, at approximately 3:32 p.m., HICKS called SANFORD

TOWNSEND, JR. (call # 11514).  TOWNSEND[6] asked HICKS if he was going to the gym.

HICKS said that he was in the kitchen at the moment. TOWNSEND asked HICKS what he was

---

[6]  A discussion of the identification of TOWNSEND is outlined below in ¶ 140(a).

going to do after that. HICKS said that he would sit down for about thirty minutes and then go to the gym. TOWNSEND asked if HICKS was going to the gym for sure today. HICKS said most definitely, but he had to "do this shit" and probably lay down for about thirty, forty minutes and "relax my nerves and shit" then he would go.

45.   At approximately 3:35 p.m., HICKS was observed exiting the residence at 6020 S. Carpenter, Chicago, Illinois, and he placed an unidentified object into a Pontiac G6 that was parked nearby. HICKS then walked back into the residence carrying a dark-colored bag (similar to a small plastic garbage bag).

46.   At approximately 6:27 p.m., a surveillance agent reported that an unidentified male black individual walked from the northern section of Carpenter and entered 6020 South Carpenter. The agent observed the interior lights of the residence on the second floor of that residence. A surveillance agent drove to the rear of the residence and observed the interior lights activated on the second floor believed to be a kitchen area. Shadows were observed through the windows.

47.   On January 28, 2008, at approximately 6:53 p.m., HICKS received an incoming call from TOWNSEND on Target Phone 1 (call # 11519). TOWNSEND asked HICKS what happened with the gym. HICKS told TOWNSEND that HICKS was still at the table doing the last one. HICKS asked TOWNSEND what time it was. TOWNSEND said "six thirty, G". HICKS said he would be there [gym] tomorrow (At this time, a chopping sound which, based on my experience as an agent and the experience of others, was consistent with chopping practices used in the processing of powder cocaine). TOWNSEND asked HICKS if he was going to hit the block. HICKS told TOWNSEND that as soon as HICKS was taken through this.

48.   On January 28, 2008, at approximately 7:55 p.m., HICKS received a phone call from an

26

unidentified caller using an unknown number (call # 11521). The unidentified caller asked HICKS if he was still at the crib. HICKS said "yeah, I'm drying that thing off" [I understand this to mean that HICKS is allowing the crack cocaine to dry]. The unknown male said all right.

49.     At approximately 8:34 p.m., a surveillance agent went to the rear of 6020 South Carpenter and observed a vehicle that had been parked in the rear of the residence. The vehicle was identified as a 1997 Chevrolet van reflecting Illinois registration 9844636. This vehicle is registered to Isaiah Hicks, 5358 South Hoyne, Chicago, Illinois. The surveillance was terminated at approximately 9:00 p.m.

### January 28 and 29, 2008 Trash Searches

50.     On January 28, 2008, an ATF agent participated in the surveillance of HICKS, and observed the rear of this residence at 6020 S. Carpenter, Chicago, Illinois.  At that time, the agent looked into two garbage cans that stood behind this residence and noticed two garbage bags inside.

51.     On January 29, 2008, the agent returned to the above described location, drove to the rear of this residence and looked inside the same garbage cans he had looked into on the previous evening.  However, the agent noticed a new brown plastic garbage bag that had not been in there the previous evening.

52.     The agent took this bag, along with the two other garbage bags, and returned with them to the ATF Office.   Agents inspected the contents of the brown garbage bag that was observed on January 29, 2008.   Inside that garbage bag, agents found a heavy clear plastic bag containing a white powder residue.  This heavy clear plastic bag was approximately 16" in length, and 12" inches in width, with the words "Food Saver" printed in small white lettering, and the number "995" written in black magic marker on the front of the bag.

53.    The appearance of this clear plastic bag with white powder residue was consistent with that of packaging used to wrap kilogram amounts of cocaine. In addition, the "995" printed on this bag in magic marker is consistent with the training and experience of law enforcement officers relative to systems of weight and measure used by high volume cocaine dealers (995 grams).

54.    Agents photographed the large plastic bag described above, and used a NIK Cocaine Wipe field test kit to swab a portion of this plastic bag containing the white powder residue. The field test kit indicated positive for the presence of cocaine. The plastic bag was sent to the DEA Lab for analysis which confirmed the residue contained cocaine.

55.    Based on the above information, I believe that, on January 28, 2008, HICKS purchased a kilogram or more of powder cocaine, took it to the residence at 6020 S. Carpenter, Chicago, Illinois. Based on the content of the intercepted calls as described above, including HICKS' comment that he was in the kitchen, that he had to "do that shit", the chopping sounds, and the comment about "drying", I believe HICKS processed the powder cocaine into crack cocaine and packaged it for resale.

*April 8, 2008 Calls and Surveillance Related to Processing Cocaine*

56.    Based on the content of intercepted calls and surveillance, on April 8, 2008, I believe HICKS processed a kilogram or more of powder cocaine at a residence at 6152 S. Albany Ave, Chicago, Illinois [SEARCH SITE G].

57.    On April 8, 2008, at approximately 8:49 a.m., HICKS, who was using Target Phone 1 (call #21867), placed a call to MASUCA. HICKS asked where MASUCA was at. MASUCA said he was dropping her off now and going back to the crib to "grab that." [pickup the powder cocaine to be processed]. HICKS told MASUCA to "grab both of 'em", [two kilos] indicating

28

that he was going to use both of them rather than "have to redo" [cook again]. HICKS said that "as they rack up from there", he could go on ahead.

58.    At approximately 9:08 a.m., HICKS, who was using Target Phone 1 (call #21878), placed a phone call to MASUCA at Target Phone 4. HICKS advised him to come on, but first go down to Cuz's house and pick him up two "dub" [a 20 dollar bag of marijuana] first, before he touch anything, so "that way you won't be hot." [HICKS is requesting that MASUCA pickup and bring him some marijuana before he brings over the powder cocaine]. HICKS told MASUCA that he would wait on MASUCA, though "she" is going to court, so HICKS says that he and MASUCA will be the only ones there.    [HICKS is saying that he and MASUCA will be the only ones in the residence because LATASHA WILLIAMS would be going to court that morning – LATASHA WILLIAMS had a court date in Cook County in criminal case number 08CR0588701 at 9:30 a.m. on this same date].

59.    At approximately 9:45 a.m., MASUCA, who was using Target Phone 4, placed a phone call (call # 00955) to HICKS on Target Phone 2. MASUCA advised HICKS that MASUCA was downstairs and that HICKS should let MASUCA in.    At approximately the same time as this call, at 9:45 a.m., surveillance agents observed MASUCA's green Saturn, bearing Illinois Temporary License plate 490J270, parked in front of 6152 S. Albany, Chicago, Illinois [SEARCH SITE G].    Investigators also observed a 2003 Gold Monte Carlo, Illinois License plate X404457, parked in front of 6152 S. Albany.    This vehicle is registered to LATASHA WILLIAMS, at 12412 S. Eggleston, Chicago, Illinois.    Surveillance had previously identified this vehicle with AHMAD WILLIAMS.

60.    At approximately 10:46 a.m., HICKS, who was using Target Phone 1 (call #21895), received a call from INDIVIDUAL BB. During the telephone call, HICKS can be heard speaking

29

to someone off the phone saying "This shit is good, Damn, Whoo wee!" [HICKS is pleased with the quality of the cocaine being processed].

61.    At approximately 4:07 p.m., HICKS, who was using Target Phone 1 (call #21943), received call from JAMAL WASHINGTON[7].   WASHINGTON asked HICKS if "Bird" [IVORY WATSON] had called HICKS, and HICKS said he got up with Bird.  WASHINGTON then asked HICKS if "he got his shit whipped up?" [WASHINGTON was asking if he had finished processing the cocaine].  HICKS explained that he needed to wash his ass, and WASHINGTON said all right.

62.    At approximately 4:12 p.m., HICKS, who was using Target Phone 1, placed a call to MASUCA on Target Phone 4 (call #21958).  HICKS told MASUCA that the "bag" was up there, but he had to clean up and change clothes.  HICKS asked if MASUCA wanted to pick the bag up on the way home, and MASUCA said he was going to pick the bag up.  [HICKS is informing MASUCA that the bag containing the newly processed crack is at the 6152 S. Albany residence and asked if MASUCA wanted to pick it up].  HICKS asked MASUCA if he had LATASHA WILLIAMS's  phone number, and MASUCA said he had her old one.  HICKS told MASUCA to hold on, and answered a call waiting from Ivory WATSON.  WATSON told HICKS that he is down in front [to pick HICKS up].  HICKS said all right, and resumed speaking to MASUCA. MASUCA told HICKS to give her [LATASHA WILLIAMS] his phone number and she can call him when she gets back to the crib.  HICKS said all right.  [Since HICKS is leaving the residence, he wants MASUCA to contact LATASHA WILLIAMS to pick up the bag from her residence.]

---

[7]   WASHINGTON was involved in three controlled buys with the U/C and also intercepted on calls regarding other narcotics transactions using the telephone he used during those controlled buys.

63.   At approximately 4:11 p.m., agents observed Ivory WATSON arrive on the block in his white Oldsmobile sedan, baring Illinois License plate X605927, and park on the east side of Albany opposite 6152 S. Albany [SEARCH SITE G].   At approximately 4:15 p.m., agents observed HICKS and LATASHA WILLIAMS exit 6152 S. Albany, and watched as HICKS walked to WATSON's car and got in the front passenger seat.  Agents also observed LATASHA WILLIAMS enter her Monte Carlo.  HICKS exited the building carrying a small grocery bag.

64.   At approximately 6:08 p.m., HICKS, who was using Target Phone 1 (call #21990), placed an outgoing telephone call to LATASHA WILLIAMS[8].  HICKS asked LATASHA WILLIAMS if she was back at the crib, and LATASHA WILLIAMS advised that she just made it back in.  HICKS told LATASHA WILLIAMS that "he" [MASUCA] was "fittin' to come over there right now." [HICKS was informing LATASHA WILLIAMS that MASUCA was going to come over to pick up the newly processed cocaine].

65.   At approximately 6:09 p.m., HICKS, who using Target Phone 1 (call #21991), placed an outgoing telephone call to MASUCA. HICKS told MASUCA that "she over there right now, go ahead." MASUCA told HICKS all right. At approximately 6:25 p.m., HICKS, who was using Target Phone 1 (call #21996), had a "direct connect"[9] conversation with MASUCA. MASUCA told HICKS to have her come downstairs and let him in.

66.   At approximately 6:28 p.m., HICKS, who was using Target Phone 1 (call #22000), received call from LATASHA WILLIAMS.  LATASHA WILLIAMS advised HICKS that her phone was off.   HICKS told her to open the door downstairs [to let MASUCA in].  At

---

[8]  A discussion of the identification of LATASHA WILLIAMS is outlined in ¶¶ 329 – 332 below.
[9]  The term "direct connect" refers to use of a cellular telephone feature that allows the caller to instantly connect to the cellular phone of a call recipient whose cell phone also offers that feature.  This cellular telephone feature is also referred to as "push-to-talk."

approximately 6:28 p.m., HICKS, who was using Target Phone 1 (call #22003), had a direct connect conversation with MASUCA. HICKS called MASUCA and asked if he is good. MASUCA responded that he is good. [he had been let into the apartment and picked up the bag with the newly processed crack cocaine].

67.    At approximately 6:59 p.m., HICKS, who was using Target Phone 2 (call #1054), called MASUCA on Target Phone 4. HICKS asked if MASUCA made it home all right, and MASUCA said yeah. HICKS then informed MASUCA that he now had "28 of you [(28) 63gram quantities], 8 "big boys" [(8) 126gram quantities], and 7 "quarters—seven jabs on the quarter side, on birds" [(7) bags each containing (25) eight-ball quantities of crack]. HICKS then told MASUCA, "you know what came in the bag anyway—you home?" MASUCA told HICKS he is already home and looked in the bag. HICKS also asked MASUCA if "Vski" had a couple out, and instructed MASUCA to give him "a full ticket down there" [a full accounting of narcotics and money at the stash house, as well as debts owed].

68.    Based on the above outlined calls and surveillance, I believe that on this date, HICKS processed powder cocaine into crack cocaine and packaged it for resale at the 6152 S. Albany residence.

### (3) HICKS IS THE LEADER/ORGANIZER OF THE NARCOTICS TRAFFICKING ORGANIZATION

69.    During the course of the investigation, several calls were intercepted which indicate that HICKS is the leader and organizer of the narcotics trafficking organization.

***HICKS Directed Workers Following Police Interaction***

70.    On April 25, 2008, at approximately 2:00 p.m., law enforcement agents conducted at

traffic stop of a vehicle driven by IVORY WATSON a/k/a "BIRD"[10]. The officers asked WATSON for his identification, which he provided to them, indicating he was IVORY WATSON. At approximately 2:32 p.m., WATSON called HICKS on Target Phone 1 (call # 24120), and told him that "one of them bitches" [the police] just pulled him over. WATSON told HICKS, "someone is doing some talking too, G." WATSON told HICKS "we need to see each other." HICKS told WATSON to call his other phone (Target Phone 2).

71.    On April 25, 2008, at approximately 4:06 p.m., HICKS, who was using Target Phone 1, called IVORY WATSON (call # 24149). HICKS told WATSON, "don't call the niggas, just ride on them and let them know what's going on" [HICKS instructed WATSON to tell the others in person rather than using the phone]. WATSON told HICKS that he "just told Zook [KEVIN MASUCA]." WATSON said "fuck the '4' [54th St], don't even stand out there, G." HICKS said "that's the only way." WATSON said he had told INDIVIDUAL GG. When HICKS asked if he had told "Cuz," WATSON said he had not, adding that he didn't want to talk on the phone. Based on the content of this call and the context of the investigation, HICKS and WATSON are believed to be discussing the fact that WATSON had been stopped by the police earlier in the day, and that in reaction to the police interaction, HICKS was telling WATSON to advise the other members of the organization about it and was warning them to avoid conducting business on 54th Street.

72.    On April 25, 2008, at approximately 5:13 p.m., HICKS, who was using Target Phone 1, called INDIVIDUAL U (call # 24163) and instructed INDIVIDUAL U to "tell them niggas don't be standing their motherfucking ass there at all" [not to be in the area of 54th St] adding "no one needs to stand there ever again." HICKS told INDIVIDUAL U, "not only that, for you, you

---

[10]    A discussion of the identification of WATSON is outlined below in ¶ 92.

already know." HICKS said "get your ass from right there, you could stay in, motherfucker call you, you know what to do." INDIVIDUAL U said allright. HICKS said, "don't go fucking around right there, be real careful, you know, keep your eyes open, don't go doing no stupid shit – you already know what I be talking about." I believe that, in reaction to the traffic stop of WATSON, in this call, HICKS was instructing INDIVIDUAL U to avoid conducting business outside in the area of 54th St, and that INDIVIDUAL U should stay inside and handle the business over the phone.

73. On April 26, 2008, at approximately 11:36 a.m., AHMAD WILLIAMS a/k/a "AG" and "G-Ball"[11] called HICKS on Target Phone 1 (call # 24254). HICKS told WILLIAMS that he was "not fucking around down there, G" [that he was not going to conduct business on 54th St], adding "if the pot is hot, the pot is hot." HICKS said "it wasn't nothing but a pull up" [referring to the traffic stop of IVORY WATSON that had occurred the day before]. HICKS said he had been talking about making the "change to off the block" and that "all this did was make it happen." HICKS told WILLIAMS that he isn't going to challenge the police, he doesn't want "a motherfucker" [the police] looking at him." HICKS said "they can have the block" and that "there are too many of them." HICKS said "a motherfucker doesn't need to be down there, the way it is designed was on the 'hizzle'" [horn or phone -- as discussed above, some code words combine the first letter of the real word, in this case "h" for "horn", followed by "izzle"]." WILLIAMS said that he is decent and that he "works off his phone." [I believe HICKS is saying that their business is designed to operate over the phones as opposed to being tied to a specific geographic location]. HICKS said that the police told "Bird" [WATSON], in so many words, "get the fuck on player" [stop doing business there]. HICKS said "it doesn't stop business, the

_____

[11] A discussion of WILLIAMS' voice identification is outlined below in ¶ 102.

business is the business, it is still good and it does not stop" indicating that they can still sell their "CDs and DVDs and shit." WILLIAMS agreed and said that he isn't going to do any "exchanging hands" [hand-to-hand transactions] right there [on 54th St].

### (4) HICKS MAINTAINS NARCOTICS AND CASH PROCEEDS AT HIS RESIDENCE

*May 10, 2008 Money, Narcotics and Guns Moved to Residence in Response to Police Activity*

74.     On May 10, 2008, at approximately 12:40 a.m., Chicago Police officers searched the residence at 5437 S. Hoyne Ave. [SEARCH SITE B]. Later that morning, there was a series of calls between HICKS and INDIVIDUAL BB which indicate that HICKS arranged for INDIVIDUAL BB to transport contraband that had been held at that location to HICKS' residence in Harvey, Illinois.

75.     On May 10, 2008, at approximately 11:10 a.m., HICKS, who was using Target Phone 2, had a conversation with KEVIN MASUCA (call # 4282) during which HICKS told MASUCA to pack up the two "goddamnits" [guns], the narcotics, and the "change" [money proceeds] and that he was going to have his "baby's mamma" [INDIVIDUAL BB] come and pick up these items after work and that they [HICKS and INDIVIDUAL BB] would store this at the "low low" [the "low key" residence HICKS maintains with INDIVIDUAL BB in Harvey, Illinois]. At approximately 11:48 a.m., HICKS, who was using Target Phone 2, called INDIVIDUAL BB (call # 4294). INDIVIDUAL BB told HICKS that she didn't want him to worry. INDIVIDUAL BB suggested that HICKS buy a safe [for the money, narcotics, and guns]. HICKS said he was going to buy one anyways too put his legal documents in. HICKS told INDIVIDUAL BB that "he" still has that case, and that HICKS doesn't want to wait until nighttime to get up with MASUCA as he knows that this is a time of increased police activity. INDIVIDUAL BB asked what "he" got, and HICKS told her some "chronos" [chronic

weed/marijuana] and maybe two of his "gatfles" [guns]. INDIVIDUAL BB asked if he wanted

her to go get it when she gets off work, or is he straight? HICKS said that, that is what he was

trying to let her know.

a.    At approximately 6:40 p.m., INDIVIDUAL BB called HICKS on Target Phone 1

(call # 26096) and asked HICKS if he still wanted her to "do that", or "you did it already?"

HICKS advised that he had not done it, but knew he needed to do it. INDIVIDUAL BB advised

HICKS that he should tell "him" [MASUCA] to come by the cleaners or something. HICKS

asked where she was, and she advised that she was dropping someone off on 5th and Winchester.

HICKS instructed INDIVIDUAL BB that when she got over that way, she should ride from

Damen to Hoyne through the alleys and the block, and then call him right then and he would set

her up right there. At approximately 7:00 p.m., a surveillance agent observed INDIVIDUAL BB

driving a tan Pontiac Grand Prix, bearing Illinois license plate G912171, proceeding westbound

on Garfield Boulevard, northbound on S. Hoyne Ave. to 54th Place where she turned around,

then she proceeded southbound to the alley and eastbound through Seeley into the Gyro's

parking lot where she parked the car.

b.    At approximately 7:03 p.m., INDIVIDUAL BB called HICKS on Target Phone 2

(call # 4346) and told him that everything appeared all right in the neighborhood. HICKS asked

INDIVIDUAL BB if she was sure, and INDIVIDUAL BB said yes she had just rolled around 3

times. HICKS instructed INDIVIDUAL BB to buckle up and obey the speed limit— adding that

she knows what to do. INDIVIDUAL BB told HICKS that she ain't fittn' to go out in front of

his [MASUCA's] house, he is going to probably gonna have to walk somewhere. HICKS

advised that he can't walk that far because he can't walk with "that" [the narcotics and guns].

HICKS instructed INDIVIDUAL BB to go to the back of MASUCA's crib. HICKS told

36

INDIVIDUAL BB that he is fittn' to call him right now and told INDIVIDUAL BB to go in the back. At approximately 7:04 p.m., HICKS, who was using Target Phone 2 called MASUCA on Target Phone 4 (call # 4348). HICKS advised that his girl is at his back, and to go ahead. MASUCA said all right, and HICKS said he already knows what he meant. HICKS said when he leaves here then he is going to come and check it, but he first got to clean him up though. HICKS told MASUCA to be her [INDIVIDUAL BB's] eyes a little bit for her [watch for police]. MASUCA said all right.

c.      At approximately 7:05 p.m., a surveillance agent observed INDIVIDUAL BB exit the Gyro's parking lot onto Seeley. The agent observed INDIVIDUAL BB drive eastbound through the east / west alley between Seeley and Hoyne. The agent observed the car then turn north at the "T-alley" and pull behind MASUCA's house. At approximately 7:06 p.m., HICKS, who was using Target Phone 2, called MASUCA on Target Phone 4 (call # 3083). HICKS told MASUCA to check his alley that there was someone back there with a yellow car. MASUCA advised HICKS that he knew who that individual was, and said "he ain't nobody." HICKS told MASUCA to go ahead then, she in back.

d.      At approximately 7:08 p.m., INDIVIDUAL BB called HICKS on Target Phone 2 (call # 4352). INDIVIDUAL BB complained that HICKS was supposed to be on top of his game, and he had not called her back to let her know what was going on. HICKS told INDIVIDUAL BB he didn't need to as he told her she good, MASUCA is trying to take care of her, he good, he got her. INDIVIDUAL BB asked "he got me?" and HICKS says he [MASUCA] knows who it is. HICKS explained that if he didn't call her back then it must be good, and INDIVIDUAL BB explained that she did not know that though. HICKS told INDIVIDUAL BB not to make it worse than it was, and INDIVIDUAL BB asked what HICKS

37

is talking about worse than what it is, she's already nervous. INDIVIDUAL BB and HICKS continue to argue a short time longer, and then they discuss repairing INDIVIDUAL BB's vehicle's brakes. At approximately 7:10 p.m. on this same date, the surveillance agent observed INDIVIDUAL BB exit the neighborhood and drive eastbound on Garfield Boulevard through Damen. At approximately 7:12 p.m., HICKS, who was using Target Phone 2, called MASUCA on Target PHONE 4 (call # 4354). HICKS asked MASUCA if she is good, and MASUCA advised "yeah, she good." HICKS told MASUCA that he was "fittn' to swing dead on him." HICKS told MASUCA that he had "something"; he had "a couple out of his pocket". MASUCA said all right.

     e.    At approximately 7:12 p.m., HICKS, who was using Target Phone 2, called INDIVIDUAL BB (call # 4355). HICKS asked INDIVIDUAL BB if she was okay, and INDIVIDUAL BB advised that she was good. HICKS asked INDIVIDUAL BB where she was and she advised that she was about to get onto the expressway. HICKS instructed INDIVIDUAL BB to obey the speed limit and to keep looking at her thing to make sure. INDIVIDUAL BB advised HICKS that she was already on it. The surveillance agent continued to conduct mobile surveillance of INDIVIDUAL BB as she drove east on Garfield Boulevard to the Dan Ryan Expressway, and then south on the expressway to 147th Street where she exited and drove to the residence she shares with HICKS located at 15231 Lincoln Avenue in Harvey, Illinois [SEARCH SITE C].

     f.    At approximately 7:29 p.m., HICKS, who was using Target Phone 2, called INDIVIDUAL BB (call # 4357). HICKS asked INDIVIDUAL BB if she was home yet, and INDIVIDUAL BB explained that she had just gotten off the expressway on 147th Street. HICKS again told her to obey the speed limit, and not to drive fast. INDIVIDUAL BB agreed. HICKS

then told her that if she felt like it she should go and buy front brakes too when she was finished. INDIVIDUAL BB told HICKS that she could stop and get the brakes right now [she had to pass the auto parts store on her way home] and HICKS told her no, no, you don't—"business is first, go ahead." INDIVIDUAL BB complained that if she went home first, her mother would leave [and there would be no one to watch their child]. HICKS told INDIVIDUAL BB that she still could not do that, "you can't never be deep like that" [she shouldn't drive around with narcotics in the car]. At approximately 7:37 p.m., HICKS, who was using Target Phone 2, called INDIVIDUAL BB (call # 4361). HICKS asked INDIVIDUAL BB if she was home, and she advised that she had made it home. HICKS then asked INDIVIDUAL BB if she saw that second drawer right there? INDIVIDUAL BB explained that she was getting back in the car to go to Murray's [auto parts store]. HICKS said okay—in my second drawer is, just make sure everything is—I am going to handle it.

### (5) HICKS POSSESSES FIREARMS

76.     During the course of the investigation there have been several intercepted calls which indicate that HICKS possesses firearms:

a.     On February 2, 2008, at approximately 1:07 p.m., HICKS, who was using Target Phone 1, placed a call to JAMAL WASHINGTON (call # 12417) during which HICKS and WASHINGTON discuss an interaction with a rival gang crew. HICKS said that he knew that the other guys had a "bumper" [gun]. HICKS said that if he had "rolled through the alley with a pipe [gun] like they did" that he "couldn't have lived with himself if he kept going." WASHINGTON explained that the crew didn't "pull anything" because they knew that he, HICKS and "Zook" [MASUCA] "had some things" [guns].

b.     On February 19, 2008, at approximately 7:00 p.m., HICKS, who was using Target

Phone 1, called MASUCA on Target Phone 4 (call # 14751) and instructed him to "bring the papers with the number so I can know what we working with and bring my pipe [gun]."

    c.   On March 5, 2008, at approximately 5:19 p.m., HICKS, who was using Target Phone 1, called IVORY WATSON (call # 16224) and told WATSON to let him in the house so he could get his "pipe" [gun]. WATSON replied "what?" HICKS said "let me in so I can get my pistol."

    d.   On March 22, 2008, at approximately 3:25 p.m., GLENN ISLAND called HICKS on Target Phone 2 (call # 0651) and told him that "this kid" wanted to sell a .40 [caliber] for $300 and "nine dean" [9 mm] for $250.00. HICKS said he would be over there in about an hour. ISLAND said the guy was trying to pop these off [sell them] and he was calling another buyer. HICKS asked if he could hold it for about an hour, he would get it.

    e.   On March 27, 2008, at approximately 11:01 a.m., IVORY WATSON called HICKS on Target Phone 1 (call # 19591) and told him that someone wanted "our pipe" [gun] and he got two of them.

    f.   On April 2, 2008, at approximately 2:57 p.m., HICKS, who was using Target Phone 1, had a conversation with MASUCA (call # 20694) during which HICKS said he had to go to "Cuz's house" to "get me my 'crank' [gun]" HICKS said he had to go to "4-5's" [SANFORD TOWNSEND] house in the basement where he left his "crank" a few days ago.

    g.   On April 18, 2008, at approximately 9:32 a.m., HICKS, who was using Target Phone 1 (call # 23096), is overheard having a conversation in which he states, "hey killer, it's time you learned something. Go downstairs and get that gun and get that dope."

### KEVIN MASUCA a/k/a "ZOOK"

    77.   Based on the investigation, KEVIN MASUCA appears to be HICKS' "second in

command" and main "runner." MASUCA assists HICKS in the management of the narcotics

trafficking organization by maintaining accounting records, by distributing narcotics to other

workers or runners, and by directing that activities of other runners.

78.    Based on law enforcement records as well as intercepted wire communications on

Target Phone 1 and Target Phone 2, KEVIN MASUCA is believed to be using Target Phone 4 to

facilitate the narcotics trafficking activities.  Target Phone 4 is subscribed to INDIVIDUAL Z at

5437 S. Hoyne Ave., Chicago, Illinois.  According to Illinois Secretary of State records,

MASUCA lists 5437 S. Hoyne Ave., Chicago, Illinois as his residence.    According to Chicago

Police Department records, MASUCA was arrested for domestic battery in an incident in which

INDIVIDUAL Z was listed as the victim and which occurred at 5437 S. Hoyne Ave., Chicago,

Illinois.

### (1)    KEVIN MASUCA SERVES CUSTOMERS

79.    During the course of the investigation there have been intercepted telephone calls

between HICKS and MASUCA which indicate that MASUCA serves as a runner who delivers

narcotics to HICKS' customers.  For example, on March 31, 2008, at approximately 11:44 p.m.,

HICKS, who was using Target Phone 2, called MASUCA on Target Phone 4 (call # 0858) and

told him to "get ready to run an order."  HICKS told MASUCA that he needed two "halsteds" [63

gram quantity of crack cocaine][12] and then told him to "bring me one of the 'big boys' [4 ½

ounce quantity of crack cocaine]."

80.    In addition to the transaction outlined above, MASUCA has been observed by

---

[12]    During the course of the investigation, there have been several calls which indicate that
HICKS and the members of his organization use the term "halsted" to refer to a 63-gram quantity
of crack cocaine.  For example, as outlined in ¶ 115 below, on February 29, 2008, COPRICH
called HICKS and inquired about purchasing "halsteds," then later that same day, called HICKS
to complain that "they" [the quantities he bought] were weighing in at only 62 grams [rather than
63].

surveillance agents participating in several other meetings with HICKS' suppliers or customers which, based on the context of the investigation and content of intercepted calls, are believed to have been narcotics transactions including, among others: the March 13, 2008 transaction involving MICHAEL GONZALEZ (See ¶¶ 34 - 38 above); the March 27, 2008 transaction involving DANIEL COPRICH (See ¶ 121 below); the March 12, 2008 transaction involving VINCENT STRAUGHTER (See ¶ 147 below); the April 2, 2008 transaction involving GLENN ISLAND (See ¶¶ 188 - 190 below); the February 27, 2008 and February 29, 2008 transactions involving TAMEKA GRANT (See ¶¶ 199 - 200 below); the March 3, 2008 transaction involving DWAYNE GARRETT and PATRICK JONES (See ¶¶ 233 - 249 below); the March 15, 2008 transaction involving ROMELL HOLLINGSWORTH (See ¶¶ 263 - 265 below); and the May 2, 2008 transaction involving JOE LONG (See ¶¶ 279 - 282 below).

### (2) KEVIN MASUCA MAINTAINS THE INVENTORY AND ACCOUNTING

81.    During the course of the investigation there have been intercepted telephone calls between HICKS and MASUCA which indicate that MASUCA maintains an inventory of narcotics and cash for HICKS. For example:

a.    On February 11, 2008, at approximately 5: 42 p.m., MASUCA, who was using Target Phone 4, called HICKS on Target Phone 1 (call #13813) and told HICKS he had "6-9-15" [$6,915]. HICKS told MASUCA to hold on so he could write it down. HICKS told MASUCA to "run the shorts down" to him [tell him who owed money for purchases of narcotics made]. HICKS said "James short $225 for 2 on that order for them." MASUCA agreed and said he gave him 8, so that James owes a stack and $225 [$1,225]. MASUCA said that "4-5's Cousin" [DESHAUN GERMANY][13] came and gave him [MASUCA] $1,590, so he is $10 short.

_____

[13]    During the course of the investigation, there have been several calls in which HICKS and

MASUCA said that "4-5's Uncle" came with 12 cents [$1,200] and HICKS said that was "3 dollars" [$300] off. MASUCA said that Greg came with "a stack" [$1,000], and HICKS said Greg was $500 short. MASUCA said that "4-5's Cousin" came again with 14 [$1,400], and HICKS said that was short "2 dollars" [$200]. MASUCA said "AG" [AHMAD WILLIAMS] and "Boss Hog" [JOSHUA MCELROY], and HICKS replied "don't worry about them, just on the seven" and adds" don't count "DSki" [VINCENT SLAUGHTER]. HICKS told MASUCA, "you remember 'DSki' and I'll remember 'Boss Hog.'" HICKS told MASUCA that "DSki" paid his bill [$1,300], but that he is $200 short. HICKS asked MASUCA if he had one left, and MASUCA said "right." HICKS said that if he adds "DSki", "Boss Hog", and Ahmad, that they are still short somewhere. HICKS said the shorts come to about "2 stacks" [$2,000] and $125. HICKS said that they already have $6,000 and then that $9,000 and that is $15,000. MASUCA said he wrote down everything, and HICKS told MASUCA that he doesn't blame him. HICKS asked again, you still got one left, right? MASUCA replied that he did. HICKS said, "with the one more Halsted left if will be like ten [$10,000]." HICKS said that they were missing $300 from "Boss Hog", one [63 gram quantity] from "DSki", and MASUCA added that Ivory [IVORY WATSON] took one and that they gave "AG" [AHMAD WILLIAMS] one [WATSON and WILLIAMS had each gotten a 63 gram quantity on credit]. HICKS said, Okay, that is $4,500.

---

others refer to an individual as "4-5's cousin." On March 24, 2008, as outlined below in ¶¶ 268 - 271, this individual was monitored on intercepted calls setting up a transaction with HICKS and was then surveilled and identified as Deshaun Germany.

b.  on April 8, 2008, at approximately 7:42 p.m., HICKS, who was using Target Phone 1, called MASUCA on Target Phone 4 (call #22026), who told HICKS that, once he "knocks out the four birds [8-ball quantities of crack cocaine] he has left," that the "ticket number" would be "like 28 and 80 bucks [$28,080]. HICKS said, "so you have four birds [8-ball quantities of crack cocaine]." MASUCA replied yeah. HICKS said, "that's 28, gonna turn it into 29 and we're gonna try to beat 30." MASUCA replied "alright."

c.  On April 8, 2008, at approximately 6:59 p.m., HICKS, who was using Target Phone 2, called MASUCA on Target Phone 4 (call #1054), and asked MASUCA if he made it home all right. MASUCA said yeah. HICKS said you got "28 of you" [(28) 63-gram quantities of crack cocaine], eight big boys [(8) 4 ½ ounce quantities of crack cocaine]? HICKS then asked if "Ski" [VINCENT STRAUGHTER] had a couple out [that HICKS had "fronted" a quantity of crack cocaine to STRAUGHTER for him to sell]. HICKS told MASUCA that he needed him to give him "the full ticket number" down there [that he wanted an accounting of the narcotics MASUCA had]. HICKS repeated, that they have "28 of you, 8 big boys, and you have 7 quarters – seven jabs on the quarter side, on Birds" [(7) bags each containing 25 8-ball quantities].

**(3) KEVIN MASUCA POSSESSES FIREARMS**

82.    During the course of the investigation, several calls have been intercepted which indicate that KEVIN MASUCA possesses firearms:

a.  On February 17, 2008, at approximately 4:31 p.m., MASUCA, who was using Target Phone 4, called HICKS on Target Phone 1 (call # 14522) and told him that he had "heard a few shots bustin" the night before and he called "everybody" to "see if they cool." HICKS asked if he was about to take INDIVIDUAL U his "strap" [gun] and MASUCA replied that he was. HICKS told him not to do this. HICKS said, "no, keep my shit, Zook." HICKS repeated,

44

"no, keep my shit yourself, Zook." MASUCA replied, "allright, I got both then" [he had two guns belonging to HICKS].

b. On February 29, 2008, at approximately 10:54 p.m., MASUCA called HICKS on Target Phone 1 (call # 15703) and told him that he was just at "Old Girl's crib" [5358 S. Hoyne Ave, SEARCH SITE A] and INDIVIDUAL U "gave me your pipe" [gun]. HICKS asked why. MASUCA said he didn't know why. MASUCA said that he [INDIVIDUAL U] asked if he [MASUCA] had one because MASUCA didn't come out with his own, so he told MASUCA to "take this." HICKS said allright.

c. On April 6, 2008, at approximately 1:09 a.m., HICKS, who was using Target Phone 1, called MASUCA on Target Phone 4 (call # 21422) and asked if MASUCA was in the crib and he replied that he was. HICKS said he might need MASUCA to bring that "goddamnit" [gun] and come to 53th and Ashland.

## IVORY WATSON

83.    During the course of the investigation, there have been intercepted telephone calls which indicate that IVORY WATSON a/k/a "BIRD" is one of HICKS' runners.

84.    On February 1, 2008, at approximately 3:54 p.m., HICKS, who was using Target Phone 1, called IVORY WATSON[14] at (708) 623-3377 (call # 12202) and told him that "4-5's Cousin" [DESHAUN GERMANY] was "fittin to come on the side of the crib." HICKS said that "4-5" owes him $200 already. HICKS directed WATSON to give "4-5's Cousin" "10 bizzles of you." [8-ball quantities]. HICKS said he [4-5's Cousin] was buying a $400 piece and that he wanted 2 to get fronted off [bought on credit] so that he would give WATSON "a stack" [$1,000] because he owes HICKS $200 already. WATSON told HICKS that he [WATSON] "ain't got nothing but

---

[14]    A discussion of the identification of IVORY WATSON is outlined below in ¶ 92.

..." HICKS interrupted him and said, "Okay, break it down" [ HICKS is instructing WATSON to break down larger quantities down into smaller pieces].

85.    On February 27, 2008, at approximately 12:54 p.m., HICKS, who was using Target Phone 1, called IVORY WATSON (call # 15269). HICKS complained in the background that "Bird" [WATSON] doesn't stay on top of customers. HICKS asked WATSON what time he was going to "go holler at old girl." WATSON said that he was on his way. HICKS told WATSON that she might call somebody and they would miss money. HICKS said that's why WATSON was stuck with 25 [8-balls] for a whole week.

86.    On February 29, 2008, at approximately 8:31 p.m., MASUCA, who was using Target Phone 2, called HICKS on Target Phone 1 (call # 15698) and had a conversation about WATSON. MASUCA told HICKS that he collected $2,150 from WATSON. HICKS replied that he was "short, 3." HICKS said that WATSON said that "they" [the shortages] came from another individual but that he thinks WATSON is lying. MASUCA agreed. MASUCA said that WATSON had complained the he had worked for two weeks without pay. HICKS said, "if you are 3 off" [$300 short], "how is someone supposed to pay them?" HICKS said, before he gave WATSON 25 of them [8-balls], he gave WATSON $700 in pay, and that even though he gave WATSON this money, he still came to him $300 short.

87.    On March 9, 2008, at approximately 5:31 p.m., HICKS, who was using Target Phone 2, called MASUCA on Target Phone 4 (call #0357), and MASUCA asked HICKS if he wanted one of the "big dogs" and HICKS replied no, that he needed that for "all the birds, but first we gonna lock in those other ones we have laying around." MASUCA told HICKS that he was "through with everything but what he just gave him." HICKS asked MASUCA how many "birds" MASUCA had. MASUCA replied that had a few. HICKS is then overheard through Target

Phone 2 asking "Bird" [IVORY WATSON] how many "bizzles" he had.  WATSON replied that

he had twenty-seven [agents listed to this call and identified the voice as that of IVORY

WATSON].

88.   On March 29, 2008, at approximately 2:57 p.m., ISAIAH HICKS ("HICKS"), who was

using Target Phone 1, called WATSON (call # 20080), during which HICKS asked WATSON

where he put the two "small boys" [a quantity of narcotics] that HICKS had given to WATSON

for himself and had told WATSON to put in his can.  WATSON said that he did not remember,

then HICKS asked if he remembered those two "little short dogs" [a quantity of narcotics] that

HICKS said he was going to "fuck with."  WATSON replied that he was on his way to get some

"all white ones."

*April 2, 2008 Transaction Involving IVORY WATSON and TAMEKA GRANT*

89.   On April 2, 2008, HICKS, who was using Target Phone 1, had a conversation with

TAMEKA GRANT[15] (call # 20665) who told HICKS she was having some financial difficulties.

In response HICKS said he would "let her hold a zone" [he would "front" her an ounce] until the

next day as soon as she "pops it off" [sells it].  At approximately 7:51 p.m., GRANT called

HICKS on Target Phone 1 (call # 20750) and said she was at 55th and Ashland.  HICKS told her

to call when she was there.  GRANT said she would be there in two minutes.  At approximately

7:56 p.m., GRANT called HICKS on target Phone 1 (call #20753) and said she was "over here"

and to tell "him" [HICKS' runner] that she was not in "her car" [the car she usually drives], that

she was in a black Monte Carlo.  At approximately 8:01 p.m., GRANT called HICKS on Target

Phone 1 (call # 20755), and HICKS said "here he come."  At approximately 8:03 p.m.,

WATSON called HICKS on Target Phone 1 (call # 20757) and said there ain't nobody right

---

[15]   A discussion of the identification of TAMEKA GRANT is outlined below in ¶ 198.

here. HICKS said "next to Gyro's'" and asked what color car she was in. At approximately 8:06

p.m., GRANT called HICKS on Target Phone 1 (call # 20762) and said "tell him I'm in the

alley." At approximately 8:07 p.m., WATSON called HICKS on Target Phone 1 (call # 20764)

and HICKS told him that she was "right there at the alley." WATSON said he was in Gyro's.

HICKS told him to come out and that she was waiting in the alley.

90.     At approximately 8:08 p.m., WATSON called HICKS on Target Phone 1 (call # 20766)

and HICKS asked WATSON if he saw her. WATSON said no and that he was right by the

alley. At approximately 8:09 p.m., HICKS, who was using Target Phone 2, called GRANT (call

# 0912) and told her that WATSON couldn't see her. GRANT said she was in the alley between

Seeley and Hoyne and that WATSON should walk towards Hoyne. WATSON called Target

Phone 2 and spoke to HICKS (HICKS used the call waiting feature) and said he did not see her.

HICKS instructed WATSON to stay in Gyro's. GRANT said that she would walk from her car

to Gyro's. WATSON and GRANT meet while GRANT is on the phone call with HICKS.

91.     In addition to the above, WATSON was observed by surveillance officers participating

in a March 13, 2008 meeting with ANDREA THOMAS that is believed to have been a narcotics

transaction arranged with SCOTT O'NEAL (See ¶ 257 below).

92.     On April 25, 2008, at approximately 2:20 p.m., surveillance agents observed a white

Oldsmobile, driven by IVORY WATSON illegally parked in the middle of W. 54th St. next to a

black Chevrolet Tahoe, driven by HICKS. Agents observed what appeared to be HICKS passing

an object to WATSON. WATSON then drove eastbound on W. 54th St. Agents conducted a

traffic stop of the car WATSON was driving near Winchester and Wolcott Streets. When agents

approached the car, WATSON advised that he had no picture identification and gave his name as

IVORY WATSON. Agents advised WATSON that he could not double park in the middle of

48

the street. WATSON stated that he had stopped to speak with his brother, Isaiah. Agents asked WATSON for consent to search his vehicle and WATSON gave permission. A brief search was conducted. Agents observed a color photograph of five black individuals taped to the inside dashboard of the car marked with the caption "54 Crew." An agent asked WATSON who was depicted in the photograph and WATSON stated that it was his "crew" but only identified himself and his brother, Isaiah HICKS. In the photograph, WATSON was holding a large amount of United States currency.

93.    During the traffic stop conducted on April 25, 2008, an agent asked WATSON if he had a street name or nickname. WATSON denied having a street name. The agent asked WATSON if they call him "Bird." WATSON denied this.

94.    After the stop, surveillance agents viewed a photograph of IVORY WATSON available from CPD records and identified WATSON as the driver they had stopped who had identified himself as IVORY WATSON. In addition, they listened to several recorded telephone calls intercepted on Target Phones 1, 2, and 4 involving the individual referred to as "Bird" and identified the voice of "Bird" on these calls as that of IVORY WATSON.

95.    On April 25, 2008, at approximately 2:32 p.m., WATSON called HICKS on Target Phone 2 (call # 24120), and told him that "one of them bitches" [the police] just pulled him over. WATSON told HICKS, "someone is doing some talking too, G." WATSON told HICKS "we need to see each other." HICKS told WATSON to call his other phone [Target Phone 2]. At approximately 4:06 p.m., HICKS, who was using Target Phone 1, called WATSON (call # 24149). HICKS told WATSON, "don't call the niggas, just ride on them and let them know what's going on." WATSON told HICKS that he "just told Zook [KEVIN MASUCA]." WATSON said "fuck the '4' [54th St], don't even stand out there, G." HICKS said "that's the

49

only way." WATSON said he had told INDIVIDUAL GG. When HICKS asked if he had told "Cuz," WATSON said he had not, adding that he didn't want to talk on the phone. Based on the content of this call and the context of the investigation, HICKS and WATSON are believed to be discussing the fact that WATSON had been stopped by the police earlier in the day, and that in reaction to the police interaction, HICKS was telling WATSON to advise the other members of the organization about the traffic stop and was warning them to avoid conducting business on 54th Street.

## AHMAD WILLIAMS

96.    During the course of the investigation, there have been intercepted telephone calls which indicate that AHMAD WILLIAMS is one of HICKS' workers who distributes smaller quantities of crack cocaine. For example:

a.    On February 19, 2008, at approximately 9:11 p.m., AHMAD WILLIAMS[16] called HICKS on Target Phone 1 (call #14775) and asked HICKS if he was back. HICKS replied that he was. HICKS told WILLIAMS that "Old Girl" [referring to Individual C, HICKS' housekeeper] was complaining that WILLIAMS was selling her sawbucks [$10.00 amount of narcotics] for $30. WILLIAMS told HICKS that he had just given her something when she had called earlier and said he was going to call her up. At approximately 10:12 p.m., AHMAD WILLIAMS called HICKS on Target Phone 1 (call #14785) and explained that he and Individual C must have had a misunderstanding. WILLIAMS explained that she had to have been thinking about the bags that were worth over a hundred dollars. WILLIAMS said "who gonna buy something for $30 and aint' gonna look at it that big?" WILLIAMS said "our shit ain't been that big that we could sell it for $30.00." WILLIAMS added that he was "running low" and that he

---

[16]    A discussion of WILLIAMS' voice identification is outlined below in ¶¶ 102 - 103.

had gotten "that extra little bag from Zook [MASUCA]." WILLIAMS told HICKS that he didn't

give him [MASUCA] the change [proceeds from the drug sales] though, that he had the change

in his pocket and some money at the crib. WILLIAMS told HICKS that he would give HICKS

all his change when he saw him.

   b. On March 13, 2008, at approximately 5:32 p.m., AHMAD WILLIAMS called

HICKS on Target Phone 1 (Call #17320) and told HICKS to tell "Bird" [IVORY WATSON] to

"give me that" because he had someone waiting on him. WILLIAMS said he was trying to get

that "jab" from him. HICKS said alright. At approximately 5:33 p.m., HICKS, who was using

Target Phone 1, called WILLIAMS (call #17322) and told him that he had to come in and get "it"

because he [WATSON] was not going to bring it to him.

   c. On March 15, 2008, at approximately 1:48 p.m., MASUCA, who was using Target

Phone 4, called HICKS on Target Phone 1 (call# 17693) and told HICKS that "Ahmad"

[AHMAD WILLIAMS] had just called him for half an onion [1/2 ounce] and HICKS said OK,

"4 dollars, 350 or 4 dollars" [the price should be $350 – 400].

   d. On March 19, 2008, at approximately 7:16 p.m., AHMAD WILLIAMS called

HICKS on Target Phone 1 (call# 18276) and told him that he was "really running low" and that

all he had was "2 of them boys."

   e. On April 1, 2008, at approximately 6:12 p.m., HICKS, who was using Target Phone

2, placed a call to INDIVIDUAL V (call # 0867) and asked him what he was trying to get, "a

billa [8-ball quantity of crack cocaine] right?" INDIVIDUAL V said, no, that it was for him

personally. HICKS said he was going to send his little brother to him and to give him about ten

minutes. INDIVIDUAL V asked where to meet, and HICKS told him "on 54th right there, at,

damn, at Gyro's." INDIVIDUAL V asked "how much we talking?" HICKS said "you already

know – $125." INDIVIDUAL V said he didn't have that much and HICKS told him to call back

when he had at least $100. INDIVIDUAL V asked "how about half of that then?" HICKS

replied that he doesn't go that low. INDIVIDUAL V then said, "give me a 16 year old girl" [a

smaller quantity] HICKS suggested that he call AHMAD [AHMAD WILLIAMS] on anything

"small". HICKS said that he normally had them, but didn't have any right then. INDIVIDUAL

V said he would call back.

97.    On April 25, 2008, at approximately 1:42 p.m., MASUCA received a call from

AHMAD WILLIAMS on Target Phone 4 (call # 02017). WILLIAMS asked MASUCA where

he was, who responded "at the crib." WILLIAMS asked where "Rock" [ISAIAH HICKS] was,

and MASUCA said he didn't know. WILLIAMS told MASUCA to "chirp folks" [use the direct

connect feature of the cell phone to call] because he had to "come around there and get one of

them halsteds [63 gram quantity of crackcocaine]." WILLIAMS said that he was walking down

by MASUCA's "crib" and that he [MASUCA] should come out to the front [to bring him the

narcotics]. At approximately 1:48 p.m., HICKS, who was using Target Phone 1, called

MASUCA on Target Phone 4 (call # 24108). MASUCA told HICKS that "AG" [WILLIAMS]

called and said that he needed "one of me" [63 gram quantity]. HICKS said that he knew that,

that MASUCA should "just chill" and that he [HICKS] was on his way over there right now.

98.    On April 25, 2008, at approximately 1:51 p.m., a surveillance agent observed a black

male walking southbound on S. Hoyne Avenue at Garfield Ave. The agent observed this

individual then walk east bound through the alley located south of Garfield Ave. off of S.

Hoyne.

99.    At approximately 1:56 p.m., AHMAD WILLIAMS called MASUCA on Target Phone 4

(call # 02020) and told him to come outside for a second. At approximately 2:00 p.m., the

surveillance agent observed a black male exit the residence of 5437 S. Hoyne Ave. [SEARCH

SITE B]. The surveillance agent observed another black male join the first black male. At

approximately the same time, WILLIAMS, who was using Target Phone 4, called HICKS on

Target Phone 1 (call # 24177) and asked him "how am I gonna slow up and I aint' got the shit?"

WILLIAMS added "I got the dough – we right – I got the money." WILLIAMS said "the money

is right, go on ahead let me get that so I can ride, dude waiting on me now" [he had the money

and a customer was waiting for him]. HICKS told WILLIAMS that he had to wait and that

HICKS would be there. WILLIAMS asked if he should go in the house to wait. HICKS said "if

that's what you want to do" adding "I'll be there in about ten minutes."

100.    At approximately 2:37 p.m., AHMAD WILLIAMS called MASUCA on Target Phone

4 (call # 02028) and asked how far away HICKS was and to have HICKS come back. At

approximately 2:39 p.m., MASUCA, who was using Target Phone 4, called HICKS on Target

Phone 1 (call # 24135) and told him to call "AG" [WILLIAMS]. HICKS told MASUCA that

WILLIAMS owed him close to 600 dollars and he would call WILLIAMS and tell him to give

that to MASUCA and then he would go ahead and turn WILLIAMS on [HICKS would supply

WILLIAMS with crack cocaine again if he paid his debt]. At approximately 2:44 p.m.,

MASUCA, using Target Phone 4, called WILLIAMS back at (773) 331-3604 (call #2030), and

told WILLIAMS that HICKS said for WILLIAMS to bring MASUCA that change. WILLIAMS

told MASUCA that he was outside.

101.    At approximately 2:50 p.m., (call # 24138) MASUCA, using Target Phone 4 called

HICKS on Target Phone 1. MASUCA asked HICKS if he could give "one of me" [63 gram

quantity] to AHMAD WILLIAMS. HICKS told MASUCA yes and also said that WILLIAMS

no longer needed to go through HICKS but could go right to MASUCA. At approximately 2:51

p.m., a surveillance agent observed MASUCA standing outside of the residence at 5358 S. Hoyne Ave. talking on his cell phone. A surveillance agent observed another black male, now identified as Ahmad WILLIAMS, in his 20's, with braided hair, wearing a T-shirt and jeans approach MASUCA in front of 5437 S. Hoyne. After meeting, the two walked towards the house and appeared to conduct some type of exchange. A short while later, a surveillance agent observed WILLIAMS get into a green 4-door sedan with a broken rear driver's side window, bearing Illinois license plate X58 0164 and drive away.

102.    At approximately 2:54 p.m., surveillance agents drove northbound on Hoyne and pulled alongside AHMAD WILLIAMS' vehicle as it was parked on the west side of Hoyne. An agent asked WILLIAMS how he broke the driver's side rear window. WILLIAMS gave an explanation. WILLIAMS then pointed to a house on the west side of Hoyne and stated that he was visiting his cousin who lived over there. WILLIAMS then volunteered his wallet and consent to search his wallet for his identification without being solicited by either agent. An agent looked in the wallet and observed a valid Firearm Owner's Identification Card (FOID) in the name of Ahmad WILLIAMS.

103.    Subsequent to this encounter, the agents viewed an Illinois Driver's License picture as well as an Illinois State Identification picture of Ahmad WILLIAMS and both were able to identify WILLIAMS as the individual they approached on Hoyne with a broken rear window in his vehicle. In addition, one of the agents listened to several recorded telephone calls intercepted over Target Phones 1, 2 and 4 involving a participant known as "Ahmad" or "AG". The agent concluded that the person referred to as "Ahmad" or "AG" in these calls was the same individual the agents had come into contact with on that same date on Hoyne, who presented identification in the name of Ahmad WILLIAMS.

104.    On April 26, 2008, at approximately 11:36 a.m., AHMAD WILLIAMS a/k/a "AG"

and "G-Ball" called HICKS on Target Phone 1 (call # 24254). HICKS told WILLIAMS that he

was "not fucking around down there, G" [that he was not going to conduct business on 54th St],

adding "if the pot is hot, the pot is hot." HICKS said "it wasn't nothing but a pull up" [referring

to the traffic stop of IVORY WATSON that had occurred the day before]. HICKS said he had

been talking about making the "change to off the block" and that "all this did was make it

happen." HICKS told WILLIAMS that he isn't going to challenge the police, he doesn't want "a

motherfucker" [the police] looking at him." HICKS said "they can have the block" and that

"there are too many of them." HICKS said "a motherfucker doesn't need to be down there, the

way it is designed was on the 'hizzle'" [horn or phone -- as discussed above, some code words

combine the first letter of the real word, in this case "h" for "horn", followed by "izzle"]."

WILLIAMS said that he is decent and that he "works off his phone." [I believe HICKS is saying

that their business is designed to operate over the phones as opposed to being tied to a specific

geographic location]. HICKS said that the police told "Bird" [WATSON], in so many words,

"get the fuck on player" [stop doing business there]. HICKS said "it doesn't stop business, the

business is the business, it is still good and it does not stop" indicating that they can still sell their

"CDs and DVDs and shit." WILLIAMS agreed and said that he isn't going to do any

"exchanging hands" [hand-to-hand transactions] right there [on 54th St].

105.    On May 7, 2008, at approximately 11:17 a.m., AHMAD WILLIAMS called

MASUCA on Target Phone 4 (call # 02845) and told MASUCA that he had money for him, but

that he didn't want to bring the money to MASUCA's crib. MASUCA said that needed a second

to put a "you" [usual amount of crack cocaine WILLIAMS received from MASUCA] together

right quick. WILLIAMS then asked MASUCA if he knew what he needed, and MASUCA said

yes, and WILLIAMS stated "same thing though." MASUCA asked WILLIAMS to give him a

second, and WILLIAMS asked MASUCA to call him when he was ready.

106. On that same date, at approximately 11:28 a.m., AHMAD WILLIAMS called

MASUCA on Target Phone 4 (call # 02847). WILLIAMS advised MASUCA that he had moved

to the area of 77th and Concord, across Stoney Island, and MASUCA stated that he was not going

to bring "it" to WILLIAMS. WILLIAMS asked if he could start heading MASUCA's way with

the money, and MASUCA said not yet, as he has to let "some shit dry out." MASUCA verified

the amount of crack cocaine WILLIAMS wanted, and WILLIAMS told him he wanted a "you"

[63g crack cocaine] and that he had the money. MASUCA again advised that he had to "let the

shit dry," and WILLIAMS asked him "an hour, right?" MASUCA responded "yeah." At

approximately 1:03 p.m., WILLIAMS called MASUCA on Target Phone 4 (call # 02849).

MASUCA advised WILLIAMS to come to the Gyro's Restaurant. WILLIAMS told MASUCA

that he is on Cottage Grove and would be there in 10 minutes. At approximately 1:15 p.m.,

WILLIAMS called MASUCA on Target Phone 4 (call # 02851). WILLIAMS asked MASUCA

if he was at the Gyro's, saying he was at 55th and Seeley and was "fittn' to come to Gyro's right

now," and wanted to know if MASUCA was up there. MASUCA then told WILLIAMS he was

going to walk up to the restaurant right now.

107. At approximately 1:16 p.m., MASUCA, using Target Phone 4 called HICKS on

Target Phone 2 (call # 3971), and advised HICKS that AHMAD WILLIAMS had called and

asked HICKS how much "change" [money] WILLIAMS was supposed to be bringing? Further,

MASUCA stated that WILLIAMS told him he was "done." HICKS then told MASUCA 1180

[$1,180] and MASUCA said all right. HICKS also told MASUCA to tell WILLIAMS he was

good. MASUCA said all right.

108.    At approximately 1:19 p.m., a surveillance agent observed a green 4-door sedan, bearing Illinois license plate X580164, enter the Gyro's parking lot. This car was previously associated with AHMAD WILLIAMS. The agent observed a black male was the driver and there was a black female passenger in the car as well. At approximately 1:20 p.m., the surveillance agent observed MASUCA emerge from the alley between S. Hoyne and S. Seeley Avenues and enter the Gyro's parking lot. The agent observed MASUCA meet with the driver of the green car and conduct an exchange.

109.    Based on the content of intercepted calls, AHMAD WILLIAMS possesses firearms:

a.    On February 14, 2008, at approximately 1:48 p.m., AHMAD WILLIAMS called HICKS on Target Phone 1 (call # 14146). During this call, HICKS told WILLIAMS, "that's why you need to keep that pipe [gun] with you, folks."

b.    On February 16, 2008, at approximately 6:23 p.m., MASUCA and AHMAD WILLIAMS, who were using Target Phone 4, have a conversation with HICKS on Target Phone 1 (call # 14500) about an interaction with a rival gang crew. HICKS told WILLIAMS that he should have "shot that bitch up." WILLIAMS said that "I got it [gun] right now, we down on the block, we got'em [guns]." HICKS told WILLIAMS that he should have brought his pistol out because "he knows what time it is." WILLIAMS explained that he took the pistol out of his car and took it in the crib when he went in the crib and since he had to go to a baby shower he didn't bring it out with him again until now.

## DANIEL COPRICH a/k/a "D-BLOCK"

110.    Based on the content of intercepted calls, surveillance, and information provided by cooperating individuals, DANIEL COPRICH is a distributor who purchases "weight" quantities of crack cocaine from HICKS and also brokers transactions between HICKS and one of his

powder cocaine suppliers.

***Information from Cooperating Individuals***

111.    As outlined above in ¶ 16(b), CI-2 identified DANIEL COPRICH as a GD gang member and worker who sells "weight" quantities of crack cocaine for HICKS in the area of 54th and Damen.

***February 19, 2008 Intercepted Call Regarding Narcotics***

112.    On February 19, 2008, at approximately 1:36 p.m., HICKS, who was using Target Phone 1, had a conversation with COPRICH (call # 14681) during which they talked about a problem with the narcotics that COPRICH had recently purchased from HICKS. COPRICH said he thought HICKS was "trying to kill my people" [COPRICH's customers] and that when he got that "lick" [narcotics], he was wondering what HICKS put on the lick. HICKS said that it came that way, and that it was like that after he let it dry out [because it smelled bad, had an ammonia smell]. HICKS asked if people [customers] noticed. COPRICH indicated that was how he knew about it. HICKS said that even when he was "doing it" [either bagging it up or cooking it] he was like "what the fuck! Damn!" [meaning that HICKS also noticed the unusual odor]. HICKS said that someone had shown him how to deal with problems like that, but that you can't take away the smell, "what was there was there." COPRICH said they put ammonia on that shit. COPRICH said he was hoping that "no one fell out over it" [got sick]. COPRICH said he called "Zook" [MASUCA] and told him that if any murders come of it its on you [MASUCA] and "Chub"[HICKS]. After which COPRICH and HICKS laughed.

***February 26 and 27, 2008 Calls Regarding Narcotics***

113.    COPRICH was intercepted in phone calls intercepted on February 26, 2008 and February 27, 2008 with HICKS (See ¶¶ 26 - 27 above) which indicate that COPRICH was

arranging transactions in which HICKS would acquire cocaine.

**February 29, 2008 Calls Regarding Narcotics**

114.    On February 29, 2008, at approximately 2:59 p.m., DANIEL COPRICH called

HICKS on Target Phone 1 (call # 15645) and asked if "anybody is doing anything over at

HICKS' Old Girl's crib [5358 S. Hoyne Ave]?" and asked, "them Halsteds laying around?"

HICKS replied, yeah and that Zook [MASUCA] had them.  At approximately 3:00 p.m., HICKS,

who was using Target Phone 1, called MASUCA on Target Phone 4 (call # 15647) and asked

him where he was.  MASUCA said he was "on the way heading back."  HICKS told MASUCA

to call Dan [COPRICH] and MASUCA said he had just talked to Dan and told Dan to give him

20 or 30 minutes.  MASUCA told HICKS he would call Dan as soon as he hit the crib.  At

approximately 3:02 p.m., HICKS, who was using Target Phone 1, called COPRICH (call #

15648) and told him that MASUCA would be back in 30 minutes and told COPRICH that he

[HICKS] didn't have any Halsteds [63 gram quantities of crack cocaine] on location, and that

Ivory [WATSON] didn't have any either.  At approximately 3:29 p.m., MASUCA, who was

using Target Phone 4, called HICKS on Target Phone 1 (call # 15656) who asked if MASUCA

had spoken with COPRICH.  MASUCA replied that he was "heading back to take care of him."

HICKS admonished MASUCA for not being around to serve customers because they "don't want

to miss that money."

115.    On February 29, 2008, at approximately 4:28 p.m., HICKS, who was using Target

Phone  1, received an incoming call from MASUCA, who was using Target Phone 4 (call

#15666), during which MASUCA told HICKS that COPRICH had just called and said that

"they" were coming up "62."  HICKS replied that he did not know how, but that COPRICH is

okay.  MASUCA said that he put it on the scale and "they" actually are coming up "62."

MASUCA said he would check all of them. Based on the training and experience of law

enforcement agents involved in the investigation and the context of the investigation, in this call,

MASUCA was informing HICKS that, according to COPRICH, the 63 gram packages of crack

cocaine were actually weighing in at only 62 grams.

### March 5, 2008 Recovery of Cash

116.    On March 5, 2008, at approximately 3:54 p.m., HICKS, who was using Target Phone

1, called COPRICH (call # 16194), and asked COPRICH what his guy [supplier] said.

COPRICH said he called him but he did not answer. COPRICH told HICKS that he was riding

up Damen and was going to ride through the "4" [he was coming to W.54th St.]. At

approximately 4:15 p.m., a surveillance agent observed HICKS and unknown individuals talking

with an individual in a red Dodge Charger that was parked on W. 54th St., west of S. Hoyne Ave.

At approximately 6:10 p.m., a surveillance agent observed the red Charger travel southbound on

S. Hoyne Ave., and stop in the alley near 5437 S. Hoyne Ave. The vehicle stopped there for

approximately 3 -4 minutes. The surveillance agent then observed the vehicle as it traveled from

the area and then parked on the east side of Aberdeen in the area of 5609-5615 S. Aberdeen. At

approximately 6:20 p.m., a surveillance agent observed a black male, who was later identified as

Daniel COPRICH a/k/a "D-BLOCK", exit the vehicle and walk around the area, then enter the

residence at 5609-5615 S. Aberdeen. At approximately 6:25 p.m., a surveillance officer

observed COPRICH exit the residence and get into his car and leave the area.   Surveillance

officers followed the vehicle and conducted a traffic stop for failure to signal. The driver was

identified as Daniel Coprich based on his Illinois Driver's license. Agents obtained verbal

consent to search the vehicle. One agent conducted the search while the other conducted a field

interview of COPRICH. During the search, the agent recovered a large quantity of cash, $1,250,

in the unlocked arm rest of the vehicle.

117.   Agents took the cash to the ATF office and requested a narcotics dog to conduct a field test for the presence of narcotics on the cash that had been seized. The test was conducted with a positive response indicating the presence of narcotics residue on the currency that had been recovered.

118.   That same day, at approximately 7:18 p.m., COPRICH called HICKS on Target Phone 1 (call #16238) and told him that one of the police detectives took his "loot" [money]. COPRICH explained that he hid the money in the glove box, that the police searched his car, and that when he got back into the car, the money was gone. HICKS asked why they stopped him, and COPRICH said they pulled him over for weaving and going too fast. COPRICH stated that he didn't want to "snap" because he still had that "lick" [crack cocaine] on him that he had just grabbed. HICKS said "exactly." On that date, agents who had participated in the traffic stop listened to this intercepted call and identified the voice in these calls with HICKS as that of DANIEL COPRICH.

### March 26, 2008 Meeting to Obtain Crack Cocaine

119.   On March 26, 2008, at approximately 6:53 p.m., DANIEL COPRICH called MASUCA on Target Phone 4 (call #00064), and told him to "get ready to come out" and asked if he could "please get a 'trey' [63 gram quantity of crack cocaine]." COPRICH told MASUCA that he was "on the four" [W. 54th St.] and that he was "fittn to come through the alley right now."

120.   At approximately 6:57 p.m., a surveillance agent observed a blue Cadillac bearing temporary license plate number 593J228 that was parked in front of the residence at 5437 S. Hoyne Ave., Chicago, Illinois. According to Secretary of State Records this temporary license

plate is associated with a 2000 Cadillac Deville Model, bearing VIN: 1G6KD54YXYU312523 and registered to Dan Coprich at 4206 Applewood Lane, Chicago, Illinois [SUBJECT VEHICLE B]. The agent observed the Cadillac back into the alley to the south of the residence. At approximately 7:00 p.m., the agent observed the same Cadillac pull up and park in front of the residence at 5358 S. Hoyne Ave [SEARCH SITE A]. The agent observed HICKS as he walked up to the driver's side of the Cadillac. The agent observed COPRICH exit the vehicle and walk with HICKS across the street to the rear of the residence at 5358 S. Hoyne [SEARCH SITE A].

### March 27, 2008 Meeting to Obtain Crack Cocaine

121. On March 27, 2008 at approximately 5:10 p.m., COPRICH called MASUCA on Target Phone 4 (call #00265), and told him to "bring one with you" [63 gram quantity of crack cocaine]. At approximately 5:17 p.m., COPRICH called MASUCA on Target Phone 4 (call # 00267) and told him that he was "out there." At approximately 5:18 p.m., surveillance agents observed the blue Cadillac registered to Dan Coprich [SUBJECT VEHICLE B] park in front of the residence at 5437 S. Hoyne Ave., Chicago, Illinois [SEARCH SITE B], and then pull into the alley south of the residence between S. Hoyne Ave. and S. Seeley Ave. At approximately 5:19 p.m., a surveillance agent observed MASUCA exit the residence at 5437 S. Hoyne Ave. [SEARCH SITE B], and meet with COPRICH in the alley.

### April 24, 2008 Call Regarding Narcotics

122. On April 24, 2008, at approximately 11:26 a.m., DANIEL COPRICH called ISAIAH HICKS on Target Phone 1 (call # 24001), and told HICKS that "his man" [powder cocaine supplier] just hit him up, Joe" [called]. HICKS asked if they were "trying to pur again" [sell cocaine]. COPRICH said that "his guy" asked him "what up with you guys?" [were they interested in purchasing cocaine]. COPRICH told HICKS "he say 21 and a half" [$21,500 for a

kilo of cocaine]. HICKS said okay, and that he hoped "that everything goes back to the way it's supposed to be because ever since that shit ain't been right, I been fucked up Cuz." Based on the context of the investigation and the content of this call, I believe HICKS was referring to the rising prices of powder cocaine. HICKS said he was going to "swing down" on [meet face to face with] COPRICH.

### *COPRICH's Use of SUBJECT VEHICLE B*

123.    On March 22, 2008, at approximately 8:02 p.m., HICKS, who was using Target Phone 1, spoke with COPRICH (Call # 18750) who told HICKS to tell "Bree" to "get his shit ready because he is pulling up right now." HICKS agreed and the call ended. At approximately 9:20 p.m., a surveillance agent observed SUBJECT VEHICLE B parked on 54th Street, on the side of the residence at 5358 S. Hoyne Ave.. The surveillance agent observed HICKS leaning on the vehicle speaking with the driver. At approximately 10:45 p.m., the surveillance agent observed SUBJECT VEHICLE B drive northbound on S. Hoyne Ave., and the agent was able to identify the sole occupant as DANIEL COPRICH.

### <u>UBEX LOPEZ a/k/a "LITTLE MAN"</u>

124.    Based on the content of intercepted wire communications, surveillance, information provided by a cooperating individual, as well as law enforcement records, UBEX LOPEZ is one of HICKS' suppliers who sells kilo quantities of powder cocaine to HICKS.

125.    During the course of the investigation, several calls have been intercepted which indicate that UBEX LOPEZ a/k/a "LITTLE MAN" is one of HICKS' suppliers. See, for example, the January 28, 2008 call outlined above in ¶ 41, the calls intercepted from March 11, 2008 through March 13, 2008 as outlined above in ¶¶ 28 - 33 as well as the following:

### *March 27, 2008 Transaction Involving UBEX LOPEZ*

126.    On March 26, 2008, at approximately 4:46 p.m., LOPEZ , who was using (773) 828-2160, called HICKS on Target Phone 1 (call # 19424) and told HICKS that he was "missing his beat" because he had been calling HICKS all morning telling him to "hit him back" [return his call]. LOPEZ stated that "his man" [powder cocaine supplier] had called to tell him he had "three hours laying around" [3 kilos of cocaine available], "talking about Michael Jordan" [for the price of $23,000]. LOPEZ  told HICKS that he thought someone else was going to "jump on them," but that if HICKS wanted him [LOPEZ ] to put HICKS in, he could. HICKS told him "not for no Michael Jordan" and said that he "got some still." LOPEZ told HICKS that he would tell him if something changed. HICKS told LOPEZ that if the other person didn't "get all of them" to let him know. In this call, I believe LOPEZ is informing HICKS that his supplier had 3 kilos of cocaine available for sale for $23,000 each. LOPEZ then told HICKS that he thought someone else was going to buy them, but if HICKS was interested, he [LOPEZ] would help him. HICKS replied that he was not interested for the price of $23,000 [not for no Michael Jordan]. But HICKS then said that if the other person didn't buy them all, to let him know.

127.    On March 26, 2008, at approximately 5:44 p.m., LOPEZ called HICKS on Target Phone 1 (call # 19452) and asked if he was "good." HICKS said that he was going to "wait it out." LOPEZ said he would call if anything changed [if the price dropped].

128.    On March 27, 2008, at approximately 11:03 a.m., LOPEZ called HICKS on Target Phone 1 (call # 19593) and asked "what is up?" HICKS told LOPEZ that he was looking at a "dub" [$20,000]. LOPEZ reminded HICKS that he had been "talking about Michael Jordan" [the price had been $23,000], but that he got it to $22,200, and that all he is going to do for him is "2 bucks" [$200]. HICKS replied "give me one second." LOPEZ then said "I already put it to the side for you Fam, so don't take too long, nigga." In this call, I believe LOPEZ was informing

HICKS that the price for the kilo of cocaine had been lowered to $22,200.

129.    On March 27, 2008, at approximately 11:59 p.m., LOPEZ called HICKS on Target

Phone 1 (call # 19612) and told HICKS to "at least have him walk on toward the neighborhood,

Paulina or something like that." HICKS said "that's some hot shit there for real." LOPEZ asked

"how about if he stays on the 'double nickel'?" In this call, I believe LOPEZ and HICKS were

arranging for MASUCA to meet with LOPEZ to provide payment for the purchase of cocaine.

130.    On March 27, 2008, at approximately 12:28 p.m., LOPEZ called HICKS on Target

Phone 1 (call # 19625), and asked "what happened" and said that he didn't want HICKS to make

him wait too long. HICKS explained that he was waiting for his guy to call him back and tell

him everything's good because his guy had something to do right fast. HICKS told LOPEZ that

he would call back to let him know that "everything's good." LOPEZ said "alright."

131.    On March 27, 2008, at approximately 1:07 p.m., HICKS, using Target Phone 1, called

LOPEZ (call #19646), and asked if he was "over there." LOPEZ replied "yeah." HICKS said

"OK, let me call him right now, hold on." At approximately 1:08 p.m., HICKS, using Target

Phone 1, called MASUCA on Target Phone 4 (19647), and told him "get that 'dub' [$20,000]

ready." MASUCA said that he had it ready. HICKS told him that LOPEZ was going to come

by.

132.    At approximately 1:08 p.m., HICKS, using Target Phone 1, called LOPEZ (call #

19648), and told him to "go ahead" and to call him when he gets through. LOPEZ said alright

and asked if "he" [MASUCA] was going to be on "the nickels" [Garfield Blvd], and HICKS

replied, "yeah." LOPEZ told HICKS to tell "fam" [MASUCA] to be "posted up" [outside on the

street] because he was going to try to "swing in and swing out quick." HICKS told LOPEZ that

"he" [MASUCA] could not stand outside with "it" but that LOPEZ should call him when he was

close by. LOPEZ replied "alright."

133. At approximately 1:14 p.m., LOPEZ called HICKS on Target Phone 1 (call #19651), and told him that he was coming down "D" [Damen St.] right then, so he would be there in "like one minute." At approximately 1:14 p.m., HICKS, using Target Phone 1, called MASUCA on Target Phone 4 (call # 19652), and told him that LITTLE MAN was going to pull up any second. At approximately 1:15 p.m., LOPEZ called HICKS on Target Phone 1 (call #19653), and told him that he was "right here." At approximately 1:16 p.m., HICKS, who was using Target Phone 1, called LOPEZ (call # 19654) and asked what color [car] he was in. LOPEZ replied "the white one, fam, same one" [according to surveillance, LOPEZ was actually in a black truck][17] and told HICKS to tell him [MASUCA] to look out and he'd see it. At approximately 1:16 p.m., HICKS, using Target Phone 1, called MASUCA on Target Phone 4 (call # 19655)and said "LITTLE MAN is outside" and told MASUCA to hurry because "LITTLE MAN doesn't like to wait." At approximately 1:17 p.m., LOPEZ called HICKS on Target Phone 1 (call #19656), and told him that he was out front right then, and that he could see "him" [MASUCA]. At approximately 1:25 p.m., LOPEZ called HICKS on Target Phone 1 (call # 19663) and told him that he'd call HICKS when it was time to "post up" [when HICKS needed to put up the rest of the money in addition to the money provided by MASUCA to LOPEZ earlier in the day].

134. That same day, at approximately 5:48 p.m., HICKS, using Target Phone 1, called LOPEZ (call # 19734) who said he would "swing down around 7:30 - 8:00." At approximately 8:31 p.m., LOPEZ called HICKS on Target Phone 1 (call #19763), and told him to "hold if off until the mornin' man."

---

[17] Based on my experience, providing misinformation about the color of the car is likely intended as a counter-surveillance tactic. During the course of the investigation, LOPEZ has often practiced counter-surveillance measures such as this.

135.    On March 28, 2008, at approximately 2:00 p.m., LOPEZ called HICKS on Target Phone 1 (call # 19888), and told him he might come by, and that HICKS had to have that "22" [$2200] for him [the balance of the purchase price for the kilo]. HICKS replied "all right." At approximately 7:21 p.m., LOPEZ called HICKS on Target Phone 1 (call # 19946), and said it was taking longer than he thought [to get the kilogram of cocaine for HICKS] and HICKS said, "they better come on."

136.    On March 30, 2008, at approximately 11:09 a.m., LOPEZ called HICKS on Target Phone 1 (call # 20224), and left a message telling him that he had not forgotten about HICKS and that he would be over about 6 o'clock and that he's got some "brand new shit" [meaning a new supply of cocaine].

137.    On March 31, 2008, at approximately 3:01 p.m., LOPEZ called HICKS on Target Phone 1 (call # 20407) and complained that HICKS didn't get his messages and told HICKS that he needed to talk to him. LOPEZ told HICKS that he got stuck with "three chevys" that "aren't woody" [3 kilos that are not of good quality]. LOPEZ said he had "15 dollars" [$15,000 of what HICKS had already given him] and promised to return it. LOPEZ said they should not meet on "the nickels" [Garfield Ave.] and that they should meet up "on the 9" by his crib.

138.    At approximately 7:23 p.m., LOPEZ called HICKS on Target Phone 1 (call # 20434) and told him that his female was behind him and asked if he should have her "roll up" because he wanted to holler at him. LOPEZ told HICKS that his female would roll up right there and so HICKS should have "Fam" [MASUCA] "on point" [waiting outside] and that HICKS could jump in with him [LOPEZ]. LOPEZ said he was about 5 minutes away. At approximately 7:32 p.m., LOPEZ called HICKS on Target Phone 1 (call # 20435) and said he was "hitting the block" right then. At approximately 7:34 p.m., MASUCA, who was using Target Phone 4, called HICKS on

Target Phone 1 (call # 20436), and asked where LOPEZ was. HICKS replied that he thought he was in a "black boy, a black truck you know?" MASUCA said he did not see him. At approximately 7:35 p.m., LOPEZ called HICKS on Target Phone 1 (call # 20439) and said he was "right by the crib." LOPEZ said he was not on the "nickel side", but that he was "on the 4" [W. 54th St]. LOPEZ told HICKS that he was "right in front of him" in a small brown car. LOPEZ told HICKS to hurry up because "she" was sitting there. At approximately 7:36 p.m., MASUCA, who was using Target phone 4, called HICKS on Target Phone 1 (call # 20443), and asked if LOPEZ was by "Old Girl's crib". HICKS said yeah. MASUCA said he could see him parked there and that he would be down there in a second. At approximately 7:37 p.m., LOPEZ called HICKS on Target Phone 1 (call # 20444) and told him to come on so that he could holler at him. HICKS said all right. Based on the content of these calls, I believe MASUCA met with "LOPEZ' girl" to take delivery of the kilogram of cocaine and HICKS got into the car to speak with LOPEZ.

139.    At approximately 7:39 p.m., a surveillance agent observed a black Chevrolet SUV, license plate 954-9675 driving south on Hoyne toward Garfield Boulevard. According to Illinois Secretary of State records, this license plate is associated with a 2002 Chevrolet Model Tahoe SUV, VIN: 1GNEK13Z22R204336, registered to Individual A and Individual B, 3512 W. Columbus Ave., Chicago, Illinois [SUBJECT VEHICLE C]. Surveillance agents followed the vehicle as it left the area. Surveillance agents observed that this vehicle had no front license plate. At approximately 7:49 p.m., agents conducted a traffic stop of this vehicle. When agents approached, the driver identified himself as UBEX LOPEZ and provided a driver's license consistent with this identity. The only other occupant of the vehicle was ISAIAH HICKS who was sitting in the front passenger seat. When asked who owned the vehicle, LOPEZ replied that

it belonged to Individual A, who was a friend of his. LOPEZ provided an insurance card for the vehicle in the name of Individual A and Individual B. Later that evening, after the traffic stop was concluded, a surveillance agent identified the driver as UBEX LOPEZ based on viewing a photograph of that individual from Illinois Department of Corrections as well as an Illinois Driver's License photograph. The agents who conducted the traffic stop were able to identify the voice of UBEX LOPEZ as the same as that of the person referred to as "Little Man" in the intercepted calls listed above.

### SANFORD TOWNSEND, JR. a/k/a "NOOK" and "4-5"

140.    During the course of the investigation, there were several intercepted calls indicating that TOWNSEND brokers transactions for HICKS. For example:

a.    On January 29, 2008, at approximately 6:22 p.m., TOWNSEND called HICKS on Target Phone 1 (call # 11797) and asked if "Bird" [IVORY WATSON] was in the crib and HICKS said he was not there. HICKS told TOWNSEND to call "Bird." TOWNSEND told HICKS that he had someone who wanted a "bizzle" [8-ball quantity of crack cocaine]. HICKS said he was going to call him and told TOWNSEND to hold on. At approximately 6:23 p.m., HICKS, who was using Target Phone 1, called IVORY WATSON (call # 11800) and asked him where he was. WATSON told HICKS that he was right there. HICKS told WATSON that "4-5" [TOWNSEND] wanted "a bizzle." WATSON asked if HICKS was at his house. HICKS said he was, and WATSON told HICKS he was coming over anyway. On this date, a surveillance agent who was conducting surveillance of HICKS at Lance's Gym, located on Iron St in Chicago, Illinois, interacted with TOWNSEND and identified his voice as the caller HICKS refers to as "4-5" or "Nook." In addition, on January 25, 2008, at approximately 10:16 a.m., HICKS, who was using Target Phone 1, had a conversation with TOWNSEND (call # 10727) during which

HICKS referred to TOWNSEND as "Sanford" and he responded "don't use my real name."

b.  On February 4, 2008, at approximately 7:47 p.m., TOWNSEND called HICKS on Target Phone 1 (call # 12739) and asked if "Bird" was "still good down there" [did WATSON have a supply of crack to sell?]. HICKS said no, that "Zook is the man" [MASUCA had drugs available]. TOWNSEND asked HICKS for MASUCA's phone number and explained that someone "came over and wanted one of 'em." At approximately 8:27 p.m., TOWNSEND called HICKS on Target Phone 1 (call # 12749) and asked if HICKS was going to come. HICKS replied no, that he was moving. TOWNSEND asked if he needed to see MASUCA. HICKS asked TOWNSEND if his customer was there, and TOWNSEND said, yeah. HICKS said "here he comes then" [MASUCA would come to him ]. TOWNSEND asked if HICKS wanted "a dollar" [$100] and HICKS said yeah. HICKS is overheard telling MASUCA, whose voice can also be heard in the background, to "put '4-5' in your phone – he wants something" [HICKS is instructing MASUCA to put TOWNSEND's phone number into MASUCA's cell phone]

c.  On February 27, 2008, at approximately 12:28 p.m., TOWNSEND, who was using Target Phone 1, called an unidentified female (call #15256) who told him that "old girl" wanted four "2's" and that she wanted two "nicks" [nickel bags]. TOWNSEND asked if she wanted him to send someone over. The unidentified female said yes, that he should "send someone right now" and that "she" [the person who wanted the "2's"] told her to call her back in 15 – 20 minutes." At approximately 12:35 p.m., HICKS, who was using Target Phone 1, called IVORY WATSON (call # 15259) and told him that "4-5's girl" is trying to do "one of you" right fast. At approximately 12:36 p.m., TOWNSEND, who was using Target Phone 1, called the unidentified female (call # 15263) and told her that a guy [WATSON] was sent on his way and that she should look out for him and that he will be in the "other" white car with the tint in the window

[based on surveillance information, WATSON drives a white Oldsmobile].

141.   On February 28, 2008, at approximately 10:16 a.m., TOWNSEND called HICKS on Target Phone 1 (call # 15407) and told him that "a couple of mother fuckers are short" [a few customers did not pay what they owed].  HICKS asked "on what, the business?"  TOWNSEND replied "yeah."  HICKS told TOWNSEND not to worry about it.  HICKS said he would handle it.

142.   On March 3, 2008, at approximately 1:19 p.m., HICKS, who was using Target Phone 1, called TOWNSEND (call # 15966) who told TOWNSEND "it's been hotter than a motherfucker" [police presence].  HICKS asked TOWNSEND about it still being "hot."  TOWNSEND said "hell, yeah."  TOWNSEND said that "Tine" had just seen two "crown vics" [police vehicles] this morning.  TOWNSEND told HICKS that INDIVIDUAL W said that HICKS should "be careful" because he got "miked on" [stopped by police] after he was dealing with HICKS.  HICKS said he was planning on doing that [being careful].  TOWNSEND suggested that HICKS change "both of them," [referring to HICKS' phone numbers] adding "even your main line [referring to Target Phone 1].  HICKS said he was worried that it [changing phone numbers] will "fuck with the people who's in the phone already."

### VINCENT STRAUGHTER a/k/a "VINO" and "DSKI"

143.   During the course of the investigation, several calls were intercepted which indicate that VINCENT STRAUGHTER a/k/a "VINO" and "DSKI" is a distributor who purchases "weight" quantities of crack cocaine from HICKS.

#### *March 6, 2008 Narcotics Transaction Involving VINCENT STRAUGHTER*

144.   On March 6, 2008, at approximately 10:14 a.m., HICKS, who was using **Target**

**Phone 1**, received a call from VINCENT STRAUGHTER a/k/a "VINO"[18] (call #16276), who was using (773) 416-6244, during which STRAUGHTER told HICKS that he [STRAUGHTER] wanted to make some money. HICKS replied that he didn't have anymore "raw Slosky". STRAUGHTER told HICKS he would take "whatever he got" because he "just needs to make these dollars real quick". HICKS repeated that he had no "raw slosky's" and that all he had was "hardball." STRAUGHTER replied "that's cool" and that he wanted to make the money and then told HICKS to give him the "Halsted". HICKS asked "what you got?" STRAUGHTER laughed and HICKS laughed and STRAUGHTER said "why don't' I just grab one and you front me one– you do that?" HICKS replied that he had a few "loose ends" and that he didn't have a problem with that. In this call, I believe HICKS informed STRAUGHTER that he didn't have any more powder cocaine ("raw slosky") and that all he had was crack cocaine ("hardball"). STRAUGHTER agreed to buy the crack cocaine because he needed to make some money. Then he asked HICKS if he would sell him one of a certain quantity and "front" him another.

145.    At approximately 10:57 a.m. that same day, HICKS, who was using Target Phone 1, and STRAUGHTER had another phone conversation (call # 16280) during which STRAUGHTER told HICKS to have MASUCA meet him [STRAUGHTER] at the Gyro's restaurant to complete the transaction. At approximately 10:57 a.m., HICKS, who was using Target Phone 1, had a conversation with STRAUGHTER (call #16281), during which he told STRAUGHTER to call when he got there because "it's too fucked up for him [MASUCA] to be outside like that." STRAUGHTER said he was "fittn to pull up in like 2 minutes." At approximately 11:00 a.m., HICKS, who was using Target Phone 1, called STRAUGHTER (call #16283), and asked if he was up there. STRAUGHTER replied that he was about to pull up. At

---

[18]    A discussion of the identification of STRAUGHTER is provided below in ¶ 147.

approximately 11:05 a.m., MASUCA, who was using Target Phone 4, called HICKS on Target phone 1 (call #16288), and said "he" [STRAUGHTER] wasn't up there yet.  HICKS said "hold on, let me call him."  At approximately 11:05 a.m., HICKS, who was using Target Phone 1, called STRAUGHTER (call #16291) and asked where he was.  STRAUGHTER replied that the person he was riding with wouldn't bring him over there, but that he was close.  At approximately 11:06 a.m., HICKS, who was using Target Phone 1, called MASUCA on Target Phone 4 (call #16292) and told him that STRAUGHTER wasn't ready so he should "put it up." At approximately 11:07 a.m., STRAUGHTER called HICKS on Target Phone 1 (call #16293), and said he was on his way to Gyro's and that he would be there in 2 minutes.  At approximately 11:08 a.m., STRAUGHTER had a conversation with HICKS on Target Phone 1 (call #16294), during which STRAUGHTER asked if he could get "it" for "12" [purchase the 63 gram quantity of crack cocaine for $1,200].  HICKS said he would "knock off" $50 and let him get it for $1,250, but that it should be $1,350.

146.    At approximately 11:10 a.m. that same day, surveillance agents observed a gold Chrysler, bearing Illinois license plate X401520, occupied by one black male, pull into the Gyro's parking lot.  According to Illinois Secretary of State records, this vehicle is registered to Vincent Straughter.  At approximately 11:10 a.m., HICKS, who was using Target Phone 1, called MASUCA on Target Phone 4 (call # 16296) and advised that STRAUGHTER was at the Gyro's restaurant in a gold Chrysler 300M.  Surveillance agents observed MASUCA walk into the parking lot and enter the gold Chrysler 300M.  At approximately 11:18 a.m., surveillance agents observed MASUCA exit the vehicle and walk westbound, back in the direction from which he came.  Based on this information and the context of the investigation, I believe MASUCA distributed two 63-gram quantities of crack cocaine to STRAUGHTER.

73

*March 12, 2008 Transaction Involving VINCENT STRAUGHTER*

147.    On March 12, 2008, at approximately 4:07 p.m., VINCENT STRAUGHTER called HICKS on Target Phone 1 (call # 17192) and told him that he wanted a "Halst-boy" [63 gram quantity of crack cocaine]. HICKS said they "got em good and hard for ya." HICKS told STRAUGHTER to call him when he got to the restaurant [Gyro's]. At approximately 4:19 p.m., STRAUGHTER called HICKS on Target Phone 1 (call # 17194) and told him that he was ready and that he was "right there." HICKS asked if he was in the truck. STRAUGHTER said no, that he was in the 300M, brown. At approximately 4:21 p.m., HICKS, who was using Target Phone 2, called MASUCA on Target Phone 4 (call# 0423) and told him that "Vino" [STRAUGHTER] was trying to get "one of you" [63 gram quantity of crack cocaine] and that he was in the brown 300 – Chrysler 300. MASUCA asked HICKS where STRAUGHTER was, and HICKS replied, "you know, Gyro's." HICKS told MASUCA to go take care of "Vino" right fast, and to call him when that was through so he could "fix the birds." At approximately 4:20 p.m., a surveillance agent observed a brown or gold colored Chrysler 300M park at the Gyro's restaurant. The agent then observed MASUCA walk in the alley and enter the 300M. At approximately 4:25 p.m., the agents observed MASUCA exit the vehicle and walk back into the alley. At approximately 4:36 p.m., agents observed MASUCA walk from the alley into the Gyros' parking lot and enter the 300M a second time. At approximately 4:37 p.m., agents observed MASCUA exit the 300M and walk back through the alley. Agents then observed the 300M exit the Gyro's parking lot. Agents followed the vehicle to where it parked in a parking space in front of a residence on Racine, Chicago, Illinois. Agents observed STRAUGHTER exit the vehicle and enter the residence at 5917 S. Racine. Agents identified STRAUGHTER based on viewing his driver's license photograph.

*March 31, 2008 Intercepted Calls and Surveillance*

148.   At approximately 2:45 p.m., VINCENT STRAUGHTER called HICKS on Target Phone 1 (call #20397), and asked if "its' cracking" over there. HICKS replied "you already know it." STRAUGHTER asked "what, Gyro's"[19] to find out where to meet. HICKS replied yeah. STRAUGHTER said he was "fittn to pull up to that boy in 2 minutes." HICKS, who was using Target Phone 1, then called MASUCA on Target Phone 4 (call # 20398) and told him that "VISKI" [STRAUGHTER] was coming to "holler at you" in a few minutes and that he wanted a Halsted [63 gram quantity of crack cocaine].

149.   At approximately 2:47 p.m., surveillance agents observed MASUCA walk through the alley connecting S. Hoyne Ave. to S. Seeley Ave. and get into a white Chevrolet Impala that was parked on S. Seeley Ave.

150.   At approximately 2:48 p.m., HICKS, who was using Target Phone 1, called STRAUGHTER (call # 20400) and asked if he was up there. STRAUGHTER replied "shit, I am right here." HICKS, who was using Target Phone 1, then called MASUCA on Target Phone 4 (call #20401), and told him that "he" [STRAUGHTER] is there right now. MASUCA replied, "where, at the Gyro's?" HICKS said yeah.

151.   At approximately 2:54 p.m., HICKS, who was using Target Phone 1, called MASUCA on Target Phone 4 (call #20402), and asked where he was. MASUCA replied that he was at Gyro's. HICKS asked if he has some money in his pocket. MASUCA replied that he did. HICKS told MASUCA to "get up with him when he gets back."

### COREY WILLIAMS a/k/a "FOUR"

---

[19]   Several transactions discussed herein take place in, around or near the Garfield Gyro's restaurant located at 2020 W. Garfield Blvd., Chicago, Illinois. Most of the subjects of the investigation refer to this restaurant as "Gyro's."

152.    During the course of this investigation, COREY WILLIAMS participated in ten controlled purchases of crack cocaine completed by the ATF undercover agent.

153.    On April 14, 2007, the U/C met with CI-1[20] and discussed a person CI-1 knows as a Four Corner Hustler gang member known as "Four." CI-1 stated that "Four" had sold crack cocaine to CI-1 for approximately six or seven months. CI-1 stated that "Four" lived with his girlfriend and children at 4521 S. Honore in Chicago, Illinois. CI-1 drove the U/C to that residence and the U/C observed as CI-1 had a conversation with the person he called "Four," who the U/C later identified as COREY WILLIAMS from a CPD photograph. CI-1 introduced the U/C to WILLIAMS as a drug trafficker and partner of CI-1. The U/C told WILLIAMS that he was interested in purchasing an "eight-ball" of crack cocaine. WILLIAMS told the U/C the price and stated: "I'll work with you, Joe."[21] WILLIAMS gave the U/C his cellular telephone number (773) 567-9379 (hereinafter "Williams Cell Phone 1") and his home telephone number (773) 475-6575 (hereinafter "Williams Home Phone 1") for future contact. After this initial introduction by CI-1, the U/C engaged in ten narcotics transactions directly with WILLIAMS over the course of the next 10 months.

*April 19, 2007 Controlled Buy of Narcotics*

154.    On April 19, 2007, at approximately 1:41 p.m., the U/C met with WILLIAMS to

---

[20]    CI-1 is a former low-level drug dealer with felony convictions for possession of a controlled substance, larceny and arson. CI-1 is familiar with numerous drug traffickers and street gang members operating in the Englewood area of Chicago, Illinois and was privy to many of their criminal activities. CI-1 has provided CPD and federal law enforcement agencies with information that has proven reliable and has formed the basis for numerous state search warrants which resulted in the recovery of guns and drugs. CI-1 is cooperating with ATF in exchange for payment and has been paid just over $1,000 by the ATF, and the ATF has also paid for the CI to use a cell phone while cooperating. CI-1 has also been paid by ATF for his cooperation in other cases.

[21]    Based on my experience as an agent and the experience of other agents, WILLIAMS used the name "Joe" as a colloquialism used to address a person not well known by the speaker, not because he believed the U/C's name was in fact "Joe."

conduct a controlled purchase of crack cocaine. This transaction had been previously arranged via a series of recorded telephone calls to (773) 567-9379 (hereinafter "Williams Cell Phone 1") and (773)475-6575 (hereinafter "Williams Home Phone 1") prior to the transaction. WILLIAMS gave the U/C a clear plastic bag containing an off-white rock-like substance in exchange for $150. During this undercover transaction, the U/C expressed interest in purchasing a large quantity of crack cocaine, specifically 63 grams (a "63"). WILLIAMS told the U/C that he would have to go through his supplier to sell the U/C this quantity of crack cocaine, and placed a telephone call in front of the U/C purportedly to his supplier. WILLIAMS stated "What's up cuz. You good cuzzo? Hey, how much you charge him for a 63, Joe? All right." WILLIAMS then told the U/C that his source told him that 63 grams of crack cocaine would cost about $1450 to $1500. Telephone records for Williams Cell Phone 1 show that the call the U/C observed WILLIAMS make on April 19, 2007 at 1:45 p.m. to his narcotics supplier was placed to Target Phone 1. In addition, WILLIAMS made statements implying that his narcotics source was his cousin. The substance purchased was later confirmed by DEA lab testing to be 1.1 grams of cocaine base. Based on the U/C's examination of the appearance of the drugs[1], the investigation to date, and my experience as an ATF agent investigating narcotics trafficking, I believe the substance is crack cocaine.

### April 26, 2007 Controlled Buy of Narcotics

155.    The U/C placed several recorded telephone calls to WILLIAMS in order to set up another narcotics transaction. On April 26, 2007, the U/C met with WILLIAMS to complete the

---

[1]  The U/C has participated in over 30 undercover purchases of crack cocaine, including resale quantities and, less frequently, personal use amounts. Based on the U/C's training and participation in undercover purchases of crack cocaine, he is experienced in the identification of crack cocaine, code words used to describe crack cocaine, as well as methods for the sale and distribution of crack cocaine.

purchase of approximately 63 grams of crack cocaine that they had agreed to in the earlier calls. WILLIAMS had explained to the U/C that they would need to travel to his drug supplier in the area of 54th and Damen (Chicago, Illinois) in order to make this purchase. At approximately, 12:44 p.m., the U/C met WILLIAMS at his residence at 4521 S. Honore, Chicago, Illinois. WILLIAMS entered the U/C's undercover vehicle, and he directed the U/C to the area of 2132 W. 54th Place. The U/C observed WILLIAMS place a telephone call to an individual, saying in essence "Man, I am on my way through the alley, man, you want me to come in and get it, chief? Hey Mal, I'm on my way through the alley right now, man. You want me to come in or do you want to bring shit out? Come on out Joe." Telephone records show an outgoing call was placed to (773) 419-5453, a cellular telephone number subscribed to by Jamal WASHINGTON and another individual.

156.    At approximately 12:59 p.m. on this same date, the U/C observed WILLIAMS place another cellular telephone call. WILLIAMS told the individual who answered the call "I am over here, man, tell that nigga to come outside with that 63, man. Here he come, I see him." Telephone records indicate that an outgoing call was placed from Williams Cell Phone 1 to Target Phone 1 at 12:59 p.m.   Based on this information, I believe WILLIAMS had called HICKS to let him know that WILLIAMS and the U/C were waiting outside for the drug delivery, and that during this call, WILLIAMS said he saw the runner, who was later identified as JAMAL WASHINGTON, coming with the drugs. ("Here he come, I see him.")

157.    At approximately 1:00 p.m. on this same date, WASHINGTON entered the U/C's vehicle. The U/C gave WILLIAMS $1,550.00 in United States Currency and the U/C observed WILLIAMS give this money to WASHINGTON.   After counting the money, WASHINGTON gave the U/C a clear plastic bag containing approximately 64 grams of an off-white rocklike

substance (suspect crack cocaine). WASHINGTON then gave WILLIAMS more money (amount unknown) and left the undercover vehicle. During this drug transaction, the U/C observed WILLIAMS receive a cellular telephone call. WILLIAMS answered the telephone call and said "Yeah, I'm fittn' to weigh it up now, Cuz. All right Chief." Telephone records for Williams Cell Phone 1 indicate that this call to Williams Cell Phone 1 originated from Target Phone 1 at 1:01 p.m. Based on this information, I believe WILLIAMS had spoken with HICKS to confirm that he had received the crack from WASHINGTON.

158.    The U/C subsequently viewed a photo made available from Chicago Police Department (CPD) records of JAMAL WASHINGTON. From this photograph, the U/C identified JAMAL WASHINGTON as the runner involved in this transaction. In addition, the substance recovered was forwarded to the DEA Lab for analysis which confirmed that the substance was cocaine base and the weight totaled 61.7 grams. Based on the U/C's examination of the appearance of the drugs, the investigation to date, and my experience as an ATF agent investigating narcotics trafficking, I believe the substance is crack cocaine.

### May 17, 2007 Controlled Buy of Narcotics

159.    On May 17, 2007, the U/C conducted another controlled purchase of crack cocaine with WILLIAMS. Similar to the April 26, 2007 transaction, during the course of this deal, phone calls were placed to and from WILLIAMS' cell phone to and from Target Phone 1 and Target Phone 2, which were believed to be used by HICKS, indicating that HICKS was supplying the crack cocaine for the deal. WASHINGTON served as the runner for this transaction as well. The substance recovered following this transaction was forwarded to the DEA Lab for analysis which confirmed the substance was cocaine base and the total weight was 63.4 grams. Based on the U/C's examination of the appearance of the drugs, the investigation to

79

date, and my experience as an ATF agent investigating narcotics trafficking, I believe the substance is crack cocaine.

### June 28, 2007 Controlled Buy of Narcotics

160.    On June 28, 2007, the U/C conducted a controlled purchase of crack cocaine with WILLIAMS. During the course of this transaction, telephone calls were placed to and from WILLIAMS' cell phone to Target Phone 2, which was believed to be used by HICKS. In addition, during the course of this transaction, the U/C observed WILLIAMS entering and exiting from the residence at 5358 S. Hoyne Ave., Chicago, Illinois, a residence associated with HICKS [SEARCH SITE A]. The U/C subsequently sent this substance that was recovered to the DEA Lab for analysis. DEA lab testing subsequently confirmed that the substance was 63.3 grams of cocaine base which also contained sodium bicarbonate. Based on the U/C's examination of the appearance of the drugs, the investigation to date, and my experience as an ATF agent investigating narcotics trafficking, I believe the substance is crack cocaine.

### July 25, 2008 Controlled Buy of Narcotics

161.    On July 25, 2007, the U/C conducted a controlled purchase of crack cocaine with WILLIAMS. During the course of this transaction, telephone calls were placed to and from a cellular phone used by WILLIAMS that he described as his wife's cell phone and Target Phone 1, indicating HICKS was the supplier of the crack cocaine for this transaction.

162.    CLIFTON HARALSON served as the runner for this transaction. After a series of calls involving WILLIAMS and Target Phone 1, the U/C observed a black male, who was later identified as CLIFTON HARALSON, walk up to the undercover vehicle. WILLIAMS opened the passenger door to allow HARALSON into the rear seat of the U/C's car. The U/C gave WILLIAMS $1,650 in United States Currency. WILLIAMS told HARALSON that he would be

80

right back and handed the money to HARALSON. HARALSON then gave the U/C a clear plastic bag containing an off-white, rocklike substance of approximately 65 grams in weight. HARALSON told WILLIAMS and the U/C to watch out for a black car he believed to be the police. I believe HARALSON was referring to one of the law enforcement surveillance vehicles being used to monitor the transaction.

163.    At approximately 1:29 p.m., WILLIAMS and HARALSON got out of the U/C's car and the U/C observed HARALSON give WILLIAMS an unknown amount of the cash.

164.    The U/C subsequently viewed a photograph available from CPD records of CLIFTON HARALSON and identified HARALSON, as the individual involved in the transaction described above. In addition, the U/C subsequently sent this substance that was recovered during the transaction to the DEA Lab for analysis. DEA lab testing subsequently confirmed that the substance was 63.5 grams of cocaine base. Based on the U/C's examination of the appearance of the drugs, the investigation to date, and my experience as an ATF agent investigating narcotics trafficking, I believe the substance is crack cocaine.

***August 29, 2007 Controlled Buy of Narcotics***

165.    On August 29, 2007, the U/C conducted a controlled purchase of crack cocaine with WILLIAMS.   Several calls were placed to and from a cellular telephone used by WILLIAMS and Target Phone 1, indicating HICKS was the supplier of the crack cocaine for this transaction. During the course of this transaction, WILLIAMS called the U/C and told him that his supplier did not have the "stuff" at his house and that he was going to meet the supplier at 55th and Ashland and that WILLIAMS should to meet up with the U/C "over that way."  Phone records show that, between 12:37 p.m. and 1:00 p.m. that same day, seven phone calls were placed between a cell phone used by WILLIAMS and Target Phone 1. WILLIAMS drove to 55th and Ashland and met with an unidentified person in a black Jaguar car bearing Illinois license plate, 135-458. According to Illinois Secretary of State records, this license plate is associated with a 1998 Jaguar Model  XK8, bearing VIN: SAJGX2247WC027422 and registered  to ISAIAH HICKS, 5358 S. Hoyne Ave., Chicago, Illinois [SUBJECT VEHICLE A].   After WILLIAMS met with the person in the Jaguar, surveillance officers observed the person in the Jaguar drive that car back to the residence at 5358 S. Hoyne Ave, where the car sat for a few moments without anyone getting out.  Then the person driving the Jaguar left that area.  Surveillance officers were unable to identify who was driving the Jaguar.

166.    At approximately 1:06 p.m., WILLIAMS called the U/C and told the U/C to come to 59th and Ashland.  At approximately 1:16 p.m., the U/C arrived at the area near 59th and Ashland, drove into the parking lot of a CVS store there, and parked next to WILLIAMS' car. WILLIAMS got into the U/C's car and gave the U/C approximately 65.1 grams of suspected crack cocaine.  The U/C gave WILLIAMS an additional $150 in United States Currency.

167.    The U/C subsequently sent this substance to the DEA Lab for analysis.  DEA lab testing subsequently confirmed that the substance was 61.3 grams of cocaine base. Based on the

U/C's examination of the appearance of the drugs, the investigation to date, and my experience as an ATF agent investigating narcotics trafficking, I believe the substance is crack cocaine.

**October 1, 2007 Controlled Buy of Narcotics**

168.    On October 1, 2007, the U/C conducted a controlled purchase of crack cocaine with WILLIAMS. During the course of this transaction, telephone calls were placed to and from a cellular telephone used by WILLIAMS and Target Phone 1, indicating HICKS was the supplier of the crack cocaine for this transaction. WASHINGTON served as the runner for this transaction.

169.    The U/C subsequently sent the substance recovered during the transaction to the DEA Lab for analysis. DEA lab testing subsequently confirmed that the substance was 62.8 grams of cocaine base, which also contained sodium bicarbonate. Based on the U/C's examination of the appearance of the drugs, the investigation to date, and my experience as an ATF agent investigating narcotics trafficking, I believe the substance is crack cocaine.

**November 8, 2007 Controlled Buy of Narcotics**

170.    On November 8, 2007, the U/C conducted a controlled purchase of crack cocaine with WILLIAMS. During the course of this transaction, phone calls were place to or from a cellular telephone used by WILLIAMS and Target Phone 3, another cellular telephone believe to be used by HICKS[22]. During the course of this transaction, the U/C observed WILLIAMS meet with a black male, who WILLIAMS referred to as his neighbor and who was later identified as INDIVIDUAL X. The U/C observed WILLIAMS and INDIVIDUAL X get into a white mini-van. Surveillance officers observed the mini-van drive to the area near 2132 W. 54th Place,

---

[22]  Target Phone 3 is a cellular telephone assigned telephone number (773) 503-4181 and Electronic Serial Number ("ESN") 03404201918, operated on the network of service provider U.S. Cellular, subscribed to by Rick Ross, 5350 S. Point Avenue, Chicago, Illinois, that was believed to have been used by HICKS.

which is also near the residence at 5358 S. Hoyne associated with HICKS. Once there, an

unidentified black male got into the vehicle and all three individuals returned to the area near

4521 S. Honore.  The U/C returned to 4521 S. Honore and parked on the street nearby behind

the white mini-van. WILLIAMS got out of that car and got into the U/C's car while the others

remained in the minivan. While in the U/C's car, WILLIAMS gave the U/C the "can safe" which

contained approximately 63.2 grams of off-white rock-like substance, suspect to be crack

cocaine.

171.    The U/C subsequently sent the substance that was recovered to the DEA lab for testing

which confirmed that the substance was 60.7 ounces of cocaine base.  Based on the U/C's

examination of the appearance of the drugs, the investigation to date, and my experience as an

ATF agent investigating narcotics trafficking, I believe the substance is crack cocaine.

***December 3, 2007 Controlled Buy of Narcotics***

172.    On or about December 1, 2007, at approximately 10:54 a.m., the U/C placed a

recorded phone call to WILLIAMS at a new home telephone number, (773) 417-4061

(hereinafter "Williams Home Phone 2").  INDIVIDUAL O answered and the U/C asked to speak

to "her man."  INDIVIDUAL O told the U/C that WILLIAMS could be reached at his mother's

house and she gave the U/C the phone number there.  Thereafter, INDIVIDUAL O and the U/C

had a phone conversation in which the U/C told her that he was trying to contact WILLIAMS

because he was "look'n to go to the store – hook up with him next week."  INDIVIDUAL O and

the U/C discussed money being "tight" and the U/C told her that's why he was selling drugs,

saying: "That's why you gotta hustle, that's why I am doing this."

173.    The U/C was unable to reach WILLIAMS at the phone number INDIVIDUAL O gave

him.  At approximately 11:02 a.m., the U/C called Williams Home Phone 2 again and spoke to

INDIVIDUAL O again who told the U/C she would get in touch with WILLIAMS, explaining:

"Cause he gonna get mad if he don't talk to you and shit." The U/C told INDIVIDUAL O, "tell

him I am look'n to go to the store, he knows I am trying to get my 63 – just let him know and he

can call me." INDIVIDUAL O told the U/C to hold on, then came back to the phone a short time

later. The U/C told her that "I was telling him about it before – he just didn't know what size and

all – tell him I'm looking for my 63 or whatever. He'll be good, just let him know – have him

call my phone." INDIVIDUAL O asked the U/C for his phone number and said she would have

him call him back.

174.    At approximately 11:20 a.m., the U/C noticed a missed call on his undercover cell

phone from (773) 715-4367. The U/C placed a recorded phone call to that phone number and

WILLIAMS answered. WILLIAMS told me: "Don't tell me you not coming for that piece, Joe.

He holding for you, actually passed up money." Based on the recent interactions between the

U/C and WILLIAMS in which the U/C had implied that he wanted to buy two 63's, the U/C

understood that WILLIAMS had heard from INDIVIDUAL O that he only wanted one 63, and

that WILLIAMS was disappointed that the U/C wanted to buy the lower quantity.

175.    On December 3, 2007, the U/C conducted a controlled purchase of crack cocaine with

WILLIAMS. During the course of this transaction, telephone calls were placed between a

cellular telephone used by WILLIAMS and Target Phone 1 and Target Phone 3. In addition,

during the course of this transaction, surveillance agents observed WILLIAMS meeting with an

unidentified black male who had emerged from the residence at 5358 S. Hoyne Ave. [SEARCH

SITE A].

176.    The U/C subsequently sent the substance recovered during the transaction to the DEA

Lab for analysis. DEA lab testing subsequently confirmed that the substance was 62.3 grams of

cocaine base, which also contained sodium bicarbonate. Based on the U/C=s examination of the appearance of the drugs, the investigation to date, and my experience as an ATF agent investigating narcotics trafficking, I believe the substance is crack cocaine.

***February 28, 2008 Controlled Buy of Narcotics***

177.    On February 27, 2008, at approximately 11:50 a.m., the U/C placed a telephone call to COREY WILLIAMS and told him that he wanted to purchase 63 grams of crack cocaine. According to phone records resulting from the interception of wire communications on Target Phone 1, two calls were placed from (773) 931-1226 [a telephone used by COREY WILLIAMS] to Target Phone 1 (call # 15236 at approximately 12:05 p.m. and call # 15244 at approximately 12:08 p.m.). However, HICKS did not answer and the caller did not leave a message. At approximately 12:11 p.m. that same day, HICKS, who was using Target Phone 1, placed a call to WILLIAMS (call # 15248), during which WILLIAMS informed HICKS that he (WILLIAMS) needed a "sixty-trey" [63-gram quantity of crack cocaine] the next day. WILLIAMS asked how much it would be and HICKS replied "1350" [$1,350], but it's really supposed to be "14" [$1400].

178.    On February 28, 2008, at approximately 12:28 p.m., the U/C called WILLIAMS and they agreed to meet at the CVS drug store located at 59th Street and Ashland Avenue to conduct the transaction. At approximately 12:32 p.m., surveillance agents observed a gold Ford Taurus parked at a gas station across the street from the CVS. At approximately 12:33 p.m., the U/C met with WILLIAMS in the CVS parking lot in the U/C's vehicle. The U/C gave WILLIAMS $1,900 in United States Currency. At approximately 12:34 p.m., surveillance agents observed WILLIAMS exit the CVS parking lot in the gold Taurus.

179.    At approximately 12:37 p.m. that same day, a call was placed from WILLIAMS' cell

phone to Target Phone 1, however, HICKS did not answer the phone and the caller did not leave a message. At approximately 12:38 p.m., WILLIAMS called HICKS on Target Phone 1 (call# 15445) and told him "I'm ready Cuz," indicating he was ready to complete the transaction they had discussed the prior day. HICKS responded, "Hold on, hold on. I'm fixing to call your phone right now." At approximately 12:40 p.m., HICKS, who was using Target Phone 2, called WILLIAMS (call #0022) and asked where he was. WILLIAMS stated that he was "right here on 57th and Ashland." HICKS asked WILLIAMS if he knew where the Gyro's restaurant was on 55th and Seeley. HICKS gave WILLIAMS further directions and told WILLIAMS to call him when he got there [to Gyro's].

180.    At approximately 12:41 p.m. that same day, surveillance agents observed the gold Ford Taurus pull into the parking lot of the Gyro's restaurant located at Seeley and Garfield Avenues. At approximately 12:48 p.m. WILLIAMS called HICKS on Target Phone 1 (call # 15450) and told him that he [WILLIAMS] had arrived at the restaurant. HICKS told him to "stay right there." At approximately 12:48 p.m., HICKS, who was using Target Phone 2, called MASUCA, who was using Target Phone 4 (call # 0023), and asked if he knew his [HICKS'] cousin who used to be in a Taurus. MASUCA replied "Mmmm." HICKS further explained, "that beige, brown Taurus." MASUCA replied affirmatively and HICKS said his cousin was trying to get "one of you" right fast. At approximately, 12:55 p.m. MASUCA called HICKS on Target Phone 1 (call # 15454) and asked, "you said he up there in Gyro's in the Taurus, right?" HICKS replied "Yeah, he up there." MASUCA stated, "Yah, I see him, he right here."

181.    At approximately 12:53 p.m. that same day, surveillance agents observed WILLIAMS meet with MASUCA in the parking lot of the Gyro's restaurant. At approximately 12:57 p.m., WILLIAMS called the U/C and told the agent that he [WILLIAMS] was on his way back to the

CVS parking lot. Surveillance agents then observed WILLIAMS drive into the CVS parking lot, exit the car with a bag in his hand and get into the U/C's vehicle. WILLIAMS gave the U/C a bag containing approximately 63 grams of a chunky, white substance that is suspect crack cocaine. This substance was subsequently sent to the DEA lab for testing and was confirmed as 59.5grams of cocaine base which also contained sodium bicarbonate. Based on the U/C's examination of the appearance of the drugs, the investigation to date, and my experience as an ATF agent investigating narcotics trafficking, I believe the substance is crack cocaine.

### JAMAL WASHINGTON a/k/a "MAL"

182. In addition to his direct involvement in controlled purchases of crack cocaine on April 26, 2007, May 17, 2007 and October 1, 2007 made by the U/C as outlined above (See ¶¶ 156 – 158, 159, and 168 above), there have been intercepted calls which indicate that, WASHINGTON serves as one of HICKS' runners and also brokers transactions for HICKS.

183. On January 26, 2008, at approximately 12:48 p.m., WASHINGTON called HICKS on Target Phone 1 (call # 11045) and told him that he was with an individual who wanted "two of them things." At approximately 12:53 p.m., HICKS, who was using Target Phone 1, had a conversation with WASHINGTON (call # 11050) and HICKS told WASHINGTON that he was on his way right now. At approximately 12:54 p.m., MASUCA called HICKS on Target Phone 1 (call # 11052) and said he was there. HICKS told MASUCA that he was sending another individual [a customer] to Gyro's. At approximately 12:54 p.m., HICKS, who was using Target Phone 1, called WASHINGTON (call # 11054) and asked what kind of car the customer was in. WASHINGTON said he was in a black one, like a black, four-door Riviera. At approximately 12:54 p.m., HICKS, who was using Target Phone 1, called MASUCA (call # 11055), and told him "the guy is in a black four-door Riviera" in the Gyro's lot. MASUCA said he didn't see a car

like that. At approximately 1:06 p.m., WASHINGTON called HICKS on Target Phone 1 (call # 11073) and told him that he was at Gyro's. At approximately 1:07 p.m., HICKS, who was using Target Phone 1, called MASUCA (call # 11075) and told him that they are at the Gyro's right now. At approximately 1:11 p.m., HICKS, who was using Target Phone 1, called an unidentified individual and asked where he was. He told HICKS "we all good, we just got in touch with him [MASUCA]." HICKS said okay.

184.    On February 21, 2008, at approximately 9:30 p.m., WASHINGTON called HICKS on Target Phone 1 (call # 15109) and asked if he had a "trey" [63 gram quantity of crack cocaine]. HICKS told WASHINGTON that he would have to wait until Ahmad [AHMAD WILLIAMS] got back. WASHINGTON said he would come see HICKS. HICKS said he was at his "old girl's" [SEARCH SITE A]. WASHINGTON said he had "5 dollars" left. HICKS said, to give him about ten minutes and he would have it.

185.    During the course of the investigation there have been intercepted calls which indicate that WASHINGTON possesses firearms:

    a.    On March 29, 2008, at approximately 3:43 p.m., HICKS, who was using Target Phone 1, called WASHINGTON (call # 20093) and asked WASHINGTON if he still had "that click, still has some more of that goddamnit [gun], goddamnit man?" WASHINGTON said, yeah, that he was "fittin to come around the corner right now."

    b.    On April 22, 2008, at approximately 12:57 a.m., WASHINGTON called HICKS on Target Phone 2 (call # 2392). HICKS instructed WASHINGTON to "just bring the goddamnit [gun] so he can know when he see (unintelligible) he got to respect it."

### GLENN ISLAND a/k/a "BABY DOUGH"

186.    During the course of the investigation, several calls were intercepted which indicate

that **GLENN ISLAND** a/k/a "BABY DOUGH" is a distributor who purchases "weight" quantities of crack cocaine from HICKS.

187.    On March 27, 2008, at approximately 9:16 p.m., HICKS, who was using Target Phone 1, called ISLAND[23] (call # 19787) who told HICKS that his phone was messed up and that he was going to send his girl to him for a "halsted" [63 gram quantity]. HICKS said he would have "his man" make it for him right now. ISLAND told HICKS he would give his girl's number to HICKS and that she would call him from a "331 number." At approximately 9:30 p.m., ISLAND called HICKS on Target Phone 1 (call # 19793) and told him that "she" was on her way right now and would pull up in "a hot minute."

*April 2, 2008 Transaction Involving GLENN ISLAND*

188.    On April 2, 2008, at approximately 4:05 p.m., GLENN ISLAND called HICKS on Target Phone 1 (call # 20700) and said that he wanted to "go through there and holler at one of them people over there" [buy some narcotics]. HICKS said "that's still decent – you want to bust a move right?" ISLAND said yeah. ISLAND advised HICKS that he was going to pick up his kids. HICKS asked ISLAND when he wanted to go. ISLAND replied "right now" because he was "dead as hell" [had no narcotics to sell] and that people were "hitting his phone" [calling to buy narcotics]. HICKS told ISLAND to wait 20 minutes. ISLAND told HICKS he would bring the "bread with him" [money owed for previous narcotics purchases from HICKS]. ISLAND asked HICKS if he was going to be there in 20 minutes. HICKS replied, "no, Zook [MASUCA], you know who takes care of that."

189.    At approximately 5:00 p.m., a surveillance agent observed a white Chevrolet Malibu pull in front of the residence at 5437 S. Hoyne Ave [SEARCH SITE B]. There was an adult

---

[23]    A discussion of the identification if ISLAND is outlined below in ¶ 190 below.

driving the car and there were children inside the car.

190.   At approximately 5:09 p.m., ISLAND called HICKS on Target Phone 1 (call # 20708) and told him that he was outside. HICKS asked "outside where, on the 4 [W.54th St]?" ISLAND said yeah. HICKS told ISLAND to go park towards the L&M joint and to call when he got there. At approximately 5:10 p.m., HICKS, who was using Target Phone 2, called MASUCA on Target Phone 4 (call #0892), and told him that "Baby Dough/Baby Joe" is "fittn to come down there by your joint" and that he was "ready for that thing." MASUCA said all right. At approximately 5:12 p.m., ISLAND called HICKS on Target Phone 1 (call # 20710) and told him that he was outside. HICKS, who was using Target Phone 2, called MASUCA on Target Phone 4 (call # 0893) and told him that "he's out there now" and that "he's out there right now in front of yo' joint." At approximately the same time, a surveillance agent observed MASUCA exit the residence at 5437 S. Hoyne Ave. [SEARCH SITE B] and walk up to a white Malibu. The agent observed a hand-to-hand transaction between MASUCA and the driver of the white Malibu who was later identified by the surveillance agent as GLENN ISLAND based on viewing his driver's license photograph. The cellular telephone ISLAND is known to use is also subscribed in the name of Glenn Island.

***May 2, 2008 Transaction***

191.   On May 2, 2008, at approximately 8:03 p.m., HICKS, who was using Target Phone 2, called ISLAND (call # 3479). ISLAND said "9 dollars [$900], right?" HICKS laughed and said "he's good." ISLAND said he was going to "grab one" and asked HICKS if he would "throw a motherfucker one?" [ISLAND wants to buy a 63 gram quantity and have HICKS "front" him another 63-gram quantity]. HICKS said, yeah, go on ahead. ISLAND said that he didn't have "Zook's" [MASUCA's] number and asked HICKS to give MASUCA his number and to have

MASUCA to call ISLAND right now.  HICKS directed ISLAND to the cleaners [at 55th and S.

Seeley Ave.] to meet MASUCA.  ISLAND said he need to "holler at him in person."  HICKS

said "he was already gone."  ISLAND said he would come holler at him where he was.  HICKS

said to call when he got up there.  At approximately 8:50 p.m., ISLAND called HICKS on Target

Phone 2 (call # 3480).  HICKS asked if he was at the cleaners.  ISLAND said he was.  At

approximately 8:51 p.m., HICKS, who was using Target Phone 2, called MASUCA on Target

Phone 4 (call # 3482) and told him that "Baby Dough" [ISLAND] is "over there" and needs "2

of you" [(2) 63-gram quantities].  At approximately 8:55 p.m., ISLAND called HICKS on Target

Phone 2 (call # 3483) and asked if he hollered at him yet.  HICKS said, "you good, he coming."

ISLAND asked if "he" [MASUCA] knew that he [ISLAND] was going to pick up "two of them

amounts."  HICKS said yeah.

192.    Between approximately 9:01 p.m. and 9:07 p.m., there were a series of calls among

HICKS, using Target Phone 2, MASUCA, using Target Phone 4, and ISLAND (call #'s 3489,

3491, 3498, 3501, 3503) during which MASUCA and ISLAND were trying to find each other.

At approximately 9:07 p.m., HICKS, who was using Target Phone 2, called MASUCA on Target

Phone 4 (call # 3504) and said "here he comes right now" [referring to ISLAND] and asked

MASUCA if he saw him.  MASUCA replied that he did.  At approximately 9:17 p.m., ISLAND

called HICKS on Target Phone 2 (call # 3510).  ISLAND told HICKS that he was "good."

ISLAND said he was going to come holler at HICKS and asked that he give him a minute.

Based on the content of these calls, I believe MASUCA completed the transaction for two 63-

gram quantities of crack cocaine with ISLAND.

193.    On May 7, 2008, at approximately 5:25 p.m., ISLAND called HICKS on Target Phone

1 (call # 25762) and told him that he was waiting outside [at the Home Depot].  HICKS said to

"give him 5 – 10 minutes." ISLAND said "damn, G" and complained that he had someone waiting for him then. HICKS told ISLAND "Tasha is coming now." HICKS is then heard in the background telling someone to get the money from "Baby Dough."

### TAMEKA GRANT a/k/a "MEKA"

194.    During the course of the investigation, several calls were intercepted which indicate that TAMEKA GRANT is a distributor who purchases "weight" quantities of crack cocaine from HICKS.

195.    On February 16, 2008, at approximately 2:17 p.m., a female caller using (312) 320-7650, who referred to herself as "Mika" and who was later identified as TAMEKA GRANT (see ¶¶ 198 - 199 below), called HICKS on Target Phone 1 (call # 14492) and told him that she was at 63rd and Ashland and that she needed an "o" [ounce]. HICKS said okay. At approximately 2:32 p.m., the GRANT, again using (312) 320-7650, called HICKS on Target Phone 1 (call # 14494) and said that she was at Gyro's. HICKS told her that he was down in New Orleans but that he would take care of her. At approximately 2:37 p.m., GRANT, again using (312) 320-7650, called HICKS on Target Phone 1 (call # 14495) and said "here he come, baby." The caller told HICKS that she was not rushing him, but that she was on house arrest and needed to be home before 4:30 [p.m.]. HICKS said "he's coming Boo."

196.    On February 18, 2008, at approximately 11:08 a.m., GRANT, using (312) 320-7650, called HICKS on Target Phone 1 (call # 14565) and told him the she needed to "get right" [purchase some narcotics]. HICKS told her to "go on" adding "Zook [MASUCA] got ya." GRANT is overheard asking a person in the background if they want an "ounce," and then relays to HICKS that she needs a "6-3" [63-grams] and an "ozone" [ounce]. HICKS told her to "come on." GRANT told HICKS that she was going to leave right then and that HICKS should tell his

runners that she was on house arrest so they should please "be on point" [not take too long].

HICKS said "OK, baby." At approximately 1:05 p.m., GRANT, using (312) 320-7650, called

HICKS on Target Phone 1 (call # 14570) and told him that she was "up north" now and that he

should have "him" [the runner] ready because she had to be back at her house by 4 [p.m.].

GRANT added, "make it 'two and a lick' and a half." HICKS asked "make it who?" She

replied "I want the 6-3 [63-grams] and a half [ounce] instead of the 'o' [ounce]." HICKS said

OK. At approximately 1:34 p.m., GRANT, using (312) 320-7650, called HICKS on Target

Phone 1 (call # 14571), and told HICKS that she was at Damen and was about to pull up on

Seeley adding that she didn't want to go to the Gyro's, that she was going to "pull up on the

block." HICKS said OK.

197.    According to an interview conducted with an IDOC representative on February 18,

2008, TAMEKA GRANT was on parole to 427 9th Street, Rockford, Illinois. The officer

indicated that GRANT was on electronic monitoring and was required to be in her home at 4:00

p.m. daily. The officer advised that, according to IDOC records, on February 16, 2008, GRANT

had called to notify IDOC that she would be about 30 minutes late getting home. Law

enforcement records show that GRANT has ties to the Englewood neighborhood of Chicago.

According to those records, GRANT has reported 5437 S. Winchester, Chicago, Illinois as her

residential address in the past. In addition, GRANT's driver's license is listed to her at 5527 S.

Winchester, Chicago, Illinois.

198.    On March 6, 2008, a law enforcement agent was present at the Rockford North Parole

Office when GRANT was brought there. The agent observed GRANT and had the opportunity

to hear her speaking with the parole agent for several minutes. After listening to the intercepted

phone calls outlined above, the agent identified GRANT as the female caller in the above listed

calls. According to Rockford Police Department records, GRANT was arrested by the Rockford Police on February 29, 2008 and Johnnie Lavell Young provided $365 in bond money to secure her release.

### *February 27, 2008 Transaction with GRANT*

199.    On February 27, 2008, at approximately 10:11 a.m., HICKS, who was using Target Phone 1, spoke with TAMEKA GRANT, who was using 815-601-3632 (call #15216), who told HICKS she was on her way and would be there in an hour and a half. At approximately 12:19 p.m. that same day, HICKS spoke with GRANT again (call # 15253) and GRANT advised that she would meet him in about 45 minutes. At approximately 12:49 p.m., HICKS, who was using Target Phone 1, spoke with MASUCA, who was using Target Phone 4 (call # 15266) HICKS told MASUCA that she [GRANT] would be there in about 20 to 30 minutes. At approximately 1:18 p.m., HICKS, who was using Target Phone 1, spoke to GRANT (call # 15274) who told him that she was "right here on Damen, fittin' to go on Seeley". At approximately 1:19 p.m., HICKS, who was using Target Phone 1, called MASUCA on Target Phone 4 (call #15276), and told him that GRANT was there by Gyro's, and that she wanted a "Halsted." At this same time, ATF surveillance officers observed a white Taurus bearing Illinois license plate X370091drive northbound onto Seeley and park just north of the Gyro's restaurant. Agents observed MASUCA as he walked over to the white Taurus and got into the car on the rear passenger side. Agents then observed MASUCA emerge from the car and return in the direction from which he came. Surveillance officers then observed the white Taurus leave the area traveling northbound on Seeley. Based on upon the content of the series of calls leading up to this meeting, I believe a MASUCA distributed 63 grams of crack cocaine to GRANT. Surveillance officers followed the white Taurus and observed as it pulled into a Shell gas station located at Garfield and Halsted

where it parked at a gas pump. Surveillance officers observed that a black female in her 30's was driving the vehicle, and that a young black female (approximately 18 years hold) was in the front passenger seat, with a baby in a baby seat in the rear seat. Surveillance agents identified GRANT as the driver of the vehicle based on viewing the IDOC photograph of Tameka GRANT.

### February 29, 2008 Narcotics Transaction with TAMEKA GRANT

200. On February 29, 2008, at approximately 1:07 p.m., GRANT called HICKS on Target Phone 1 (call # 15587) and told him that she was out in Dolton, but that she would be there in about 20 minutes. HICKS said OK. At approximately 1:21 p.m., HICKS, who was using Target Phone 1, called MASUCA on Target Phone 4, and told him that "Meka" [GRANT] "is fittn to pull up in 20 to 30 minutes." HICKS added, "you know, V's girl, V's sister." MASUCA replied that he knew her. HICKS said he just wanted to let him know to be on point [be ready to deliver narcotics to her]. At approximately 1:30 p.m., HICKS, who was using Target Phone 1, called GRANT (call # 15622) and asked if she was "right there." GRANT replied "I'm right here." At approximately 1:30 p.m., a surveillance agent observed the white Ford Taurus previously used by GRANT on the 5400 block of S. Seeley Avenue near the Gyro's restaurant. At approximately 1:31 p.m., HICKS, who was using Target Phone 1, called MASUCA on Target Phone 4 (call # 15625) and told him that GRANT was out there and to be careful. HICKS then answered Target Phone 2 and could be heard in the background saying "okay Mek." HICKS told MASUCA to be careful. At approximately 1:34 p.m., a surveillance agent observed MASUCA in the parking lot of the Gyro's restaurant and saw him get into the white Taurus driven by GRANT. At approximately 1:36 p.m., a surveillance agent observed MASUCA exit the white Taurus and saw the Taurus then exit the parking lot. At approximately 1:40 p.m.,

MASUCA, who was using Target Phone 4, called HICKS on Target Phone 1 and told him that he had met with Meka.

### March 8, 2008 Narcotics Transaction

201.    On March 8, 2008, at approximately 8:26 p.m., HICKS, who was using Target Phone 1, received a call from TAMEKA GRANT a/k/a "MEKA", who was using (312) 320-7650 (call #16674), during which GRANT told HICKS that her little sister was going to meet up with HICKS. At approximately 8:54 p.m., GRANT called HICKS (call # 16766) to say that her sister was going to pull up over there "right now". At approximately 8:55 p.m., HICKS called GRANT (call # 16768) and asked if she (GRANT's sister) was coming in the same car to which GRANT replied, "yeah my car the Taurus". At approximately 8:56 p.m., HICKS, who was using Target Phone 2, called MASUCA on Target Phone 4 (call # 0347) and told him that Vell's sister Meka has a "hommie" that is coming up there for "one of you" [63 gram quantity of crack cocaine]. MASUCA said "OK" and HICKS told him "same Taurus and everything."

202.    At approximately 8:55 p.m., surveillance agents observed the white Taurus bearing Illinois license plate X370091 park on the west side of Seeley just north of the Gyro's restaurant. A short time later, agents observed MASUCA walk to the driver's side of the car and meet with the driver. Surveillance agents then observed MASUCA leave the area, returning in the direction from which he came, and the Taurus left as well, driving northbound on Seeley. Law enforcement officers conducted mobile surveillance of the Taurus. At approximately 9:00 p.m., officers conducted a traffic stop after observing that the vehicle did not have properly functioning break lights. The driver was identified as INDIVIDUAL FF. There were three other individuals in the car as well. INDIVIDUAL FF told the officers making the stop that the vehicle was registered to her sister, "Shamika Mason."

203.    At approximately 9:10 p.m., MASUCA, using Target Phone 4, called HICKS on Target Phone 2 (call #0348), and told him that the "shit is real short." Based on the context of the investigation, MASUCA is believed to be referring to the payment given to him by GRANT's sister [INDIVIDUAL FF ] for the purchase of narcotics. MASUCA told HICKS that they gave him $670. HICKS said he would call her. At approximately 9:11 p.m., HICKS, who was using Target Phone 2, called MASUCA on Target Phone 4 (call # 0351) and asked how much?[how much money had GRANT's sister given him]. MASUCA replied $670.

204.    At approximately 9:11 p.m., HICKS, who was using Target Phone 1,  called GRANT (call # 16771) and told her that he gave her sister a "63"and asked if that was what her sister was trying to get. GRANT told HICKS that she was trying to get an "O". HICKS told her to bring the "63" back because it was the "wrong thing." GRANT told HICKS that the police had pulled her little sister over and that she was scared and that she was going to leave "that" at her grandma's house. GRANT said that her sister didn't want to ride back because her back light was out, or something and they pulled her over – but they didn't search her. GRANT told HICKS that she could "get it down there" [return the narcotics her sister had picked up]. GRANT asked HICKS what he wanted to do. HICKS said to let him know [when she could return the narcotics] "so they can run the right thing" [so he can give her the right quantity]. At approximately 9:14 p.m., HICKS, who was using Target Phone1, called MASUCA on Target Phone 4 (call # 16772) and told him "she" [GRANT] was "gonna call him right back, she already knows to come right back" [to exchange the narcotics for the correct quantity]. HICKS instructed MASUCA to "get a zip [ounce] ready, 8 birds, 8 of birds." MASUCA said allright.

205.    At approximately 9:48 p.m., GRANT called HICKS on Target Phone 1 (call # 16775) and told him that "her little sister" was "scared as hell" and that she [her little sister] was going

to leave "it" [the narcotics] at her grandma's house and that GRANT would have to leave

Rockford to come down there. GRANT said that the police scared her sister and that the "63 is

safe at her grandma." GRANT said she would "come up there" the next day to pay him or give

part of it back because her house arrest would be over then.

***April 2, 2008 Transaction***

206.    Based on the content of intercepted telephone calls, GRANT participated in

transaction with IVORY WATSON on April 2, 2008 (see ¶¶ 89 - 91 above).

## JOHNNIE LAVELL YOUNG a/k/a "VILLE" and "VELL"

207.    During the course of the investigation, several calls were intercepted which indicate

that JOHNNIE LAVELL YOUNG a/k/a "VILLE" and "VELL" is a distributor who purchases

"weight" quantities and also brokers transactions with other customers.

208.    On February 2, 2008, at approximately 9:34 a.m., HICKS, who was using Target

Phone 1, received an incoming call from MASUCA on Target Phone 4 (call # 12388).

MASUCA told HICKS that James "VILLE" came up short. MASUCA said "VILLE" came up

with $1280. MASUCA said that he'll patch it up with his money but HICKS said that he'll

patch it up. HICKS said that as long as MASUCA keeps track of the shorts like that, at the end

we'll get those 63's, we'll know where everything. In this call, I believe MASUCA told HICKS

that YOUNG was an amount of money short when he paid MASUCA for the drugs. HICKS

explained to MASUCA that this is okay, as long as each time an individual is "fronted"

(extended credit in lieu of payment at time of delivery) drugs, he [MASUCA] writes it down and

keeps track of it.

***March 1, 2008 Seizure of Crack Cocaine From YOUNG.***

209.    On March 1, 2008, at approximately 5:01 p.m., HICKS, who was using Target Phone

1, spoke with YOUNG[24] (call #15751) who asked if he could stop by that night.  YOUNG asked

HICKS if he had any "soft thing" [powder cocaine] and HICKS said he did not."  YOUNG told

HICKS that he was "fittn to come up there."

210.    On March 1, 2008, at approximately 11:06 p.m., Illinois State Police officers

conducted a traffic stop of a 1981 white Ford LGB model driven by YOUNG.  YOUNG advised

that he did not have a driver's license and was placed into custody.  Illinois State Police officers

conducted a search incident to arrest during which they recovered a quantity of marijuana, two

marijuana cigars, a plastic bag containing 10 colored pills (suspect ecstasy).  During a

subsequent inventory search of the vehicle, officers also recovered two clear plastic bags

containing over 80 grams of a white chunky substance (suspect crack cocaine).  According to

law enforcement records, YOUNG was released on bond to electronic monitoring at the address

of 5627 S. Winchester, Chicago, Illinois.  The substance recovered was later confirmed by DEA

lab testing to be 78.6 grams of cocaine base which contained sodium bicarbonate.  Based on the

U/C's examination of the appearance[25] of the drugs, the investigation to date, and my experience

as an ATF agent investigating narcotics trafficking, I believe the substance is crack cocaine.

### March 6, 2008 Transaction

211.    On March 6, 2008, at approximately 1:40 p.m., JOHNNIE LAVELL YOUNG called

HICKS on Target Phone 1 (call # 16323) and left a voicemail asking for HICKS to call him back

saying "I need you."  At approximately 1:48 p.m., HICKS, who was using Target Phone 1, called

YOUNG (call #16327) who told HICKS that he was on house arrest.  YOUNG asked HICKS if

---

[24]  A discussion of the identification of YOUNG is outlined below in ¶¶ 210 – 211.
[25]   The U/C has participated in over 30 undercover purchases of crack cocaine, including resale
quantities and, less frequently, personal use amounts.  Based on the U/C's training and
participation in undercover purchases of crack cocaine, he is experienced in the identification of
crack cocaine, code words used to describe crack cocaine, as well as methods for the sale and
distribution of crack cocaine.

he was good, if he "got something." HICKS replied yeah. YOUNG told HICKS that he had

gotten "bumped" [arrested] with 83 grams [of crack] on the expressway when he was going to go

back to the crib the other day. YOUNG said he was going to send his "old lady" to get "one of

them things." YOUNG told HICKS that his bond amount was $100,000, with $10,000 to "walk"

[be released from jail]. YOUNG said he is going to have to have "her" [his "old lady"] "do it for

a minute while he is on house arrest" [his girlfriend is going to pick up narcotics for him since he

is on house arrest]. YOUNG said, they are "up her already" [in Chicago] and is on 56th and

Winchester [consistent with the address of his electronic monitoring]. [HICKS told YOUNG to

have his "old lady" go to the Gyro's. YOUNG said he would call HICKS when he got the money

together.

212.     That same day, at approximately 3:33 p.m., YOUNG called HICKS on Target Phone 1

(call # 16343) and left a voicemail stating that "she" will be on her way over there in 10 to 15

minutes. At approximately 3:34 p.m., HICKS, who was using Target Phone 1, called YOUNG

(call # 16346) and YOUNG told him that "she" is on her way over in 10 minutes and that he will

have her call HICKS when she is on her way. At approximately 4:05 p.m., HICKS, who was

using Target Phone 1, placed a call to (815) 991-0674 (call # 16349). The female who answered,

who was later identified as INDIVIDUAL Y, said she was "V's girl" and that she was currently

getting gas and then she was going to come to HICKS. HICKS asked her to call when she is at

the location. At approximately 4:05 p.m., a surveillance agent observed INDIVIDUAL Y

pumping gas at the Citgo gas station located at the northwest corner of 55th and Damen.

INDIVIDUAL Y was driving the white Ford Taurus bearing Illinois license plate X370091 [the

same white Taurus used by GRANT during the February 27, 2008 and used by INDIVIDUAL

FF in the March 8, 2008 transaction discussed above].

213.　　At approximately 4:10 p.m., INDIVIDUAL Y called HICKS on Target Phone 1 (call # 16351) and told HICKS that she was up there now. HICKS said "here he comes, baby." At approximately 4:10 p.m., a surveillance agent observed INDIVIDUAL Y drive into the parking lot at Gyro's restaurant. At approximately 4:16 p.m., MASUCA called HICKS on Target Phone 1 (call # 16353) and asked HICKS "where she at, Gyro's?" HICKS said that she probably was there or is on the side block, and stated that she was in a white Taurus. At approximately 4:15 p.m., surveillance agents observed a green Saturn pull up next to the white Taurus and MASUCA was seen as he exited the Saturn and got into the Ford Taurus. At approximately 4:16 p.m., surveillance agents observed MASUCA exit the Ford Taurus and re-enter the green Saturn. The white Taurus then drove out of the parking lot. Agents conducted mobile surveillance of the vehicle. At approximately 4:17 p.m., HICKS, who was using Target Phone 1, called MASUCA on Target Phone 4 (call # 16356) and asked MASUCA if he saw her. He replied that he did.

214.　　At approximately 4:55 p.m., surveillance agents observed INDIVIDUAL Y exit a residence at 5627 S. Winchester and get into the Ford Taurus with an unidentified black female. Agents observed INDIVIDUAL Y drive away in the Taurus. At approximately 5:00 p.m., agents conducted a traffic stop of the vehicle because its tail lights were non-functional. Agents identified the driver as INDIVIDUAL Y following a field interview.

*March 19, 2008 Transaction*

215.　　On March 19, 2008, at approximately 4:27 p.m., JOHNNIE LAVELL YOUNG a/k/a "VELL" called HICKS on Target Phone 1 (call # 18240) and informed him that he was sending his girl over to Gyro's to pick up the "trey." At approximately 6:16 p.m., YOUNG called HICKS again on Target Phone 1 (call # 18253) to say that his girl would be at Gyro's in about 15 minutes. At approximately 6:17 p.m., HICKS, using Target Phone 2, called MASUCA on

Target Phone 4 (call # 0615) and told him that "Old Girl" [Vell's girl] is going to be up there "where Vell's people always come " [Gyro's restaurant]. MASUCA asked "in 10 or 15 minutes?" HICKS replied "no more than 15 minutes." At approximately 6:39 p.m., YOUNG called HICKS on Target Phone 1 (call # 18264) and told him his girl got a ride. At approximately 6:43 p.m., YOUNG called HICKS on Target Phone 1 (call # 18265) and told him that she was "up there" [at Gyro's restaurant] and that she was in a green Bonneville. At approximately 6:43 p.m., HICKS, using Target Phone 1, called YOUNG (call # 18266) and asked "a Halsted right?" [that he wanted to purchase a 63-gram quantity of crack]. YOUNG replied, "yeah, a Halsted." HICKS, using Target Phone 2, then called MASUCA on Target Phone 4 (call # 0616), and said "she is up there right now in a green Bonneville" and that "she is trying to get a Halsted." MASUCA said "all right." HICKS told MASUCA "hurry up, don't be slacking with that."

216.    At approximately 6:48 p.m., MASUCA called HICKS on Target Phone 2 (call # 0617), and HICKS asked if he was good, and MASUCA replied that he was. HICKS told MASUCA that she was up in the parking lot in a green Bonneville. At approximately 6:50 p.m., YOUNG called HICKS on Target Phone 1 (call # 18270) and told him that his girl "pulled off" because she said "the boys were up there" [police were in the area], but that she was on her way back around. HICKS said "all right." HICKS, using Target Phone 2, called MASUCA on Target Phone 4 (call #0619), and told him "take it back, take it back, hurry up, hurry up." HICKS told MASUCA that he had heard some "motherfuckers, some cats [police] were around there." MASUCA said "what?" HICKS said, "hurry up, take that bitch back." At approximately 6:51 p.m., HICKS, using Target Phone 2, called MASUCA on Target Phone 4(call #0620), and asked if he was good. MASUCA replied that he was, that he was "in the crib." HICKS said he was

calling to make sure.

217.    At approximately 6:59 p.m., YOUNG called HICKS on Target Phone 1 (call # 18272) and said "just give her a few minutes, she saw a gold crown 'vic'" [ATF surveillance vehicle] spinning and she is "a little leery." YOUNG said he saw the motherfucker, too. HICKS said "we can wait." At approximately 7:43 p.m., YOUNG called HICKS on Target Phone 1 (call # 18293) and asked if "if all good?" HICKS replied yeah. YOUNG told HICKS that "she is on the way up there again—this time in a little green Skylark." At approximately, 7:45 p.m., surveillance agents observed a dark-colored Buick parked in front of the Gyro's restaurant. At approximately 7:50 p.m. HICKS, who was using Target Phone 2, called MASUCA on Target Phone 4 (call #0626), who asked "where is she at, in Gyro's or on the block." HICKS said she was probably in Gyro's lot in a green Skylark, but that she was getting something to eat. MASUCA replied that he saw the green Skylark.

218.    At approximately 7:55 p.m., an unidentified female called HICKS on Target Phone 1 (call # 18298) and, when HICKS asked who was calling, she replied "V's girl" [YOUNG's girl]. HICKS asked where she was and she told him she was at Gyro's picking up food.   At approximately 8:05 p.m., the female caller called HICKS on Target Phone 1 (call # 18312) and asked if "he" is up there. HICKS told her "here come my little brother he got a green and red jacket, maroon. HICKS asked if she was going to be in a car, and she replied, "yeah, a little green car." At approximately 8:07 p.m., surveillance agents observed a black male wearing a grey sweatshirt approach the dark Buick parked in front of the Gyro's restaurant. The black male exchanged items with a passenger in the Buick, then left the area. Based on that, I believe the drug transaction was completed.

## JOSHUA MCELROY a/k/a "BOSS HOG"

219.    During the course of the investigation, several calls were intercepted which indicate that JOSHUA MCELROY a/k/a "Boss Hog" is a distributor who purchases "weight" quantities of crack cocaine from HICKS.

***February 29, 2008 Transaction***

220.    On February 19, 2008, at approximately 2:59 p.m., HICKS, who was using Target Phone 1, called MCELROY26 (call # 14690) who said he was on his way and to "get his shit ready." HICKS asked if he was going to pay his other bill, too [pay what he owed on prior purchases]? MCELROY said "don't do me like that Joe." HICKS asked how much money he had, and MCELROY replied "16 dollars" [$1600]. HICKS asked "what about your other bill?" MCELROY said "that's the whole thing, what you mean." At approximately 3:34 p.m., MCELROY called HICKS on Target Phone 1 (call # 14695) and said he was there. HICKS told him to go on Seeley, "by that restaurant." At approximately 3:37 p.m., HICKS, who was using Target Phone 1, had a conversation with MASUCA (call # 14697) and told MASUCA that "Boss Hog" [MCELROY] was right there behind him on Seeley and that MASUCA should go see him. At approximately 3:41 p.m., MASUCA who was using Target Phone 4, called HICKS on Target Phone 1 (call # 14698) and asked what kind of car "Boss Hog" was in. At approximately 3:43 p.m., HICKS, who was using Target Phone 1, called MCELROY (call # 14702) and asked him where he was. MCELROY said that he was in the restaurant. HICKS said, "here he comes right now." At approximately 3:44 p.m., HICKS who was using Target Phone 1, called MASUCA on Target Phone 4 (call # 14703). MASUCA answered and said that he saw "Boss Hog" in there. Based on this series of calls, I believe MCELROY and MASUCA completed a transaction for a 63 gram quantity of crack cocaine.

---

26  A discussion of the identification of MCELROY is outlined below in ¶¶ 222 – 223.

*February 27, 2008 Transaction*

221.    On February 27, 2008, at approximately 4:20 p.m., MCELROY called HICKS on Target Phone 1 (call # 15305) and asked HICKS if he had "got one of those" for him. HICKS said that he did. MCELROY said he'd be there in a minute. At approximately 4:38 p.m., MCELROY called HICKS on Target Phone 1 (call # 15313) and told him that he was down there. HICKS asked if he was on Seeley. MCELROY said yeah. HICKS told him to come to Gyro's on the Seeley block and to call him when he was there. At approximately 4:41 p.m., MCELROY called HICKS on Target Phone 1 (call # 15315) and asked if HICKS wanted him to park in Gyro's. HICKS said no, and told him to park on the side block on Seeley. At approximately the same time, surveillance agents observed a black male driving a grey or champagne colored Cadillac bearing Illinois license plate X401520 onto Seeley Ave. According to Illinois Secretary of State records, this vehicle is registered to an individual with the last name MCELROY. The agent observed the vehicle park on the side of Seeley Ave. The cell phone used in the above mentioned calls is subscribed to Joshua Mcelroy. In addition, CPD records for Joshua Mcelroy list "Boss Hog" as one of his aliases. The surveillance agent subsequently viewed a driver's license photograph available from Illinois Secretary of State records and identified JOSHUA MCELROY as the driver of the Cadillac.

222.    At approximately 4:42 p.m., HICKS, who was using Target Phone 1, called MASUCA on Target Phone 4 (call # 15317) and told him that "Boss Hog" was right there on Seeley. MASUCA informed HICKS that he was at 44th and Western. HICKS asked if it will be like 10 or 15 minutes [for MASUCA to get back to Seeley] and he replied yeah. At approximately 4:43 p.m., HICKS, who was using Target Phone 1, called MCELROY (call # 15318) and told him to wait about 10 minutes because his guy was at 45th and Western.

MCELROY said alright. At approximately 4:56 p.m., MASUCA, who was using Target Phone 4, called HICKS on Target Phone 1 (call # 15319) and told him that he just drove past "Boss Hog" on Seeley. HICKS told MASUCA to put the money that "Boss Hog" gave him with "that three" because that's the money that he owed, but that he wants to get another one, so take that out of the new lick and put him down for one out of the new lick. [HICKS was selling to MCELROY on credit]. At approximately 4:57 p.m., a surveillance agent observed MASUCA emerge from the alley between S. Hoyne Ave. and S. Seeley Ave. and walk to the above described Cadillac and enter the vehicle on the passenger side. A short time later, the surveillance agent observed MASUCA exit the vehicle and walk back down the alley toward the area of 5437 S. Hoyne Ave. The surveillance agent observed MCELROY drive away.

223. At approximately 6:30 p.m., a surveillance agent observed the above described Cadillac driven by MCELROY parked in front of the residence at 6419 S. May St., Chicago, Illinois [SEARCH SITE E]. According to CPD records, MCELROY has previously used 6419 S. May St., Chicago, Illinois [SEARCH SITE E] as his address of residence. In addition, telephone records show that a cellular telephone is subscribed to MCELROY at this address.

**March 5, 2008 Transaction**

224. On March 5, 2008, at approximately 12:16 p.m., MCELROY called HICKS on Target Phone 2 (call # 0281) and told him that he was about to pull up there in about a minute. At approximately 12:23 p.m. MCELROY had a conversation with HICKS on Target Phone 2 (call # 0283) during which he told HICKS that he was out there. HICKS asked if he was by the place he was the last time and MCELROY replied that he was. At approximately 12:24 p.m., HICKS, who was using Target Phone 2, called MASUCA on Target Phone 4 (call # 0285) and told him that "Boss Hog wants you." MASUCA said he needed 15 minutes. At approximately 12:25

p.m., HICKS, who was using Target Phone 1, called MCELROY (call # 16157), and asked if he wanted to give him like 15 – 20 minutes.  MCELROY said alright.

225.    At approximately 12:42 p.m., MASUCA called HICKS on Target Phone 1 (call # 16165) and told HICKS that he was in the car with "him" [MCELROY] right now.  At approximately 3:44 p.m., MCELROY called HICKS on Target Phone 1 (call # 0293) and complained that he told him the last one was 62g [grams] and this one was 61.5g.  HICKS said "you good, when you come back you'll have it" [HICKS would make up the shortfall at his next purchase].  Based on the content of the above-described calls, I believe the transaction was completed.

### March 7, 2008 Calls Regarding Narcotics

226.    On March 7, 2008, at approximately 8:46 p.m., MCELROY called HICKS on Target Phone 1 (call # 16590) and asked if he could get "2 for 24" [two 63-gram quantities of crack cocaine for $2400].  MCELROY asked HICKS to extend him credit for part of it.  HICKS asked if MCELROY had $2,450.  MCELROY said "wait until I bump this thing real quick" [he would have the money after he sold hit].  HICKS asked if he could wait an hour.   At approximately 10:25 p.m., MCELROY called HICKS on Target Phone 1 (call # 16604) and HICKS told him "2450" and to "come on."  At approximately 10:30 p.m., HICKS, who was using Target Phone 1, called MCELROY (call # 16608) and asked how far away he was.  MCELROY said he was coming down Damen.  At approximately 10:33 p.m., MCELROY called HICKS on Target Phone 1 (call # 16611) and told him that he was there [at Gyro's].  HICKS said "here he come." At approximately 10:34 p.m., HICKS, who was using Target Phone 1, called MASUCA on Target Phone 4 (call # 16613) and told him that "he's right there."  MASUCA said he would be there.  HICKS told him to be careful and 36 [I believe HICKS is telling MCELROY that he owes

HICKS $3600, because he is paying $2,450 for the narcotics, plus he owes HICKS money from previous transactions in which HICKS "fronted" narcotics to MCELROY].

### March 25, 2008 Calls Regarding Narcotics

227.    On March 25, 2008, at approximately 5:34 p.m., MCELROY called HICKS on Target Phone 1 (call # 19090) and asked if he had any "thinall" [based on my experience and the context of the call, as well as the fact that the term includes "thin", I believe MCELROY used the term "thinall" to refer to powder cocaine]. HICKS said no. MCELROY said OK and that he would "hit him up." At approximately 9:29 p.m. MCELROY called HICKS on Target Phone 1 (call # 19137) and told HICKS that he was over there. HICKS said he was going to call "him" [MASUCA]. At approximately 9:49 p.m., HICKS, who was using Target Phone 1 called MCELROY (call # 19172) who told HICKS that he was "fitting to pull up down there in 5 minutes." At approximately 10:48 p.m., MCELROY called HICKS on Target Phone 1 (call # 19177) and told HICKS that he's down there. HICKS said all right. At approximately 10:48 p.m., MCELROY called HICKS on Target Phone 1 (call # 19178) and told HICKS that he was in a green Trail Blazer. HICKS said okay. HICKS, who was using Target Phone 1, called MASUCA on Target Phone 2 and said that they have two licks lined up for "Boss Hog" right now, two of you [two 63-gram quantities of crack cocaine] right now. HICKS told MASUCA that MCELROY would be in a green Trail Blazer. At approximately 10:55 p.m., MASUCA, who was using Target Phone 4, called HICKS on Target Phone 1 (call # 19179) and told HICKS that he wanted to let HICKS know "after that, he only got like one of 'me's'" left [after selling two 63-gram quantities to MCELROY, MASUCA had only one left].

### April 26, 2008 Call Regarding Narcotics

228.    On April 26, 2008, at approximately 5:49 p.m., MCELROY called HICKS on Target

Phone 2 (call # 2719). HICKS asked "What's up Boss Hog, you ready to come in?" MCELROY said he was trying and asked what HICKS could "do for 7 dollars [$700] though." HICKS said he could give MCELROY a "zip" [ounce] for that. HICKS and MCELROY further discuss the price. HICKS and MCELROY discuss selling "the green, on the K side" [kush marijuana]. HICKS said he needs the change because he needs to get his "chevy."

### May 1, 2008 Transaction

229.    On May 1, 2008, at approximately 11:48 p.m., MCELROY called HICKS on Target Phone 2 (call # 3315) and asked HICKS if he was up and could MCELROY "spin on top of it." HICKS said "all the time." MCELROY said he was riding around getting back in motion. HICKS said that MCELROY needed to "make that little bit better than last time" [pay more towards his outstanding bill]. MCELROY said "stop trying to do me" adding "I got you." HICKS told MCELROY to call when he was ready. MCELROY said he had 12 dollars [$1,200] for that "trey" [63-gram quantity]. MCELROY said he should make sure that he counts the change when he gets it, it's 14 cents [$1,400]. HICKS told MCELROY to let him know when he was ready. In this call, I believe MCELROY was telling HICKS that he was planning to pay $1,200 for the 63-gram quantity, but he was going to pay $200 to work down his bill.

230.    At approximately 11:06 p.m., MCELROY called HICKS on Target Phone 2 (call # 3319) and HICKS told MCELROY to "go over there by the 'kleen dean'" [go by the cleaners]. At approximately 11:07 p.m., HICKS, who was using Target Phone 2, called MASUCA on Target Phone 4 (call # 3321) and told him that "Boss Hog" [MCELROY] was waiting up at the cleaners for him and that he wanted "one of you" [(1) 63-gram quantity]. HICKS, who was using Target Phone 2, then called MCELROY (call # 3322) and said "he is on his way and will be up there in a minute" [referring to MASUCA]. HICKS asked "how long am I gonna have to

wait on you nigga?" [HICKS is asking when he is going to get paid for the drugs he has fronted

to MCELROY]. MCELROY laughed and said he was "going to make it happen." HICKS asked

what color car he was in, and MCELROY replied, a brown van. At approximately 11:08 p.m.,

HICKS, who was using Target Phone 2, called MASUCA on Target Phone 4 (call # 3323) and

said "brown van." MASUCA said all right.

231.   At approximately 11:11 p.m., MCELROY called HICKS on Target Phone 2 (call

#3324) and said he was "on this little block right here, right?" HICKS told him to "go by the

cleaners" adding "go across the boulevard." MCELROY replied that he thought he saw "him."

At approximately 11:15 p.m., HICKS, who was using Target Phone 2, placed a call to Target

Phone 4 (call # 3327) and spoke with INDIVIDUAL Z who told him that MASUCA had gone

outside. At approximately 11:18 p.m., MCELROY called HICKS on Target Phone 2 (call

#3328) and said he was "hoping he is making this shit special for me." HICKS said he was

going to make sure "he is straight." HICKS said "you gonna be able to bust someone's head

with this" [referring to the quality of the crack cocaine].

232.   At approximately 11:20 p.m., MASUCA, who was using Target Phone 4, called

HICKS on Target Phone 2 (call # 3330). HICKS asked MASUCA if he was "good." MASUCA

said that he went to the cleaners. HICKS said "he [referring to MCELROY] is in a brown van,

he must be on that side block." HICKS, who was using Target Phone 2 then called MCELROY

(call # 3332). MCELROY told HICKS that he was "right across the street of the laundromat, on

the 5-2." HICKS told him he had to go "across the double nickels across the street from the

Gyro's – the cleaners on 55th." MCELROY said "Oh, give him two minutes." At

approximately 11:21 p.m., HICKS, who was using Target Phone 2, called MASUCA on Target

Phone 4 (call # 3333) and told him MCELROY was mistaken and was on 52nd. At

approximately 11:27 p.m., MASUCA, who was using Target Phone 4, called HICKS on Target Phone 2 (call # 3334) and said that now he was good. HICKS asked, "did you see Boss Hog?" MASUCA said yeah. Based on the content of these calls and the context of the investigation, I believe MASUCA completed the transaction with MCELROY who purchased a 63-gram quantity of crack cocaine.

## CLIFTON HARALSON

### *July 25, 2007 Controlled Buy of Narcotics*

233.    On July 25, 2007, the U/C conducted a controlled purchase of crack cocaine with COREY WILLIAMS. During the course of this transaction, telephone calls were placed to and from a cellular phone used by WILLIAMS that he described as his wife's cell phone and Target Phone 1, indicating HICKS was the supplier of the crack cocaine for this transaction.

234.    CLIFTON HARALSON served as the runner for this transaction. After a series of calls involving COREY WILLIAMS and Target Phone 1, the U/C observed a black male, who was later identified as CLIFTON HARALSON, walk up to the undercover vehicle. WILLIAMS opened the passenger door to allow HARALSON into the rear seat of the U/C's car. The U/C gave WILLIAMS $1,650 in United States Currency. WILLIAMS told HARALSON that he would be right back and handed the money to HARALSON. HARALSON then gave the U/C a clear plastic bag containing an off-white, rocklike substance of approximately 65 grams in weight. HARALSON told WILLIAMS and the U/C to watch out for a black car he believed to be the police. I believe HARALSON was referring to one of the law enforcement surveillance vehicles being used to monitor the transaction.

235.    At approximately 1:29 p.m., COREY WILLIAMS and HARALSON got out of the U/C's car and the U/C observed HARALSON give WILLIAMS an unknown amount of the cash.

236.    The U/C subsequently viewed a photograph available from CPD records of CLIFTON

HARALSON and identified HARALSON, as the individual involved in the transaction described

above.  In addition, the U/C subsequently sent this substance that was recovered during the

transaction to the DEA Lab for analysis.  DEA lab testing subsequently confirmed that the

substance was 63.5 grams of cocaine base.  Based on the U/C's examination of the appearance of

the drugs, the investigation to date, and my experience as an ATF agent investigating narcotics

trafficking, I believe the substance is crack cocaine.

## DWAYNE GARRETT a/k/a "WAYNE PATRICK JONES

237.    DWAYNE GARRETT a/k/a "WAYNE" and PATRICK JONES purchased a nine

ounce quantity of crack cocaine from HICKS.

### March 3, 2008 Narcotics Transaction with DWAYNE GARRETT and PATRICK JONES

238.    On March 2, 2008, at approximately 4:44 p.m., an individual who referred to himself

as "Wayne", who was later identified as DWAYNE GARRETT (see ¶ 245 below) called HICKS

on Target Phone 2 (call # 0151) and said he needed to meet with him for "a nine."  GARRETT

further stated that the "shit has to be all the way dry, cause he can't take no wet shit cause that

shit loses too much."   HICKS told GARRETT he could look at it first and that "it's as hard as a

brick."  GARRETT told HICKS that he would be "up there tomorrow in the afternoon."  In this

call, I believe GARRETT was informing HICKS that he wanted to purchase a nine ounce

quantity of crack cocaine from him.

239.    On March 3, 2008 at approximately 1:00 p.m., GARRETT called HICKS on Target

Phone 2 (call # 0221) and said he was coming to see HICKS.  HICKS told him to call when he

got there.  GARRETT advised that he was coming for "a nine" [9 oz.] and wanted to know what

the price would be.  HICKS said "1,350 a pop, so you talking about a 9-piece so $5,400" [a 9

ounce quantity is comparable is price to (4) 63-gram quantities of crack cocaine]. GARRETT said he would take that and that he "needs that shit to be hard, hard." At approximately 1:53 p.m., GARRETT called HICKS on Target Phone 2 (call # 0230) and said he would be ready in ten or fifteen minutes. At approximately 4:01 p.m., GARRETT called HICKS on Target Phone 2 (call # 0232) to say he was ready and HICKS told him to go to the Gyro's restaurant. At approximately 4:02 p.m., HICKS called MASUCA on Target Phone 4 (call # 0234) and told him that he needed "four of you" [four 63 gram quantities of crack cocaine] at the Gyro's restaurant for "Cuz from out of town." MASUCA said he was on his way. At approximately 4:02 p.m., HICKS, who was using Target Phone 2, called MASUCA on Target Phone 4 (call # 0235) and spoke with MASUCA and asked where he was. MASUCA replied that he was at Madison and Western and to tell him [Cuz] that MASUCA would be at the Gyro's in fifteen minutes. At approximately 4:03 p.m., HICKS, who was using Target Phone 2, called GARRETT (call # 0236) and told him that MASUCA would be there in about fifteen minutes.

240.    At approximately 4:03 p.m. that same day, surveillance agents observed a purple/grey Chrysler Concorde pull into the parking lot of the Gyro's restaurant. At approximately 4:04 p.m., GARRETT called HICKS on Target Phone 2 (call # 0237) and told him he had to move because he didn't like sitting over there. GARRETT told HICKS to call back when his "dude is ready."

241.    At approximately 4:17 that same day, HICKS, who was using Target Phone 2, called MASUCA, who was using Target Phone 4 (call #0240), and MASUCA said he was coming that way. At approximately 4:19 p.m., HICKS, who was using Target Phone 2, called MASUCA on Target Phone 4 (call # 0242) and asked where he was and MASUCA said he was pulling up in front of his crib. HICKS, who was using Target Phone 2, then called GARRETT (call # 0243)

114

and told him to "come on, come on, come on." To which GARRETT replied that he would.

242.    At approximately 4:22 p.m., surveillance agents observed the same Chrysler which was occupied by two black males, pull into the Gyro's parking lot. At approximately 4:23 p.m., HICKS, who was using Target Phone 2, called MASUCA, who was using Target Phone 4 (call #0246), and told him that the "Wayne" [GARRETT] was up there right now. At approximately 4:23 p.m., HICKS , who was using Target Phone 2, called MASUCA on Target Phone  (call # 0251), and told him to bring "four" and asked "you have a four piece right?" MASUCA replied "yeah."

243.    At approximately 4:25 p.m., surveillance agents observed MASUCA as he walked eastbound into the Gyro's parking lot and got into the rear of the Chrysler.  Surveillance agents observed MASUCA make an exchange with the two individuals in the front seat of the car.

244.    At approximately 4:28 p.m., HICKS, who was using Target Phone 2, called MASUCA, who was using Target Phone 4 (call #0252), and MASUCA advised HICKS "We good, counting the change." In this call, I believe MASUCA was informing HICKS that the transaction had been successfully completed.

245.    Law enforcement officers continued to conduct mobile surveillance of the Chrysler after it left the area. At approximately 4:29 p.m., the vehicle stopped in the 5600 block of Wood Ave. and the passenger got out of the car. Law enforcement officers activated the emergency equipment to effect a traffic stop for improper lane usage. Law enforcement officers got out of their vehicle to follow the passenger who was walking northbound on Wood Ave. The passenger, who was later identified as PATRICK JONES, started to run after he looked back and saw law enforcement officers approaching him. As he ran, officers observed the individual throw several plastic bags containing a white substance into the backyard of the house at 5608

Wood Ave. Officers pursued him on foot and detained him, then recovered three plastic bags

containing a white rocky substance (suspect crack cocaine). A fourth plastic bag containing

suspect crack cocaine was later recovered by law enforcement officers. Other law enforcement

officers had stopped the driver of the car, who was identified as DWAYNE GARRETT.

246.    The substance that was recovered was sent to the DEA lab for testing and was

confirmed to total 241.4 grams of cocaine base which also contained sodium bicarbonate. Based

on the appearance of the drugs, the investigation to date, and my experience as an ATF agent

investigating narcotics trafficking, I believe the substance is crack cocaine.

247.    GARRETT and JONES were transported to the Cook County Sheriff's office in

Maywood, Illinois. At approximately 6:30 p.m., GARRETT waived his Miranda rights and

agreed to be interviewed. During the interview, GARRETT stated that he met up with JONES

earlier that day in order to purchase 9 ounces of crack cocaine.

248.    On March 4, 2008, GARRETT agreed to be interviewed and told agents that he knew

a crack cocaine supplier by the name of "Rock," and that he had been introduced to "Rock" by a

friend known to him as "Vino." GARRETT identified a photograph of VINCENT

STRAUGHTER as the person he knows by the name of VINO. GARRETT described "Rock" as

a black male, in his late 20's or 30's, heavy set, and who wears his hair in braids, a description

which is consistent with HICKS' physical appearance. GARRETT directed an ATF agent to a

phone number listed in his phone under "Roc" as (773) 440-6853 [the telephone number of

Target Phone 2]. GARRETT also stated that he knew "Rock" drove a black Chevy Tahoe and a

Jaguar. GARRETT stated that he had received a call from JONES who wanted to buy 9 ounces

of crack cocaine. GARRETT stated that he had sold crack cocaine to JONES in the past.

GARRETT stated that he had called "Rock" and ordered the crack cocaine. GARRETT stated

he and JONES drove in his car to the Gyro's restaurant to do the deal. GARRETT advised that, once there, they met "Rock's nephew", who provided them with the 9 ounces of crack cocaine for approximately $5,400. One of the agents who interviewed GARRETT, identified GARRETT as the caller who referred to himself as "Wayne" in the above-listed intercepted calls.

249.   On March 4, 2008, JONES was advised of his Miranda rights, waived those rights and agreed to be interviewed. During the interview, JONES stated that he had driven down from Wisconsin to purchase 9 ounces of crack cocaine that he planned to take back to Milwaukee, Wisconsin to sell. JONES admitted that he ran and had thrown the four bags containing crack cocaine to the ground after the police stopped GARRETT.

## SCOTT O'NEAL
## ANDREA THOMAS

250.   During the course of the investigation, a number of calls have been intercepted indicating that SCOTT O'NEAL is a distributor who purchases "weight" quantities of crack cocaine from HICKS and ANDREA THOMAS is one of his runners.

### March 7, 2008 Transaction

251.   On March 7, 2008, at approximately 10:23 a.m., an unidentified male who referred to himself as Scott called HICKS on Target Phone 1 (call # 16485) and asked him to call when he made it to the city because his "girl" was trying to get something. The caller was subsequently identified as SCOTT O'NEAL (see ¶ 260 below). At approximately 1:52 p.m., O'NEAL called HICKs on Target Phone 1 (call # 16500) and asked if he "made it up here?" HICKS said he had to make a run first and then he would meet him. At approximately 1:53 p.m., O'NEAL called HICKS on Target Phone 1 (call # 16501) and told him that his "baby's mamma" is still trying to meet up with him. HICKS told O'NEAL to give him a minute. At approximately 2:00 p.m.,

HICKS, who was using Target Phone 1 called O'NEAL (call # 16507) who asked HICKS how long it would take him because "her" ride was getting impatient. HICKS asked if he knew where the Gyro's restaurant was on 55th. O'NEAL replied that he did. HICKS told him to have his "baby's mamma" go there and to call him when she got there. At approximately 3:17 p.m., HICKS, who was using Target Phone 1, called O'NEAL (call # 16522) who told HICKS that they were up there now. HICKS asked "what she got again?" O'NEAL said "6" [$600]. HICKS asked what they were trying to get, a "zip" [ounce] or something? O'NEAL said yeah. HICKS said that his guy was coming in a white car and asked what she would be driving? At approximately 3:18 p.m., HICKS spoke with O'NEAL (call # 16524) who told him to look for a "grey two door car." HICKS said alright. At approximately 3:20 p.m., HICKS and O'NEAL had a conversation (call # 16526) and HICKS said "he's out there right now." O'NEAL said that she has three [$300] with her and to call him back. HICKS said alright. O'NEAL said he didn't know, he thought she had the same as last time. HICKS said, "here he come right now."

252.    At approximately 3:26 p.m., HICKS and O'NEAL had a conversation (call # 16528) during which O'NEAL asked if HICKS' man was still in route, and HICKS said yes. O'NEAL told HICKS that "she" [O'NEAL's runner] was in a G6 [Pontiac]. At approximately 3:29 p.m., HICKS and O'NEAL had a conversation (call # 16538) and O'NEAL asked if "she" should come by the restaurant. HICKS said yeah. At approximately 3:30 p.m., a surveillance agent observed the occupants of a Pontiac G-6 meet with the occupants of a white Oldsmobile (registered to Ivory Watson). Agents observed an unidentified black female exit the Pontiac and get into the Oldsmobile. At approximately 3:34 p.m., HICKS and O'NEAL had a conversation (call # 16542) and O'NEAL told HICKS that "she got it." At approximately 3:35 p.m., agents observed both vehicles exit the restaurant parking lot. Agents continued mobile surveillance of

the Pontiac G6.

253.   At approximately 3:37 p.m., agents conducted a traffic stop of that vehicle for a seatbelt violation. The driver was a black male, who was identified (Individual D) and there were two black female passengers. The female riding in the front passenger seat of the car identified herself as Daphne Thomas. The rear seat passenger identified herself as INDIVIDUAL E. Agents obtained verbal consent to search the purse of the person who self-identified as Daphne Thomas, and observed a large amount of cash in small denominations. Upon investigation, the agents learned that INDIVIDUAL D had an active warrant issued out of Effingham, Illinois, so he was detained. INDIVIDUAL D stated that the front seat passenger's name was Andrea. Agents later identified this person as ANDREA THOMAS. INDIVIDUAL D stated that Andrea and her boyfriend sell narcotics at the 22nd and State housing project.

### March 13, 2008 Transaction

254.   On March 13, 2008, at approximately 10:25 a.m., HICKS, who was using Target Phone 1, had a conversation with O'NEAL (call # 17267) who said that his "baby's mamma" had another "three" she was trying to "fuck with you" [she wanted to buy more narcotics]. HICKS said she could get three of them basketballs [8-ball quantities] and that if she gave him 50 more, she could get the 4-piece [(4) 8-balls]. At approximately 1:19 p.m., HICKS, who was using Target Phone 1, called O'NEAL (call # 17273) who said he was going to have his girl holler and asked if she gives him $350 that he will give her the "4 piece dinner" [(4) 8-ball quantities]. O'NEAL said that she would call HICKS when she was ready. O'NEAL said that his girl wanted to meet somewhere else [other than Gyro's] because "them people" [police] "jumped on them" [referring to the March 7, 2008 traffic stop].

255.   At approximately 5:26 p.m., HICKS, who was using target Phone 1, called O'NEAL

(call # 17319) and asked "what say she wanted, the four?" [(4) 8-balls]. O'NEAL said "yup." HICKS asked if he said "the four" and O'NEAL said "the half" [a half ounce]. O'NEAL said, she got "3-5" [$350]. At approximately 5:34 p.m., HICKS, who was using Target Phone 1, called O'NEAL (call # 17324) and asked which way she was coming from. O'NEAL replied "off 22nd." HICKS asked if the Wendy's restaurant on 55th and the Dan Ryan would work [as a meeting location]. O'NEAL said he would call her. At approximately 5:37 p.m., HICKS, who was using Target Phone 1, called O'NEAL (call # 17326) who asked HICKS "by the Dan Ryan, right?" HICKS told O'NEAL that "he" [his runner] wanted to grab something to eat from Wendy's. O'NEAL said alright and asked HICKS if he was ready. HICKS said to hold on, that he would call him to see where he was.

256.    At approximately 5:41 p.m., HICKS, who was using Target Phone 1, called O'NEAL (call # 17327) and asked if she was right there now or was she ready? O'NEAL said that she was not right there right now, but that she is going to be on her way when he let her know [O'NEAL would tell the runner when to leave]. O'NEAL said he would tell her to "leave out the house now." At approximately 5:52 p.m., HICKS, who was using Target Phone 1, called O'NEAL (call # 17328) and asked if she was ready? O'NEAL said she is getting in the car now. At approximately 5:53 p.m., HICKS, who was using Target Phone 1, called O'NEAL (call # 17331) and asked "what car?" O'NEAL said he thinks it is the black Grand Prix. At approximately 5:59 p.m., HICKS, who was using Target Phone 1, called O'NEAL (call # 17334) and O'NEAL told HICKS that she is in a green Pontiac Grand Am.

257.    At approximately 6:01 p.m., O'NEAL called HICKS on Target Phone 1 (call # 17347) and told him that she is in a green Bonneville and that it is the same female he met last time [referring to March 7, 2008 transaction]. At approximately 6:07 p.m. HICKS, who was using

Target Phone 1, called O'NEAL (call # 17359) and said to tell her it's a white car with black tinted windows.  At approximately 6:15 p.m., HICKS, who was using Target Phone 1, had a conversation with O'NEAL (call # 17365) during which HICKS asked if she sees the white car with tinted windows. O'NEAL said that she saw the white car and so she stepped out.  At approximately 6:15 p.m., HICKS, who was using Target Phone 1, had a conversation with O'NEAL (call # 17370) and HICKS told O'NEAL that he is a dark-skinned one, with a low fade. HICKS said his name is IVORY [IVORY WATSON], but that she should just say "23."  At approximately the same time, surveillance agents observed IVORY WATSON drive his white Oldsmobile into the Wendy's parking lot.  Agents briefly lost site of the vehicle.  At approximately 6:16 p.m., a surveillance agent observed ANDREA THOMAS get out of the white Oldsmobile and walk into the Wendy's restaurant.  Moments later, agents observed ANDREA THOMAS get into the green, 4-door, Pontiac.  At approximate 6:17 p.m., HICKS, who was using Target Phone 1, had a conversation with O'NEAL (call # 17376) and O'NEAL told HICKS that she was in the car with "him".

258.    During the course of the investigation O'NEAL participated in several calls related to narcotics trafficking:

a.    On April 29, 2008, at approximately 12:19 p.m., HICKS, using Target Phone 2, received an incoming telephone call from an individual (subsequently identified as Scott O'NEAL (call #3020), calling from (312) 842-2644, and advised HICKS that he had realized HICKS' telephone number changed.  HICKS apologized for not calling him with his new number and O'NEAL advised that he had just called HICKS from his house number (312) 842-2644.

b.    On April 30, 2008, at approximately 13:24 hours, HICKS, using Target Phone 2,

received an incoming telephone call from O'NEAL calling from (312) 842-2644 (call #3149), who advised that he was down in the projects, and HICKS asked "the low end?" O'NEAL said they had to, and HICKS stated that if that is what he needed to do to take care of his business and get his change right.

      c.  On May 2, 2008, at approximately 3:26 a.m., HICKS using Target Phone 2, received a call from SCOTT (call # 3422). O'NEAL told HICKS that "I am still trying to run into you; I need to you to fuck with me man." HICKS asked O'NEAL what happened, and O'NEAL said he was trying to "make a move [amount of narcotics] out of town to see if it is like a motherfucker tell me." O'NEAL told HICKS that he was not going to go, but that he is just trying to get a small move to get outta town and see what it really is. HICKS asked where he was talking about, and O'NEAL advised he was talking about Iowa. HICKS and O'NEAL agree to meet in person later to discuss O'NEAL's plans.

      d.  On May 10, 2008, at approximately 8:02 p.m., HICKS, using Target Phone 2, received an incoming telephone call from O'NEAL calling from (773) 759-8770 (call #4368), O'NEAL advised that he needed to bust some kind of move. During this conversation, O'NEAL stated that his son's birthday is on the 22nd [May] and that he would turn one on that date.

259.  On May 14, 2008, an ATF agent met with an IDOC Parole Agent regarding O'NEAL. Specifically, the IDOC Parole Agent explained that he had been assigned to maintain contact with O'NEAL pursuant to the terms of his parole, and that he had been meeting with O'NEAL on a regular basis for over a year. The IDOC Parole Agent advised that he would recognize O'NEAL's voice as he had spoke to him numerous times, and that he believed that he had a distinctive voice. The IDOC Parole Agent explained that he had just spoken with O'NEAL less than a day ago to arrange a routine parole contact with him.

260.    The ATF Agent subsequently allowed the IDOC Parole Agent to review the above

described intercepted telephone calls, as well as several others, where an individual referred to as

"Scott" had conversations with HICKS. The IDOC Parole Agent was then able to identify the

caller identified as "Scott" on the intercepted telephone calls as O'NEAL.

### MICHAEL A. GONZALEZ

261.    Based on the content of intercepted calls and surveillance observations, On March 13,

2008, MICHAEL GONZALEZ delivered a kilogram of powder cocaine to MASUCA for

delivery to HICKS. (See ¶¶ 34 – 38 above).

### ROMELL HOLLINGSWORTH a/k/a "GROSSO"

262.    During the course of the investigation, several calls were intercepted which indicate

that ROMELL HOLLINGSWORTH a/k/a "GROSSO" is a distributor who purchases "weight"

quantities of crack cocaine from HICKS and brokers transactions for others.

    a.    On January 15, 2008 at approximately 11:20 p.m., HOLLINGSWORTH[27] called

HICKS on Target Phone 1 (call # 10949) and they discussed prices for two and four ounces

[based on the context of the conversation, I believe they were discussing amounts of crack

cocaine]. At approximately 11:23 p.m., HICKS, who was using Target Phone 1, called

HOLLINGSWORTH  (call # 10953) and HOLLINGSWORTH  asked how much for four

"zippers" [ounces].  HICKS said he would give him three "Halsteds."

    b.    On January 26, 2008, at approximately 12:44 a.m., HOLLINGSWORTH called

HICKS on Target Phone 1 (Call # 10990) and told HICKS that his customer would "do one" in

the morning.

    c.    On February 2, 2008, at approximately 9:13 a.m., HICKS, who was using Target

---

27  A discussion of the identification of HOLLINGSWORTH is outlined below in ¶ 266.

Phone 1, called HOLLINGSWORTH (call # 12382) and told him that he should pull around the alley part and that someone would be waiting for him there. At approximately 10:13 a.m., HOLLINGSWORTH called HICKS on Target Phone 1 (call # 12404) and told him that one more customer would be coming in and that they'd be there at 2:00. HOLLINGSWORTH said they wanted a "Nina Dina" [9 ounce quantity].

*March 15, 2008 Transaction*

263.    On March 15, 2008, at approximately 8:00 p.m., called HICKS on Target Phone 1 (call # 17744) and asked what he could "do with the little change he got" [how much could he buy with the money he had?]. HICKS asked how much he had right now and HOLLINGSWORTH replied eleven and one-half [$1150]. HICKS asked when he would be ready and HOLLINGSWORTH said now. HICKS told him to call back in 30 minutes. HICKS asked if he knew "where Zook be at?" [where MASUCA was]. HOLLINGSWORTH replied, "your auntie's crib on the 4" [54th St]. HOLLINGSWORTH asked if HICKS would let him "owe him" [let him owe HICKS the rest of the money for the 63 gram quantity he wanted to buy]. HICKS told HOLLINGSWORTH that he would "front him" the narcotics and that he would owe HICKS $200. HICKS instructed him to go to the Gyro's restaurant on Seeley.

264.    At approximately 8:20 p.m., HOLLINGSWORTH called HICKS on Target Phone 1 (call # 17750) and told him he was on his way and confirmed that he should go to the Gyro's restaurant. At approximately 8:21 p.m., HICKS, who was using Target Phone 2 (call # 0510), called MASUCA on Target Phone 4 and told him "here come Romel he trying to get one of you" [63 gram quantity]. MASUCA asked HICKS if he [HOLLINGSWORTH] was already there. HICKS said no, that he was going to call in one second. At approximately 8:38 p.m., HOLLINGSWORTH called HICKS on Target Phone 1 (call # 17758) and asked if "he" [the

person who was to deliver the narcotics] would be walking or driving.  HICKS replied, walking and told HOLLINGSWORTH that he had to call HICKS when he got there.

265.    At approximately 8:39 p.m., HOLLINGSWORTH called HICKS on Target Phone 1 (call # 17759) and told HICKS to tell "him" to come to Gyro's.  At approximately 8:40 p.m., HICKS, who was using Target Phone 2 (call # 0512), called MASUCA on Target Phone 4 and told him "Romel is inside the Gyro's right now and he is trying to get one of you."  At approximately 8:41 p.m., surveillance agents observed a white SUV drive into the Gyro's parking lot.  Agents observed a tall, Black male, who was later identified as HOLLINGSWORTH (see ¶ 265 below), exit the vehicle and walk into the restaurant.  At approximately 8:42 p.m., surveillance agents observed MASUCA walk from the alley connecting Hoyne to Seeley and walk into the restaurant and meet with HOLLINGSWORTH. Agents observed MASUCA and HOLLINGSWORTH walk to the west side of the restaurant, away from the other patrons, where they made an exchange.  After the exchange, agents observed HOLLINGSWORTH pickup his food order, exit the restaurant, and enter the SUV.

266.    Surveillance officers followed the SUV being driven by HOLLINGSWORTH, after a short time, agents observed that HOLLINGSWORTH failed to make proper use of his turn signal and the agents conducted a traffic stop.  When stop, HOLLINGSWORTH identified himself to the officers and showed one of the officers a Minnesota identification card in the name of Romel HOLLINGSWORTH.

### DESHAUN GERMANY A/K/A "DEONTE", "4-5's COUSIN", "BIG SIN" and "SIN"

267.    During the course of the investigation, several calls were intercepted which indicate that DESHAUN GERMANY A/K/A "DEONTE", "4-5's COUSIN", "BIG SIN" and "SIN" is a distributor who purchases "weight" quantities of crack cocaine from HICKS.

a.  On January 31, 2008, at approximate 8:09 p.m., HICKS, who was using Target Phone 1, called MASUCA (call # 12069) and said "4-5's cousin is waiting on you right now." HICKS added, "and then he wanted (unintelligible) store credit – so give him ten."

b.  On February 1, 2008, at approximately 3:54 p.m., HICKS, who was using Target Phone 1, called WATSON (call # 12202) and told him to "give 4-5 cousin 10 bizzles of you." HICKS added "he is buying $400 dollar piece, and two he want to get fronted, so he gonna give you like a stack [$1,000] [because he owes HICKS $200 already].

c.  On February 6, 2008, at approximately 12:35 p.m., HICKS, who was using Target Phone 1, called MASUCA (call # 12942), and said "they've got 4-5's cousin coming to get one of you." MASUCA said, Okay, and told HICKS to call when they were there.

d.  On March 3, 2008, at approximately 9:10 p.m., an individual how was subsequently identified as GERMANY (see ¶¶ 269 - 270) called HICKS on Target Phone 2 (call # 0265) and said he was "trying to come out there right now." HICKS told him to call when he got there. At approximately 9:15 p.m., GERMANY called HICKS on Target Phone 2 (call # 0268) and said "I'm right here." HICKS asked "don't you owe me two hundred dollars?" GERMANY agreed. HICKS said "don't worry, I got you man." HICKS asked if he was "where he is always at?" GERMANY said yeah. At approximately 9:19 p.m., GERMANY called HICKS on Target Phone 2 (call # 0271) and asked how long "how long you gonna be man?" HICKS said to give him five minutes. GERMANY said all right.

e.  On March 15, 2008, at approximately 12:07 a.m., GERMANY called HICKS on Target Phone 2 (call # 0472) and told HICKS he needed "a half" [half ounce] and HICKS told him to come meet him where he always does.

f.  On March 18, 2008, at approximately 6:53 p.m., GERMANY called HICKS on

126

Target Phone 2 (call # 0565) and asked HICKS if he was over there. GERMANY said he wanted the same thing. HICKS said all right and to call him when he got there. At approximately 7:04 p.m., GERMANY called HICKS on Target Phone 2 (call # 0568) and said he was "right there." HICKS said all right. HICKS, who was using Target Phone 2, then called MASUCA on Target Phone 4 (call # 0571) and asked MASUCA if he was at the crib. MASUCA replied that he was. HICKS told MASUCA that "4-5's Cousin" is right there "where he always be" and is "tryin' to get 'one of you' [63 gram quantity of crack cocaine] right fast." MASUCA said all right. At approximately 7:07 p.m., GERMANY called HICKS on Target Phone 2 (call # 0572) and told HICKS that he was in a gray 2-door Grand Prix GT. HICKS said all right.

### March 24, 2008 Transaction

268.    On March 24, 2008, at approximately 6:45 p.m., GERMANY called HICKS on Target Phone 2 (call # 0670) and said he was gonna come through there in a minute." HICKS said "all right talk to me then." GERMANY said "can you make sure you have some dry for me." HICKS said "that nigga was dry – all right." At approximately 6:54 p.m., GERMANY called HICKS on Target Phone 2 (call # 0673) and said he was "right there" and that he just wanted "a zip" [an ounce], and to "make sure it's dry." HICKS said all right. On this same date at approximately 6:55 p.m., HICKS called MASUCA on Target Phone 2 (call # 676) and asked MASUCA if he was in the crib. MASUCA responded yeah. HICKS then told MASUCA that "45's cousin is trying to get 8 birds [an ounce of crack cocaine]. MASUCA said all right, and HICKS tells MASUCA that he is right where he always be at. MASUCA said all right.

269.    At approximately 6:55 pm on this same date, a surveillance agent observed a grey / silver Pontiac Grand Prix, bearing Illinois License plate # X408372, driven by a black male in

his 20s pull into the Garfield Gyro's parking lot and park. The agent observed this same vehicle exit the Garfield Gyro's parking lot and drive north on Seeley, where it parked on the east side of the street. The agent drove past this vehicle and observed the black male driver, the sole occupant of the vehicle, as he turned to look at the agent as he drove by.

270.    The agent was subsequently was able to view an Illinois Secretery of State Driver's License Photograph of GERMANY, and was able to positively identify the black male in the silver / grey Pontiac Grand Prix as Deshaun GERMANY.

271.    On March 25, 2008, at a approximately 7:15 p.m., a surveillance agent at the Ida B. Wells Housing Projects located at 757 E. Browning, Chicago, Illinois (an address of record for Deshaun GERMANY) observed the same silver / grey Pontiac Grand Prix, bearing Illinois License plate X409372, parked out in front of the above listed address.

272.    On March 27, 2008, at approximately 8:43 p.m., WATSON called MASUCA on Target Phone 4 (call # 00279) and told him that "4-5's cousin" wants some and wants to know where to meet you at to get an ounce. WATSON said that "4-5" is there and wants to meet MASUCA. MASUCA said to tell "4-5" to meet him on six. At approximately 8:45 p.m., MASUCA, who was using Target Phone 4, called HICKS on target Phone 1 (call # 19769) and told him that "4-5's Cousin" [GERMANY] called. HICKS asked "what is he trying to do, a Halsted?" MASUCA said that "BIRD" [IVORY WATSON] had just talked to him.

a.    On April 30, 2008, at approximately 2:33 p.m., GERMANY called HICKS on Target Phone 2 (call # 3155) and asked HICKS "what's up?" HICKS asked who was calling. GERMANY replied "Deonte" and HICKS said, "4-5's [SANFORD TOWNSEND's] cousin?" GERMANY said yeah. GERMANY asked HICKS if he was "doing shit." And HICKS asked "what you trying to do?" GERMANY said, let me hit you back [call you back] when we know

what we trying to get right now.  At approximately 2:35 p.m., GERMANY called HICKS on Target Phone 2 (call # 3157) and asked "how much is that business, for a 'zip' [ounce]?" HICKS said "seven dollars" [$700].  GERMANY said all right.

### JOE LONG a/k/a "BABY JOE" and "BJ"

273.    During the course of the investigation, several calls were intercepted which indicate that JOE LONG a/k/a "BABY JOE" and "BJ" is a distributor who purchases "weight" quantities of crack cocaine from HICKS.

274.    On March 13, 2008, at approximately 9:33 p.m., an individual who was later identified as Joe LONG aka "Baby Joe" and "BJ," (as outlined below in ¶¶ 282 - 283) and who called from (773) 699-6550, spoke with HICKS who was using Target Phone 2 (call # 0449) and advised that he just got out of jail.  HICKS asked what had happened, and LONG advised that it was some "domestic shit with his bitch."  LONG subsequently related to HICKS that his girlfriend had hit him and that he was thinking of killing her and had tried to drown her.  LONG then went on to discuss his drug sale operation with HICKS.  Specifically, LONG explained that he understood that he owed HICKS a narcotics debit of $1,300 [the amount of money HICKS charged for a 63g quantity of crack cocaine].  LONG explained that he knew he was taking too long to pay this debt back, but explained that he had gotten kicked out of his "trap" house [drug sale house] due to the domestic incident discussed above.  LONG then explained that he was planning on moving into the new joint on Monday, and told HICKS that if HICKS would put him right, "give me a blessing" [front him some more crack cocaine] "I could start bagging up everything you give me, instead of putting it in quantities."  LONG then told HICKS that he is going to package the crack in "some big ass bags," and explained that is the "only way to get this bitch jumping."  LONG then told HICKS that he needed to make his bags big in order to

compete with everyone else around him. HICKS agreed that this is a good way to proceed. LONG told HICKS that he needed him to front him more cocaine, saying "we have enough coke, but it ain't enough coke, ya know what I mean?" LONG also laid out his plans about his new drug house, saying "If I get this new crib Monday, and start putting out big ass bags and there are other mother fuckers in there trapping with me—we can ball this bitch out in a month." LONG goes on to say that he figures that by having others working for him in the drug house, they can make $3,000 to $4,000 daily. HICKS agreed to bring crack cocaine to LONG, saying he's "gonna bring [LONG] something over there whenever I come through."

275.    On March 18, 2008, at approximately 12:18 a.m., HICKS, using Target Phone 2 received an incoming telephone call from LONG calling from (773) 305-6496 (call # 0563). LONG advised HICKS that his drug spot had been raided by the police, and his workers arrested. Specifically, LONG said "they popped three of the guys off in the crib." LONG related that the police "knocked on the door like he was a hype and when the door opened they bum rushed the door." LONG stated "They found the niggas' stashes and shit." LONG then described the location of the drug house on Lowe near the park, "the big courtway by the park." LONG then told HICKS that he has to go to court for the guys who were arrested, and "see what's good with them." HICKS then asked if the men who were arrested were talking, and LONG said "niggas ain't telling nothing, they taking all the weight." LONG also recounted how he was on his way down to the drug house with "a bundle," and as he was walking he "seen four slick boys [unmarked police cars]" behind him. LONG explained to HICKS that he hid behind a house and tried to call the men in the drug house to warn them the police were coming, but that the men were asleep, "snoozing." LONG then told HICKS that he was scared because "he doesn't know if these niggas are gonna tell or not." HICKS then said they better not tell, them tell, them

motherfuckers. HICKS then told LONG to keep him posted and let him know what is going on.

276.     Later that same evening, HICKS received a call on Target Phone 1 from an unknown male identified only by nickname calling from (773) 256-7683. The caller related that "BJ" [LONG] got "bumped" [arrested] and that "BJ" had wanted the caller to tell HICKS that the police were asking him about HICKS and showing him his photograph. The caller further explained that he was just relaying the message from LONG about the police asking about "Isaiah." A minute later, HICKS called the unidentified male back, and questioned him further regarding the arrest of LONG. At HICKS' request, the caller explained that BJ had gone to court and had bonded out, and then was arrested in court. The caller also related that BJ told him that the police had questioned LONG about HICKS, and described a previous search warrant on HICKS' house, before he had moved. The caller again related that LONG had asked him to call HICKS, and HICKS said "good looking out."

277.     On April 18, 2008, at approximately 12:36 a.m., HICKS, using Target Phone 2, received a telephone call from LONG calling from (773) 879-3302 (call # 1974). LONG asked HICKS "what's up?" HICKS asked "you talking about that bizzle [8-ball]?" LONG said yes, and HICKS said come and get it. LONG asked where he should meet HICKS, and HICKS said "the same place as last time."

278.     On April 22, 2008, at approximately 5:54 p.m., LONG called HICKS on Target Phone 2 (call # 2444) and had another discussion regarding their drug distribution. HICKS asked LONG how it's going, and LONG responded that he was trying to get outta debt to HICKS. HICKS asked how that was going, and LONG responded that business had been slow, but it is all right. HICKS then told LONG that he had busted a move and purchased some "Chronic" [marijuana] and that "over there where he be at, they would love that kush"

[marijuana]. HICKS then told LONG that he "should convert at least half to that chronic; half chronic, half C [cocaine]." LONG then asked HICKS about his cocaine supply, and HICKS said he was waiting until something came in right fast.

### May 2, 2008 Transaction

279.     On May 2, 2008, at approximately 1:22 p.m., LONG, and who was using (773) 488-3592, called HICKS on Target Phone 2 (call # 3385)[28] and asked HICKS "what's good, G boy?" HICKS instructed LONG that he could not come "right there" as "it's fucked up." HICKS instructed LONG to go to the restaurant [Gyro's] next to the gas station, and to call when he was there. LONG said he was getting his hair "threaded" and that it wouldn't be done for 40 minutes. At approximately 2:10 p.m., LONG called HICKS on Target Phone 2 (call # 3396) and advised that he would be on his way in a minute and that he was going to ride his car because "he ain't got no other way to get over there." LONG asked HICKS where HICKS wanted to meet and HICKS said maybe the cleaners on Seeley at 55th St.

280.     That same day, at approximately 2:29 p.m., LONG called HICKS on Target Phone 2 (call # 3399) and told HICKS that he was at the gas station. HICKS directed him to the restaurant next door [Gyro's]. LONG asked HICKS if he should drive or walk, and HICKS told him to go get something to eat. LONG complained that he didn't have any money and HICKS laughed. HICKS then told LONG to go over there in the lot. At approximately the same time, surveillance agents observed a blue/purple Chevrolet Caprice with large chrome rims, bearing Illinois license plate G568116, drive into the Citgo Gas Station parking lot at the northwest corner of Garfield and Damen. This vehicle is registered to Joe Long at 6644 S. Union, Chicago,

---

[28]   The telephone number (773) 488-3592 which was used during this call is a land line telephone listed to 6644 S. Union, Chicago, Illinois. This number is also listed in IDOC records as the home telephone number for Joe Long. Joe Long is currently paroled to the 6644 S. Union, Chicago, Illinois address for a 1993 murder conviction.

Illinois.

281.    At approximately 2:30 p.m., HICKS, who was using Target Phone 2, called MASUCA on Target Phone 4 (call # 02511) and told him that "Baby Joe" was "waiting on him." HICKS then stated that "BJ" is talking about getting one "bird" [8-ball quantity of crack cocaine]. HICKS told MASUCA, "he good, he gonna bring back my change" [HICKS was fronting the crack cocaine to LONG and expected him to pay for it later]. HICKS told MASUCA that "BJ" was at the Gyro's waiting.

282.    At approximately 2:31 p.m., surveillance agents observed the Chevrolet Caprice drive from the Citgo gas station lot into the Gyro's parking lot. Agents observed a black male, the sole occupant of the vehicle, get out of the car and walk into the restaurant. At approximately 2:32 p.m., LONG called HICKS on Target Phone 2 (call # 3403) and said "I am right here now" and asked HICKS if he was talking about "Garfield?" HICKS said yeah, and LONG said allright. At approximately 2:35 p.m., surveillance agents observed MASUCA walk into the Gyro's parking lot and enter the restaurant. Agents observed MASUCA meet with LONG through the restaurant window. At approximately 2:40 p.m., surveillance agents observed MASUCA exit the restaurant and walk to the bus stop on the north side of Garfield Boulevard and begin to converse with unidentified individuals. At approximately 2:45 p.m., surveillance agents observed LONG leave the restaurant and get into his car, and the car then left the Gyro's parking lot. During this surveillance, an agent was able to view the driver of the car from a distance of approximately 10 feet.

283.    As noted above, the telephone number used to initiate this deal is a landline registered to an address of residence for Joe Long. In addition, the vehicle surveilled is registered to Joe Long at that address. Based on this information, a surveillance agent subsequently viewed a

photograph of JOE LONG from IDOC records and was able to identify JOE LONG as the driver of the Chevrolet described above.

284.    At approximately 5:10 p.m., surveillance agents observed the Chevrolet Caprice parked in the rear of the residence at 6644 S. Union, Chicago, Illinois.  At approximately 5:15 p.m., agents observed LONG enter the vehicle and drive it into the middle of the alley and begin to walk away leaving the vehicle unattended.  Agents drove up to LONG and advised him that he could not legally park his vehicle in the middle of the alley.  LONG thanked the agents, and explained that he was not parking, merely closing and locking his rear gate.  When agents asked LONG his name, he stated "you know who I am" and the agents said they did not.  LONG then produced a driver's license in the name of Joe Long and gave his name.  The agents who had stopped LONG subsequently reviewed the intercepted telephone calls referenced above between HICKS and "BJ" or "Baby Joe" and identified the speaker in the calls referred to as "BJ" or "Baby Joe" as JOE LONG.

### CHRISTOPHER GAVIN a/k/a "LITTLE CHRIS"

285.    During the course of the investigation, there have been intercepted telephone calls which indicate that CHRISTOPHER GAVIN is a distributer who purchases "weight" quantities of crack cocaine from HICKS.

*April 29, 2008 Transaction*

286.    On April 29, 2008, at approximately 6:57 p.m., a person whom HICKS referred to as "Little Chris" and who was later identified as GAVIN (See ¶ 295 below), called HICKS on Target Phone 2 (call #3044), and said that he needed to see HICKS.  HICKS asked if "we talking about the same flavor? [same amount of narcotics]" GAVIN said "no, the same thing plus another one."  HICKS said, "so we taking about 'neen dean' [9 ounces of crack] right?"  GAVIN

said yeah. HICKS told him to go to Gyro's and to call when he got there. At approximately 7:05 p.m., GAVIN called HICKS on Target Phone 2 (call # 3048) who asked "you up there fool?" HICKS said allright, "here he comes right now." At approximately 7:06 p.m., HICKS, who was using Target Phone 2, called MASUCA on Target Phone 4 (call # 3049) and said "Little Chris" is "up there right now at Gyro's" and that "he want you to bring '4 of you' [(4) 63-gram quantities of crack] right fast." MASUCA asked "who?" HICKS said, "you know, Little Chris – he up there right now." HICKS told MASUCA "49 cents" [the price was $4900, whereas usually the price is approximately $5600]. HICKS repeated "he wants '4 of you' right fast." MASUCA asked what HICKS wanted him to do with "the bird." HICKS told him to "just hold it" and that he would deal with it later. HICKS told MASUCA, "hurry up though, take Chris 4 of them things right fast, but be careful." MASUCA said all right.

287.    At approximately 7:11 p.m., GAVIN called HICKS on Target Phone 2 (call # 3051) and HICKS asked "you good fool?" GAVIN said, "no I'm waiting right." HICKS said "here he comes, here he comes." HICKS asked "what's wrong Chris?" GAVIN asked who he was looking for [who was running the narcotics to him]. HICKS said, "you know Zook, glasses Zook." GAVIN said "oh, all right." HICKS repeated, "here he come." At approximately 7:15 p.m., HICKS, who was using Target Phone 2, called MASUCA on Target Phone 4 (call # 3059) and asked MASUCA if he was "good." MASUCA said, "you said Chris wanted a 'bird' [8-ball quantity] right?" HICKS said, "no, G, 'you' [63 gram quantity]. HICKS said that he didn't say no "bird", he said "you." HICKS told MASUCA that he needed to hurry up. At approximately 7:17 p.m., MASUCA, who was using Target Phone 4, called HICKS on Target Phone 2 (call # 3060) and asked "just one of 'me' [63 gram quantity]?" HICKS said, "no, Zook, four, how one?" HICKS said "no, four of 'you.'" HICKS said that was why he told him the price was "49

cents" [$4,900]. MASUCA said, "oh, okay."

*May 6, 2008 Transaction*

288.    On May 6, 2008, at approximately 3:28 p.m., GAVIN called HICKS on Target Phone

2 (call # 3863) and told HICKS he needed to meet up. HICKS asked what he wanted. GAVIN

said he would let him know when he got up with him. HICKS said he wasn't going to be

around. HICKS said "his man from last time" would take care of him [referring to the April 29,

2008 transaction]. GAVIN told HICKS he would call later. At approximately 4:28 p.m.,

GAVIN called HICKS on Target Phone 2 (call # 3867) and told him that he wanted to see him in

30 minutes. GAVIN said that he wanted what he got the last time, "that, plus another one."

HICKS said, "call me when you get there, go over." GAVIN interrupted and indicated he knew

where to go. GAVIN said he would "hit him in 30 minutes. HICKS said "hold on, Chris, you

talking about what you got last time, plus another?" GAVIN said, "put the same thing on top of

that." HICKS said all right. At approximately 5:23 p.m., HICKS, who was using Target Phone

2, called GAVIN (call # 3887) and asked "is this Chris?" GAVIN said yeah. HICKS said, "my

bad, I slacked off." HICKS said "let me call right now, stay still, stay right there, let me call him

right fast." GAVIN asked "what's the ticket?" [price] HICKS said "let me call him and see

what's happening, hold on."

289.    At approximately 5:24 p.m., HICKS, who was using Target Phone 2, called

MASUCA on Target Phone 4 (call # 3888). HICKS told MASUCA "Chris wants his thing."

HICKS said, "I need, let me see, he kicked out with four, let me see." HICKS asked MASUCA

"you got eight?" HICKS said "I need eight" asking if MASUCA had "8 of you" [(8) 63 gram

quantities]. HICKS asked, "you know what I am talking about?" MASUCA said yeah. At

approximately 5:25 p.m., HICKS, who was using Target Phone 2, called GAVIN (call # 3889)

and told him "now he is already there." GAVIN said "what you talking about?" HICKS said he

would "know a couple dollars off for you, shit I'll knock two off for you, I'll knock three off."

HICKS said "knock three off man, give me ninety-seven [$9,700]. GAVIN said he would call

when he got there.

290.    At approximately 5:27 p.m., HICKS, who was using Target Phone 2, called

MASUCA on Target Phone 4 (call # 3890). HICKS said "you got eight of them?" [(8) 63 gram

quantities]. MASUCA said yeah. HICKS told MASUCA to "start getting eight ready" because

he is coming to get them. HICKS said "he is going to call me back, but just get the eight {63

gram quantities] ready." HICKS and MASUCA discuss what "Bird" [IVORY WATSON] has.

Then HICKS said "get that ready right now because Chris is coming to get that and I am waiting

on Cuervo because he is supposed to be on today."

291.    At approximately 5:36 p.m., GAVIN called HICKS on Target Phone 2 (call # 3893).

During that call, GAVIN told HICKS to not forget to put those "ones." HICKS told GAVIN his

"ass was on some bullshit" and told GAVIN he should have called back the same day. [I believe

in this call, GAVIN is complaining about the weight of the narcotics he purchased from HICKS

in their last transaction and that HICKS is suggesting that if GAVIN was complaining about the

weight, he should have called back the same day]. GAVIN told HICKS that he had been busy,

and then "looked up and said, man, this is, hold up-." HICKS asked GAVIN how he knew

someone else had not removed some crack from the bag making it lighter, and GAVIN said that

no one else beside him and his "girl" were around. HICKS told GAVIN that he knows he

doesn't get down like that, and stated that they're like 64 and 65 [referring to the actual weights

of the 63 gram quantity of crack HICKS sells] and that is how he comes all day. HICKS told

GAVIN that he doesn't even come under a "trey" [street slang for 63 grams of crack cocaine].

HICKS told GAVIN to let him know when he was there, and GAVIN advised that he was already there. HICKS then asked GAVIN if he agreed with the "ticket," the 9-7 [$9,700]. GAVIN responded that he was "cool with that." HICKS responded, "okay, let me call him right now."

292.    At approximately 5:37 p.m., surveillance agents observed a white Cadillac sedan, bearing Illinois license plate G921288, pull into the Gyro's parking lot, closely followed by a silver Chrysler minivan bearing license plate 3122076.

293.    At approximately 5:38 p.m., HICKS, who was using Target Phone 2, called MASUCA on Target Phone 4 (call # 3895). During that call, HICKS told MASUCA that "Chris" was "up there waiting on him right now" and told MASUCA to give him "8 of you" [(8) 63 gram quantities]. HICKS said he owes him a "zip" anyways, so give him 8 birds [an ounce]. HICKS repeated, "give him 8 birds and 8 you." HICKS told MASUCA that Chris was where he was the last time [Gyro's].

294.    At approximately 5:38 p.m., a surveillance agent observed MASUCA walk to the center of S. Hoyne Ave at Garfield and look eastbound toward the Gyro's restaurant while talking on a cell phone. A short time later, the agent observed MASUCA walk westbound to the restaurant, and enter the restaurant. At this same time, a surveillance agent observed the female driver of the minivan, subsequently identified as INDIVIDUAL P, and a passenger of the minivan, subsequently identified as INDIVIDUAL Q, exit the van and walk into the restaurant. Surveillance agents observed the driver of the Cadillac, exit the car and walk into the restaurant, and meet up with INDIVIDUALS P and Q. Then agents saw INDIVIDUAL Q, who was holding a white plastic bag, and the driver of the Cadillac meet with MASUCA. Agents also observed an individual, who was subsequently identified as INDIVIDUAL R, exit that Cadillac

138

and take a position as a "look-out" standing near the cars while the other were meeting.

295.   After viewing CPD photographs and driver's license photographs, agents subsequently identified CHRISTOPHER GAVIN as the driver of the Cadillac.

296.   Based on the content of intercepted calls that follow and related surveillance, I believe GAVIN received cocaine from MASUCA and then sold it to INDIVIDUAL P and INDIVIDUAL Q. At approximately 5:42 p.m., agents observed MASUCA and GAVIN exit the restaurant along with INDIVIDUAL Q. Agents observed MASUCA walk around the Cadillac before getting into the back seat of that car with GAVIN. Agents observed MASUCA and GAVIN conduct an exchange involving the white plastic bag. Agents observed INDIVIDUAL Q get back into the minivan. At approximately 5:44 p.m., agents observed GAVIN and MASUCA get out of the Cadillac and INDIVIDUAL Q got out of the minivan. Agents saw MASUCA walk to INDIVIDUAL P who was near the Gyro's entrance. A surveillance agent saw INDIVIDUAL P return to the minivan and then meet with GAVIN near the Cadillac. The agent observed INDIVIDUAL P get back into the driver's seat of the minivan. GAVIN walked to the driver's side door of the minivan and provided INDIVIDUAL P with an object that appeared to be in the plastic bag. INDIVIDUAL Q returned to the passenger seat of the minivan. At approximately 5:47 p.m., agents observed GAVIN get into the front passenger seat of the Cadillac, and shortly thereafter, INDIVIDUAL R got into the driver's seat.

297.   At approximately 5:50 p.m., HICKS, who was using Target Phone 2, called GAVIN (call # 3897) and asked if he "was good?" GAVIN said yeah. HICKS said he was "making sure." At approximately 5:52 p.m, HICKS, who was using Target Phone 2, called MASUCA on Target Phone 4 (call # 3898) and asked MASUCA if he was "good" and he replied he was good. . HICKS told MASUCA to "count his ticket up" [count the money]. MASUCA said all right.

Based on the content of these calls, I believe that GAVIN and the others had completed a transaction with MASUCA as they had discussed in the calls described above.

298.    At approximately 5:52 p.m., agents observed INDIVIDUAL Q and INDIVIDUAL P exit the restaurant, with INDIVIDUAL Q holding a pizza box and a brown paper bag. Agents then observed INDIVIDUAL Q meet with INDIVIDUAL P between the Cadillac and the silver van, have a short conversation which ended when INDIVIDUAL Q handed INDIVIDUAL P a hand-sized object. INDIVIDUAL P immediately walked to the front passenger door of the Cadillac, and handed this same object to GAVIN through the open window. Through the use of a telephoto lens, an agent was able to discern that this object was a roll of United States Currency (USC) [the money INDIVIDUALS P and Q used to pay for the narcotics].

299.    At approximately 5:55 p.m., agents observed the Cadillac, with the silver minivan following directly behind, exit the Garfield Gyro's parking lot. Agents then followed these two vehicles as they stayed directly one behind the other, with the minivan, driven by INDIVIDUAL P, mirroring any lane change or turn executed by the driver of the Cadillac (INDIVIDUAL R). Surveillance agents followed these vehicles. A surveillance agent then observed the Cadillac and silver minivan drive westbound on Garfield to California, where both vehicles turned North onto California.

300.    After the two vehicles made their northbound turn onto California (at approximately 5:57 p.m.) surveillance agents, who had previously noticed that neither INDIVIDUAL Q nor INDIVIDUAL P were wearing seatbelts (a violation of the IVC), activated their emergency equipment and attempted to curb the minivan on California at 51st Street. At this point, both the Cadillac and minivan began to slow down and appear to pull over, but instead made an eastbound turn onto 51st Street at a high rate of speed. Both the Cadillac and the van accelerated

to high rates of speed, and began to make a series of quick turns off of 51st Street onto various

side streets north of 51st Street. Agents continued to follow the two vehicles. When the Cadillac

and the van reached approximately Richmond and 47th the Cadillac went eastbound towards

Damen, and the minivan went north on Richmond, and then went around the block and south

again to 47th Street, and then east on 47th Street. Agents continued to follow the minivan as it

drove east on 47th Street to Western, and then south on Western to 51st Street.

301.    Agents conducted a traffic stop of the silver minivan. After the minivan was stopped,

agents took INDIVIDUAL P and INDIVIDUAL Q into custody, and transported them to Cook

County Sheriff's Office in Maywood, Illinois. Once there, agents searched the van with negative

results. A search of INDIVIDUAL P revealed $618 in USC, a silver Samsung cellular

telephone, telephone number (314) 704-2796, a silver Verizon cellular telephone, telephone

number (314) 707-8296, and a Missouri Commercial Driver's license. A search of

INDIVIDUAL Q revealed $226 in USC, a black cellular Samsung telephone, telephone number

(314) 494-8434, an Illinois Driver's License, a Missouri state Identification Card, a blue skull

cap and (2) casino club cards.

302.    A brief interview with INDIVIDUAL P and INDIVIDUAL Q revealed little

information. Specifically, INDIVIDUAL P stated that she did not know why they ran from

Officers, and then stated that they thought that the police were trying to stop a car in front of

them. INDIVIDUAL P offered no explanation for why they did not pull over, nor any

explanation as to what she and INDIVIDUAL Q were doing in the Garfield Gyro's parking lot.

During a brief interview of INDIVIDUAL Q, he related essentially the same.

303.    INDIVIDUAL Q and INDIVIDUAL P were subsequently released. INDIVIDUAL P

was also issued 5 traffic citations for failure to wear a seatbelt, (2) failure to obey traffic signals,

and a speeding citation. Both INDIVIDUAL Q and INDIVIDUAL P gave consent for a search of their cellular telephones.

304. On May 7, 2008, an ATF agent met with a Cook County Sheriff's Police K-9 Officer and his K-9. At the K-9 Officer's direction, the ATF agent hid the USC recovered from both INDIVIDUAL P and INDIVIDUAL Q in separate locations in an office not used or associated with the storage or packaging of evidence of any kind. Pursuant to his request, the K-9 Officer was not aware of the location of the funds hidden by the ATF agent. The K-9 Officer and his dog were then allowed to operate in this office. The dog then found each bundle of USC and alerted for the presence of narcotics on each bundle of USC. The ATF agent subsequently inventoried both of these amounts of USC as evidence.

305. On May 7, 2008, at approximately 1:52 p.m., HICKS, using Target Phone 2, received an incoming telephone call from an individual known as "INDIVIDUAL U" calling from (773) 870-3083 (call # 3975), who advised that another individual identified as "Big T" wanted to speak with HICKS. Big T then used INDIVIDUAL U's telephone, and had a conversation with HICKS regarding why HICKS never called Big T back yesterday. HICKS stated that the only calls he received yesterday night were regarding someone who told him he needed to move around "cause some niggas had threw some shit out the window on a high speed chase." Based on this information, I believe that INDIVIDUALS P & Q threw the drugs they had purchased from GAVIN via MASUCA out of the car window as they attempted to elude the traffic stop.

### KEVIN GORDON a/k/a "BIG BIRD"

306. During the course of the investigation, there were several intercepted calls indicating that KEVIN GORDON is a runner or worker for HICKS.

307.    On March 8, 2008, at approximately 4:30 p.m., GORDON[29] called HICKS on Target Phone 1 (call # 16730) and said he needed to "make a move right quick on some shit right fast." GORDON asked HICKS what he wanted for a "halsted" [the price of a 63 gram quantity of crack cocaine]. GORDON said he would "hit him right back." At approximately 6:01 p.m., HICKS, who was using Target Phone 1, called GORDON (call # 16754) and asked if he still wanted "that." GORDON said "yup." HICKS said "they'll get it right now for you." HICKS asked if he knew where Zook's [MASUCA's] crib was. GORDON asked if it was "the long place." HICKS said yeah, adding that, as soon as MASUCA got back, he was going to call GORDON.

308.    On April 26, 2008, at approximately 10:09 a.m., GORDON called HICKS on Target Phone 1 (call # 24247) and told HICKS that "on that other business" he was finished. HICKS asked if he was "talking about that other stuff?" adding "yeah, I'll go ahead and get you some more." HICKS asked if he had "an approximate with 'Zook'" GORDON said that he had one of them laying around and asked if HICKS wanted him to "get up with" MASUCA. HICKS said he was going to call MASUCA to see if he had a car and told GORDON he would call right back.

309.    On April 27, 2008, at approximately 8:48 p.m., HICKS, who was using Target Phone 2, called KEVIN GORDON (call # 2861) and complained to GORDON about one of his other workers. HICKS complained that the worker was making the bags of narcotics too small. GORDON told HICKS that people had been calling to complain about it. HICKS said that after he got through selling what he had, that they [HICKS and GORDON] will "make them" [prepare the bags of narcotics] from then on. HICKS said he made "6's, 7's even 8's." GORDON asked

---

[29]    A discussion of the identification of KEVIN GORDON is outlined below in ¶ 314.

how many more he had left.  HICKS replied three or four.  GORDON said he had the new

"lick", too – the one he had gotten the day before.  HICKS said "we got all types of shit locked

up."  GORDON replied "opened their eyes" [referring to the police contact with WATSON on

April 25, 2008].  HICKS said it was "good that it happened that way and it could have happened

another way" [meaning the it could have been more problematic if the police had executed

search warrants and/or arrested members of the organization].  GORDON said he had seen

Maxine [RUFFETTI] and them and locked her in and that they had been coming all day.

GORDON said "they" [RUFFETTI and her associates] had been down there three or four times.

310.    On May 2, 2008, at approximately 9:11 p.m., GORDON called HICKS on Target

Phone 2 (call # 3507) and told him he had a "deuce" left.  HICKS said he was going to call the

person now and that he was just leaving the building now.  HICKS said, "you know he don't

have no car."  GORDON said he would have to get down there and told HICKS "just tell him to

have that stuff ready."  HICKS said okay.  At approximately 9:31 p.m., HICKS, who was using

Target Phone 2, called MASUCA on Target Phone 4 (call # 3512) and told him that "Big Bird"

[GORDON] is coming down there in a minute.  HICKS said that he [GORDON] said that "Karl

Knauz suit was running kinda short" [GORDON was running short on marijuana].  HICKS said,

"anyway, he is going to need you again."  MASUCA said "yeah, I know.  HICKS said, "you got

it with you?"  MASUCA said, the same "whatchyacallit?"  HICKS said "no, all small boys, just

a jab and the small boys."  HICKS said, "he may give you some change, but don't get the change

mixed up."  At approximately 11:04 p.m., GORDON called HICKS on Target Phone 2 (call #

3522).  HICKS asked if "Zook gave him that?"  GORDON said that he told him to wait until the

morning.  GORDON said, "everything is good."  GORDON said it is "all in how you talk to

people – I know how to sell water to a whale."  GORDON said he did damn near $600 today.

GORDON and HICKS talk about GORDON's girl, and that they would need her when they are going to get "that weight on that thang." GORDON says he's got somebody for that. GORDON said that he has a "legit Corvette bitch, all she know is iceberg, and she has no choice but to listen." GORDON then talks about having legit women to help him run his narcotics.

311.    On May 6, 2008, at approximately 4:54 p.m., GORDON called HICKS on target Phone 2 (call # 3854) and asked HICKS how much he was going to get. GORDON said he wanted part of the lick. GORDON said he had "three left." HICKS asked GORDON what he wanted. GORDON said "on the trey side" and says he doesn't know.

312.    On May 6, 2008, at approximately 10:22 p.m., HICKS, who was using Target Phone 2, called GORDON (call # 3928). HICKS asked GORDON what he had left. GORDON said he didn't know and that he had to go home and count. GORDON said, everything he had was in one bag. HICKS said he was "running an inventory." GORDON said, "I know I got 5 something laying around still." GORDON said, "the last lick you gave me is 5 something." HICKS and GORDON talk about the money he made. GORDON said that the money he makes, he puts into one bag. HICKS said he wanted to know the exact number on what he had left. GORDON said he was "rounding it off to 6 [$600]" but that he was not counting the bags – so he might be "knocking on $940 or so." HICKS said he just wanted to understand what happened if he only had $600. GORDON said "no" that he had the "nifties" [$50 bags] off that "new lick" he just got yesterday.

313.    On May 7, 2008, at approximately 12:39 a.m., GORDON called HICKS on Target Phone 2 (call # 3946) and they had a conversation about the inventory HICKS did and how they are missing "a stack." HICKS and GORDON argued about who was short on the drug proceeds. GORDON told HICKS to write down everything he does from now on. HICKS said he is still

going to give GORDON his "chop" but that he could not give it to him then because "a motherfucker fucked up the account." HICKS said he was going to wait until GORDON brought back what he sold, put his [HICKS'] change with it, go back, and then he would give GORDON what he was going to give him – and that everything after that would have to be written down.

314.    On May 19, 2008, at approximately 11:00 a.m., agents met with INDIVIDUAL JJ who claimed to be related to KEVIN GORDON. INDIVIDUAL JJ viewed a photograph of GORDON from CPD records and identified the person in the photograph as the KEVIN GORDON to which she was related. INDIVIDUAL JJ placed a telephone call to an individual she said was GORDON. One of the agents spoke to GORDON over the telephone and arranged to meet GORDON at 12:00 p.m. that day. At approximately 12:00 p.m., agents met with GORDON at the intersection of 53rd and Maryland in Chicago, Illinois. The agents had a brief conversation with GORDON at that time. One of the agents subsequently reviewed the intercepted telephone calls associated with GORDON and was able to identify the speaker in those calls as the KEVIN GORDON the agents met with.

## LATASHA WILLIAMS a/k/a "TASHA B"

315.    As discussed above, CI-2 identified LATASHA WILLIAMS as one of HICKS' workers. In addition, during the course of the investigation, several calls were intercepted which indicate that WILLIAMS assists HICKS in processing powder cocaine.

### February 19, 2008 Calls Regarding Processing Cocaine

a.    On February 19, 2008, at approximately 8:02 p.m., MASUCA, who was using Target Phone 4, called HICKS on Target Phone 1 (call # 14758). HICKS told MASUCA that he was fittin to come down there and get something from him so that he could "hook it up." In this call, I believe HICKS was telling MASUCA that he was planning pick up powder cocaine so he

could process it into crack cocaine.

b.  At approximately 8:15 p.m., HICKS, who was using Target Phone 1, called LATASHA WILLIAMS (call # 14760), and asked her if she had blade pieces on her "thing" or just one.  She replied "just one."  HICKS said allright and told her to "get the extension cord." At approximately 8:16 p.m., HICKS, who was using Target Phone 1, called MASUCA on Target Phone 4 (call # 14761) and told him to "bring me one of those things I didn't check out." HICKS told MASUCA to "bring his bizzow, and the one he didn't fuck with."  HICKS said he would wait outside.  At approximately 8:18 p.m., HICKS, who was using Target Phone 1, called WILLIAMS (call # 14762) and asked her to get him some "soda" [baking soda].  WILLIAMS said that she got it.  HICKS said "give me a bit, I might need more."  At approximately 8:30 p.m., HICKS who was using Target Phone 1, called WILLIAMS (call # 14768) and told her to open the door downstairs [to let him in].

### March 8, 2008 Calls Regarding Processing Cocaine

316.  On March 8, 2008, at approximately 11:01 a.m., SANFORD TOWNSEND, called HICKS on Target Phone 1 (call # 16637).  HICKS told TOWNSEND that he had to "go over" and said, "I told you I had to chef" [meaning to cook powder cocaine into crack cocaine]. HICKS said "remember I told you I had to cook and everything?"

317.  At approximately 12:22 p.m., HICKS, who was using Target Phone 1, called COPRICH (call # 16657).  HICKS said he had to "go kite it up" [cook it up].  HICKS asked COPRICH didn't he have "like 18 of them?"  COPRICH said no, "like 10."  HICKS said "damn" and that he had to "get his ass up then and get over there."  HICKS said he was going to call IVORY [HICKS was going to call WATSON to come pick him up and take him to the "cook house"].

318.    At approximately 12:26 p.m., HICKS, who was using Target Phone 1, called

MASUCA on Target Phone 4 (call # 16659).  HICKS told MASUCA that he was waiting on

Ivory [to pick him up].  HICKS said that he had to find a car.  HICKS said he had to find Ivory

so he could "take care of business."  MASUCA replied, "yeah, or else we'll be in high water."

[their narcotics inventory is running low].  HICKS agreed.  At approximately 12:32 p.m.,

AHMAD WILLIAMS called HICKS on Target Phone 1 (call # 16671) and asked if HICKS was

waiting for WATSON.  HICKS told WILLIAMS that he never "made a move" that morning.

HICKS said that he needed to [make a move] because Dan [COPRICH] didn't have anything

[was out of narcotics].

319.    At approximately 1:43 p.m., HICKS, who was using Target Phone 1, spoke with

LATASHA WILLIAMS (call # 16694) and asked if she was back at the house.  WILLIAMS

said that she was at the house, and HICKS advised that he was waiting for Ivory [WATSON] and

would soon be there.  At this time, surveillance agents were dispatched to the area near the

residence at 6152 S. Albany Ave., Chicago, Illinois [SEARCH SITE G].  Once there, agents

observed the 2-door Chevrolet Monte Carlo, bearing Illinois license plate X404457,  a vehicle

registered to Latasha Williams at 12412 S. Eggleston, Chicago, Illinois, and associated with

LATASHA WILLIAMS through previous surveillance, parked on the west side of Albany Ave.

near the 6152 S. Albany residence.

320.    At approximately 4:40 p.m., that same day, HICKS, who was using Target Phone 1,

spoke with IVORY WATSON (call # 16735) and, when HICKS asked where he was, WATSON

replied he was "downstairs."  HICKS instructed WATSON not to go anywhere because Zook

[MASUCA] was getting the car and then "we fittn to get right." [process cocaine to create an

inventory of crack cocaine to sell].  At approximately 4:49 p.m., HICKS, who was using Target

Phone 1, spoke with LATASHA WILLIAMS (call # 16736) and asked her if she was still in the

crib. WILLIAMS said no, but that someone else was still there. HICKS told WILLIAMS to

have that person come outside and advised that they would be there in ten minutes. At

approximately 4:45 p.m., surveillance agents observed two unidentified black males exit the side

entrance of 6152 S. Albany and walk to the above described Chevrolet Monte Carlo, enter the

vehicle and drive away. At approximately 4:51 p.m., MASUCA, who was using Target Phone 4,

called HICKS on Target Phone 2 (call # 0329). MASUCA asked "which pair of shoes" he was

supposed to grab. HICKS directed MASUCA to grab the "one we tried out, and the one we just

got." HICKS said, they "might as well do a deuce on 'em, and the other can come through

tomorrow." At approximately 5:03 p.m., HICKS, who was using Target Phone 2, called

MASUCA on Target Phone 4 (call # 0332) and asked MASUCA if he got "it" and told him they

were waiting on him. At approximate 5:07 p.m., HICKS, who was using Target Phone 2, called

MASUCA on Target Phone 4 (call # 0333) and asked MASUCA if he remembered where "she"

[Latasha WILLIAMS] stay at. MASUCA responded that "he never forgets where dude has

stayed at." HICKS advised MASUCA that "we gonna stay behind you."

321.    At approximately 5:15 p.m., surveillance agents observed a green Saturn bearing

temporary Illinois license plate number 490J270, park in front of the 6152 S. Albany. Agents

also observed a white Oldsmobile sedan bearing Illinois license plate X605927, driven by

WATSON, [and registered to WATSON at 5358 S. Hoyne Ave., Chicago] following directly

behind the green Saturn and park just north of the Saturn on the west side of the street. Agent

observed MASUCA exit the green Saturn with bag, and meet HICKS who got out of the

Oldsmobile. Agents observed WATSON drive away in the white Oldsmobile. HICKS and

MASUCA, then walked toward 6152 S. Albany and entered the south side door of this residence.

At approximately 5:15 p.m., HICKS, who was using Target Phone 1, called LATASHA WILLIAMS and told her to come down and open the door. At approximately 5:40 p.m., agents observed a black female exit a residence at 6206 S. Albany, walk to 6152 S. Albany and enter the south side entrance. At approximately 5:50 p.m., a surveillance agent observed several black males through the second floor windows of 6152 S. Albany.

322.    At approximately 5:54 p.m., MASUCA, who was using Target Phone 4, called HICKS on Target Phone 2 (call # 0335) and advised that they "ain't got any more of them big bowls." HICKS told MASUCA to "try 71st and Ashland, or the Food for Less at 47th and Damen."

323.    At approximately 6:07 p.m., HICKS, who was using Target Phone 1, called COPRICH (call # 16757) who asked if "it came back dry good and everything?" HCIKS said yeah, and asked if he told him about his new way of "doin' that" [cooking cocaine]. COPRICH said yeah. HICKS said "it came out just like the last ones did." During this call, cooking sounds and microwave sounds can be heard in the background. COPRICH suggested that they go see Scarface that night. HICKS said, "hit him up" [call him], but "he takin' care of business."

324.    At approximately 8:00 p.m., WATSON called HICKS on Target Phone 1 (call # 16760) and asked "if it's ready." HICKS said he just knocked down a "Holly Ross", c'mon gimme one minute.

325.    At approximately 9:19 p.m., MASUCA, who was using Target Phone 4, called HICKS on Target Phone 1 (call # 16773) and asked HICKS to make some more "birds" [8-ball quantities] for him. MASUCA asked if he was almost done. HICKS said "one more to go."

326.    Between 10:22 and 10:31, there is a series of calls between HICKS, WATSON and MASUCA that appear to relate to arranging a caravan (call #'s 16778, 16779, 16780, 16782,

16784, 16786,16788, and 16789). At approximately 10:36 p.m., MASUCA, who was using Target Phone 4, called HICKS on Target Phone 1 (call # 16790) and said "we all there now." HICKS replied "here I come." At approximately 10:51 p.m., HICKS, who was using Target Phone 1, called MASUCA on Target Phone 4 (call # 16794) and said that when they got to where they were going, there would be "10 [63 gram quantities], 27 [8-balls] and a short dog [ounce] [inventory of newly made crack cocaine quantities]. At approximately 10:52 p.m., HICKS, who was using Target Phone 1, called MASUCA on Target Phone 4 (call # 16795) and asked if "both counts came up good" so he could make sure "he didn't drop anything." MASUCA said there is one "27" that is short, and then there is a "ten." MASUCA said "allright" and that he was "counting that now." HICKS said "10 big dogs, and a little '27', and a short dog." HICKS said all the "big dogs going up under birds." [the 63 gram quantities would be broken down in to 8-ball quantities].

### April 8, 2008 Calls and Surveillance Related to Processing Cocaine

327.    As outlined above in ¶¶ 56 – 67, there was a series of calls accompanied by surveillance which indicate that LATASHA WILLIAMS assisted HICKS in processing cocaine at her residence at 6152 S. Albany Ave., Chicago, Illinois [SEARCH SITE G].

328.    During the course of the investigation there were intercepted calls which indicate that LATASHA WILLIAMS is also a broker that arranges narcotics transactions for HICKS:

a.    On February 8, 2008, at 6:44 p.m., HICKS, who was using Target Phone 1, called LATASHA WILLIAMS (call # 13422). WILLIAMS asked HICKS if "Zook all good down there" [did he have narcotics available]. HICKS said "no, all ZOOK has are halsteds." WILLIAMS said that was what she was talking about. HICKS said, "yeah, he all good, call him up." WILLIAMS said she didn't have Zook's number, and HICKS gave her the number [Target

Phone 4].

b.  On March 18, 2008, at approximately 8:35 p.m., HICKS, who was using Target

Phone 1, called LATASHA WILLIAMS (call # 18143) and asked what she was doing.

WILLIAMS said there was a girl who was "trying to bust a move and shit" [buy some drugs].

HICKS asked "what is she trying to do?"  WILLIAMS said she was trying to get two

(unintelligible) on halsted."  HICKS asked "hardball?" WILLIAMS replied yeah.  HICKS asked

if she got 25 [$2,500 – the price for two 63-gram quantities] and WILLIAMS said "that all the

bitch got."  HICKS asked "doesn't she know what season it is?" HICKS asked WILLIAMS what

she wanted, "a dollar" [ $100 for setting up the deal].  HICKS said, "if she only got a quarter,

what does she want off of it?"  HICKS asked "does she know what's going on?"  WILLIAMS

said she had been [buying drugs] from "Chilly" and that's what he had been giving it to her for.

HICKS asked "you want a dollar?" WILLIAMS replied that she might as well.  HICKS asked if

she was ready right now and WILLIAMs replied that she was ready.  HICKS told WILLIAMS to

have her customer send somebody to get it, adding the he didn't want her [WILLIAMS] to pick

it up.

c.  On April 15, 2008, at approximately 2:59 p.m., LATASHA WILLIAMS called

MASUCA on Target Phone 4 (call # 01382) and asked if "Zook" was around. MASUCA asked

who was calling and WILLIAMS replied "TB." MASUCA said he was around.  WILLIAMS

asked "how many dollars does it cost to be taking people on halsted?" [the price for a 63-gram

quantity] MASUCA said he had different prices and told her to call HICKS to get the price.  She

said she would call him right back.  At approximately 3:06 p.m., WILLIAMS called MASUCA

on Target Phone 4 (call # 01384). MASUCA said "what up TB?"  WILLIAMS  said "this bitch

talking 12" [her customer wanted to pay $1,200 for the 63-gram quantity of crack] and that she

told her to "get her ass up outta here, what am I going to do that for?" [that price was unacceptable]. WILLIAMS said that if "the bitch" [customer] called back with 13 [$1,300] or something that she would call. At approximately 3:06 p.m., HICKS, who was using Target Phone 2, called MASUCA on Target Phone 4 (call # 1911) and asked MASUCA "out of that same lick you was fucking with TB [WILLIAMS] with." HICKS said, "you remember when you had made that for 'Slim'?" MASUCA said yeah. HICKS said, make me another 28 of them.

    d.  On May 17, 2008, at approximately 12:04 a.m., LATASHA WILLIAMS called HICKS on Target Phone 2 (call # 5229). HICKS told WILLIAMS that he needed some "bizzles" [8-ball quantities]. WILLIAMS said she "isn't around there right now." HICKS said okay.

### HICKS Provided Bail Money for WILLIAMS

329.    According to Chicago Police Department records, on February 21, 2008, at approximately 3:05 a.m., LATASHA WILLIAMS was arrested on a charge of possession of cocaine and bond was set at $5,500. According to CPD records, approximately 12.2 grams were recovered from WILLIAMS. On February 21, 2008, at approximately 2:26 p.m., HICKS, who was using Target Phone 1, participated in a three-way call involving LATASHA WILLIAMS (call # 14988), during which she informed him that she was in jail and that she needed $5,500 to post bond. LATASHA WILLIAMS asked HICKS to give the money to INDIVIDUAL N, and that she would give him the money back when she got home. HICKS told LATASHA WILLIAMS he would have MASUCA bring the money. HICKS told LATASHA WILLIAMS to instruct INDIVIDUAL N to go to Gyro's and that he would have MASUCA meet her there. LATASHA WILLIAMS asked HICKS about her keys [car keys] because she needed a ride.

HICKS said he had the keys to the car in his pocket. HICKS told INDIVIDUAL N to bring
LATASHA WILLIAMS the keys and the money.

330.    At approximately 4:29 p.m., HICKS, who was using Target Phone 1, called
INDIVIDUAL N and told her he was coming down "that way" but that she [LATASHA
WILLIAMS] hadn't given him any car keys. INDIVIDUAL N told HICKS that she didn't have
any way to go and "get her" [deliver the bond money for LATASHA WILLIAMS so she could
get out of jail]. HICKS said he was going to pick her up and take her after he switched up his
rental car. At approximately 5:43 p.m., HICKS, who was using Target Phone 1, called
MASUCA on Target Phone 4 (call # 15023) and told him to get "$5,500 together right fast."
HICKS said he would pay MASUCA back that day, but that he need it to help a "homie" out
right fast. At approximately 6:12 p.m., HICKS, who was using Target Phone 1, called
INDIVIDUAL N, and told her that he found the keys in the glove compartment. HICKS told
INDIVIDUAL N that she should follow him and that he was going to give her the keys [to
LATASHA WILLIAMS' car]. At approximately the same time, a surveillance agent observed a
red Dodge Charger drive up to the residence at 5720 S. Wolcott, Chicago, Illinois. The
surveillance agent subsequently identified the driver as ISAIAH HICKS. The agent then
observed a female exit the residence and walk to the red Charger. The female then walked to a
gold Chevrolet Monte Carlo, got into that car, and began to follow the red Charger. Surveillance
agents observed both the red Charger and the Monte Carlo travel to the area of 5437 S. Hoyne
Ave., Chicago, Illinois [SEARCH SITE B]. At approximately 6:15 p.m., HICKS, who was using
Target Phone 1, called MASUCA on Target Phone 4 (call # 15028) and told him to "get that
ready" [the money] and that he was coming to get it right now. Surveillance agents observed
the two vehicles stop in the middle of S. Hoyne Avenue opposite 5437 S. Hoyne. Agents

154

observed MASUCA exit the residence and meet with the two vehicles.

331.     Surveillance agents followed the Monte Carlo as it drove to the Cook County Jail located at 2800 S. California, Chicago, Illinois, arriving at approximately 6:38 p.m.

332.     Law enforcement records show that $5,500 in cash was posted as bond for LATASHA WILLIAMS, and that she was released on that day at approximately 10:22 p.m.  Agents familiar with the above-listed calls identified the voice on those calls as the same as that of LATASHA WILLIAMS who called HICKS on February 21, 2008 to request his assistance with bail money.

### ETHEL J. HAROLD a/k/a "JEANNETTE"

333.     During the course of the investigation, several calls were intercepted which indicate that ETHEL J. HAROLD  a/k/a "Jeannette" is a distributor who purchases "weight" quantities of crack cocaine from HICKS.

*February 20, 2008 Transaction*

334.     On February 20, 2008, at approximately 11:56 a.m., HICKS, who was using Target Phone 1 called HAROLD[30]  (call #14814) who told HICKS that she would be by in fifteen minutes.  HICKS said OK.  At approximately 12:39 p.m., ETHEL HAROLD called HICKS on Target Phone 1 (call #14821) and told HICKS that she was "right there at the restaurant" [Gyro's restaurant].   At approximately 12:39 p.m., HICKS, who was using Target Phone 1, called MASUCA on Target Phone 4 (call #14823) and asked if he was still asleep.  MASUCA replied that he was at the Red Snapper [restaurant].   HICKS told him that "old girl" was waiting at Gyro's for him.  MASUCA asked "who 'Maxine's chick?"  HICKS replied yeah, and said it was one of her cousins that "always be coming."  HICKS said "let me see how many she is talking" and said he'd call MASUCA back.  At approximately 12:40 p.m., HICKS, who was using Target

---

[30]   A discussion of the identification of HAROLD is provided below in ¶ 335.

Phone 1, called HAROLD (call #14824), and told her that "he" [MASUCA] was at the restaurant right across the street from her and that he was going to get his food "right fast" and then come back and get it, and suggested that she could either wait for a few seconds or call "Bird" [IVORY WATSON]. HICKS said that he [MASUCA] "ain't got it with him, so give him 5 or 10 minutes."

335.    At approximately 12:41 p.m., HICKS, who was using Target Phone 1, called HAROLD (call #14825) and asked her what she wanted anyway, and HAROLD said "just one." HICKS said okay. At approximately 12:42 p.m., HICKS, who was using Target Phone 1, called MASUCA on Target Phone 4 (call #14826) and told him that she wanted one of "Bird's seeds" [one 8-ball]. MASUCA said okay, give me a second. Moments later, a surveillance agent observed MASUCA departing the Red Snapper Grill holding a white bag in his hands. At approximately 12:43 p.m., a surveillance agent noticed a female, who was later identified as ETHEL J. HAROLD, standing in front of the Gyro's restaurant. Surveillance agents observed MASUCA meet with the female in a gold Ford sedan. Surveillance officers observed MASUCA as he got out of the vehicle and walked through the alley connecting S. Seeley and S. Hoyne Avenues. A surveillance officer observed MASUCA enter the residence at 5437 S. Hoyne [SEARCH SITE B]. A short time later, surveillance agent observed MASUCA exit the residence and walk back through the alley to the Gyro's parking lot where he met with the female again in the gold Ford. At approximately 12:53 p.m., the female departed the area, driving the gold Ford and surveillance officers followed that vehicle. Agents observed the driver make an improper lane movement and conducted a traffic stop. The driver was identified as Ethel J. Harold based on her driver's license photograph.

*March 28, 2008 Transaction*

336.    On March 28, 2008, at approximately 7:19 p.m., HAROLD called MASUCA on

Target Phone 4 (call # 00321) and asked him if he was working. MASUCA said "yes" and that

he was "over there."  HAROLD told MASUCA that she didn't have an minutes [left on her cell

phone], but that she was going to head up to the restaurant right now and that she would meet

him there at 7:30 and would be up in the restaurant eating.  MASUCA said allright.  At

approximately 7:30 p.m., surveillance agents observed a gold Ford Contour enter the Gyro's

parking lot.  The vehicle parked and three females were observed as they exited the car and went

into the restaurant.  At approximately 7:40 p.m., surveillance agents observed MASUCA

entering the restaurant.  At approximately 7:44 p.m., surveillance agents observed the three

female subjects leave the restaurant and return to the Ford Contour.

*March 31, 2008 Transaction*

337.    On March 31, 2008, at approximately 2:40 p.m., HAROLD called MASUCA on

Target Phone 4 (call # 00433) and asked him if he was working.  MASUCA replied that he was

and that he was "at the crib."  HAROLD asked where she should go, "where she went

yesterday?"  MASUCA told her to go to the restaurant.  HAROLD said she would be there in 4

minutes.

338.    At approximately 2:45 p.m., surveillance agents observed a gold Ford Contour with

what appeared to be two Hispanic female occupants, drive into the lot of the Gyro's restaurant.

At approximately 2:47 p.m., surveillance agents observed MASUCA walk through the alley

connecting S. Hoyne Ave. to S. Seeley Ave. and get into a white Chevrolet Impala that was

parked on S. Seeley Ave.  At approximately 2:49 p.m., HAROLD, called MASUCA on Target

Phone 4 (call # 00439), who told her that he was walking through the alley now."  HAROLD

replied "come on."  Moments later, surveillance agents observed the white Chevrolet Impala in

which MASUCA was riding with other unidentified males, appeared in the parking lot of the Gyro's restaurant. MASUCA got out of the car and went into the restaurant. Moments later, MASUCA exited the restaurant with two females and got into the gold Ford Contour. Agents observed MASUCA get out of the gold Ford Contour and re-enter the restaurant after which the two females in the Contour drove out of the lot. Agents observed MASUCA talking to the occupants of the White Chevrolet Impala who were inside the restaurant.

339.    At approximately 2:54 p.m., HICKS, who was using Target Phone 1, called MASUCA on Target Phone 4 (call #20402), and asked where he was. MASUCA replied that he was at Gyro's. HICKS asked if he has some money in his pocket. MASUCA replied that he did. HICKS told MASUCA to "get up with him when he gets back." Additional transactions are outlined below.

340.    Based on the above series of events, I believe MASUCA met with HAROLD inside gold Ford Contour to complete the transaction.

### April 10, 2008 Call Regarding Narcotics

341.    On April 10, 2008, at approximately 7:27 p.m., MASUCA, who was using Target Phone 4, placed a call to ETHEL HAROLD on (773) 876-2513 (call #01131), who asked MASUCA if he was working and if he could meet her at the restaurant [Garfield Gyro's]. At approximately 7:35 p.m., HAROLD called MASUCA on Target Phone 4 (call # 01132), and said she was sitting in there. MASUCA told HAROLD to exit the restaurant and that she would see him in the alley. At approximately 9:23 p.m., MASUCA, who was using Target Phone 4, called HAROLD (call # 01158), who told MASUCA that he "knows what he gave her was short, right?" MASUCA asked "how short?" HAROLD said that what she got was "a couple points off like 32 or 33." HAROLD told MASUCA that she usually doesn't call but that it was short.

HAROLD told MASUCA that she hopes he "got her in the morning" and MASUCA replied that

he's "got her with another one, better than the one he gave her." In this call, I believe that

MASUCA had sold a quantity of crack cocaine to HAROLD, but that the quantity had weighed

in at less than she expected and that MASUCA promised to replace what he sold her.

### *April 10, 2008 Call Regarding Firearm*

342.    On April 16, 2008, at approximately 10:40 p.m., HAROLD called HICKS on Target

phone 2 (call # 1509) and had a conversation during which she indicated that she possesses a

firearm. HAROLD stated that she "swears to go, if the BL's lit my niggas up tonight, Joe, oohh,

my god, I got a thumper [gun] on stand-by, we gonna light them bitch ass niggas up, Yo."

### **MAXINE RUFFETTI**

343.    During the course of the investigation, several calls were intercepted which indicate

that MAXINE RUFFETTI is a distributor who purchases "weight" quantities of crack cocaine

from HICKS.

### *February 1, 2008 Calls Regarding Narcotics*

344.    February 1, 2008, at approximately 3:21 p.m., HICKS, who was using Target Phone 1,

called RUFFETTI[31] at (773) 876-2513 (call # 12174) and asked what kind of car she was in.

RUFFETTI said she was in the restaurant ordering some food. HICKS said, "okay, here he come

right now." At approximately 3:22 p.m., HICKS, who was using Target Phone 1, called

MASUCA on Target Phone 4 (call # 12175) and told him that Maxine, "the Puerto Rican girl",

wants a "bird" [8-ball quantity of crack cocaine]. MASUCA said that he was on 95th and that he

was "getting that piece." At approximately 3:25 p.m., HICKS, who was using Target Phone 1,

called RUFFETTI (call # 12177) and told her that MASUCA was on 95th, and that she should

---

[31]   A discussion of the identification of MAXINE RUFFETTI is outlined below in ¶ 348.

come on inside his [HICKS'] crib. RUFFETTI said she'd be right there.

345.    On February 1, 2008, at approximately 8:02 p.m., HICKS, who was using Target Phone 1, had a conversation with MASUCA (call # 12255). HICKS told MASUCA that he had a lick for him right now at Gyro's. HICKS told MASUCA that Maxine [RUFFETTI] and the Puerto Rican from earlier want two "birds" [8-ball quantities of crack cocaine]. At approximately 8:06 p.m., HICKS, who was using Target Phone 1, called RUFFETTI (call # 12261) and RUFFETTI asked where the hell his people were and HICKS said that "he" [MASUCA] is on the way. At approximately 8:08 p.m., MASUCA called HICKS on Target Phone 1 (call # 12263) and told him that Maxine wants what she got earlier from them. RUFFETTI got on the phone and complained that this wasn't what she got before. HICKS explained that the last one was from the old "lick", and this one is from the new "lick." HICKS told her "that's all we got." HICKS explained that the larger one was the ones that he was charging $125 for, but he had so many calls complaining about the price that he went to the new ones. RUFFETTI said allright.

*February 2, 2008 Transaction*

346.    On February 2, 2008, at approximately 2:07 p.m., MAXINE RUFFETTI called HICKS on Target Phone 1 (call # 12434) and told him that she was sending her "girl" [INDIVIDUAL HH] over with her money for 2 [8-balls]. RUFFETTI asked if she should go to the same place as yesterday [referring to the prior transaction at Gyro's] and HICKS said yes. At approximately 2:29 p.m., RUFFETTI called HICKS on Target phone 1 (call # 12543) and told him that "she" was "right there". HICKS told her to tell INDIVIDUAL HH to sit tight right there, that "he" is fittn to come. At approximately 2:50 p.m., HICKS, who was using Target Phone 1 called RUFFETTI (call # 12449) and told her that her girl [INDIVIDUAL HH] was in

III.    **PROBABLE CAUSE FOR SEARCH WARRANTS FOR SEARCH SITES (A) – (G)**

349.    As set forth in this affidavit, I believe the facts establish probable cause that the defendants did commit a violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

350.    This affidavit is also made for the purpose of establishing probable cause in support of warrants to search the premises for Search Sites (A)-(G) (as further described below) and to seize the records, documents, and items (as further described in Attachments C-1 and C-2).  The Search Sites (A)-(G) are located at:

a.    5358 S. Hoyne Ave., Chicago, Illinois (residence/garage associated with HICKS and IVORY WATSON)

b.    5437 S. Hoyne Ave., Chicago, Illinois (residence/garage of KEVIN MASUCA)

c.    15231 Lincoln Ave., Harvey, Illinois (residence/garage associated with ISAIAH HICKS)

d.    8024 S. Honore St., 1st Floor, Chicago, Illinois (residence associated with DANIEL COPRICH)

e.    6419 S. May St., Apt 2, Chicago, Illinois (residence associated with JOSHUA MCELROY)

f.    8256 Lorel Ave., Burbank, Illinois (residence/garage of UBEX LOPEZ)

g.    6152 S. Albany Ave., Second Floor apartment, Chicago, Illinois (residence of LATASHA WILLIAMS)

351.    As set forth in this affidavit, I believe the facts establish probable cause that the records, documents, and items (as further described in Attachments C-1 or C-2 for each respective search site) constitute fruits, instrumentalities and/or evidence of violations of Title

162

21, United States Code, Sections 841(a)(1), 846, and 843 and Title 18, United States Code, Section and 2, and further that a search of Search Sites (A)-(G) will result in the discovery of such records, documents, and items.

352.    As a result of my law enforcement experience and this investigation, I am familiar with the ways in which the members of a narcotics organization conduct their business, and through my experience and my discussions with other experienced law enforcement officers, I am familiar with the methods, schemes, and operations used by major cocaine traffickers and know:

a.    That illegal drug traffickers must maintain, on hand, large amounts of United States currency in order to maintain and finance their ongoing illegal drug trafficking business;

b.    That illegal drug traffickers maintain books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, sale, and distribution of illegal drugs and that such documents may be in code;

c.    That traffickers commonly "front" illegal drugs (meaning they will provide illegal drugs to their customers on consignment and the customers will pay for it at a later date);

d.    That the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where the illegal drug traffickers have ready access to them, i.e., homes, offices, and automobiles;

e.    That it is common for illegal drug traffickers to secret contraband, proceeds of illegal drug sales, and records of illegal drug transactions, sources, and customers, in secure locations within their residences, offices, garages, storage buildings, safety deposit boxes, and other locations, including stash houses, for ready access, and also to conceal such items from law enforcement authorities;

f.   That persons involved in such trafficking conceal caches of illegal drugs, large

amounts of currency, financial instruments, precious metals, jewelry, and other items of value

and/or proceeds of drug transactions, and evidence of financial transactions relating to obtaining,

transferring, secreting, or spending large sums of money made from engaging in illegal drug

trafficking activities, in their residences, offices, garages, storage buildings, automobiles, and

safety deposit boxes;

g.   That illegal drug traffickers commonly maintain addresses or telephone numbers in

books, papers, pagers, or cellular phones (and often have multiple cellular phones and pagers)

which reflect names, addresses, and/or telephone numbers for their associates in the trafficking

organization, even if said items may be in code;

h.   That illegal drug traffickers frequently take, or cause to be taken, pictures of

themselves, their associates, their property, and their product, and that these traffickers usually

maintain these pictures in their residences;

i.   That when traffickers amass large monetary proceeds from the sale of illegal drugs,

they attempt to legitimize these profits by utilizing foreign and domestic banks and their

attendant services, including securities, cashier's checks, money drafts, letters of credit,

brokerage houses, real estate, shell corporations, business fronts and other methods;

j.   That courts have recognized that unexplained wealth is probative evidence of

criminal activity in which transactions involving large amounts of cash and high profit margins

are common, including trafficking in controlled substances;

k.   That it is common for illegal drug traffickers to use, carry, and possess firearms and

ammunition in the course of their narcotics trafficking to use as protection for themselves and

their proceeds and narcotics, and that it is common for illegal drug traffickers to store and

164

conceal such firearms and ammunition in locations that they control or own, including their own residence or place of work; and,

I.     That it is common for narcotics traffickers to conceal and store items related to their narcotics trafficking within safes, footlockers, boxes, containers and other hidden compartments, and within places that they own or over which they exercise control.

### SEARCH SITE (A):  5358 S. HOYNE AVE., CHICAGO, ILLINOIS

353.    SEARCH SITE A is the premises commonly described as 5358 South Hoyne Avenue, Chicago, Illinois, is a brown/reddish brick, single family, one-story residence on the northwest corner of 54th Street and Hoyne Avenue with enclosed back porch and detached garage. The number "5" appears on the front of the mailbox of the residence.

354.    Based on the investigation to date, there is probable cause to believe that evidence of the violations alleged in this Affidavit (described in Attachment C-1) will be found at 5358 S. Hoyne Ave. [SEARCH SITE A]  HICKS is associated with this address.  At least two vehicles are registered to HICKS at 5358 S. Hoyne, including (1) a 1998 Jaguar Model  XK8, bearing VIN: SAJGX2247WC027422, 5358 S. Hoyne Ave., Chicago, Illinois [SUBJECT VEHICLE A]; and (2) a 1997 Chevrolet van bearing Illinois registration 9844636, 5358 South Hoyne, Chicago, Illinois.

355.    IVORY WATSON is also associated with this address.  As of May 20, 2008, Illinois Secretary of State records list 5358 S. Hoyne Ave. as WATSON's residence.  As explained above, WATSON is one of HICKS' runners, and typically serves customers requiring smaller quantities of crack cocaine such as an 8-ball quantity or less.

356.    Controlled transactions, phone communications and surveillance establish that HICKS, and others are conducting narcotics transactions at 5358 S. Hoyne Ave.  For example,

during the June 28, 2007 controlled buy transaction, the U/C saw COREY WILLIAMS enter and exit from this residence (See ¶ 160). In addition, during the December 3, 2007 controlled buy transaction, the U/C observed WILLIAMS meet with an unidentified male who had emerged from this residence (See ¶ 175).

357.    On February 21, 2008, at approximately 12:32 p.m., INDIVIDUAL CC, an elder relative of HICKS, called HICKS on Target Phone 1 (call #14974) during which INDIVIDUAL CC and HICKS discussed how Individual G and Individual H, who live with her [INDIVIDUAL CC] at 5358 S. Hoyne, are "bringing people in all night" [to sell narcotics]. INDIVIDUAL CC complained that these individuals "do so much shit at night" that it could "lead to problems." INDIVIDUAL CC stated that these individuals are "doing so much upstairs" that HICKS should be "scared to do anything in the house."

358.    On February 29, 2008, at approximately 2:59 p.m., DANIEL COPRICH called HICKS on Target Phone 1 (call # 15645) and asked if "anybody is doing anything over at HICKS' Old Girl's crib [5358 S. Hoyne Ave]?" and asked, "them Halsteds laying around?" HICKS replied, yeah and that Zook [MASUCA] had them. See ¶ 362 below ("Old Girl" refers to INDIVIDUAL CC as "Old Girl")

359.    On March 26, 2008, at approximately 6:53 p.m., DANIEL COPRICH called MASUCA on Target Phone 4 (call #00064), and told him to "get ready to come out" and asked if he could "please get a 'trey' [63 gram quantity of crack cocaine]." Shortly thereafter, at approximately 7:00 p.m., a surveillance agent observed a Cadillac registered to COPRICH pull up and park in front of 5437 S. Hoyne Ave. The surveillance agent observed HICKS as he walked up to the driver's side of the Cadillac. The agent observed COPRICH exit the vehicle and walk with HICKS across the street to the rear of the residence at 5358 S. Hoyne [SEARCH

SITE A].

360.    On May 13, 2008, at approximately 6:01 p.m., HICKS, who was using Target Phone 2 (call # 4734), called INDIVIDUAL CC at 773-498-9437, a land-line subscribed to INDIVIDUAL CC at 5358 S. Hoyne Ave.  HICKS asked INDIVIDUAL CC if [INDIVIDUAL U] was there, and INDIVIDUAL CC told HICKS that he [INDIVIDUAL U] gave her "that" [money].  HICKS said that he was going to send over Ahmad [AHMAD WILLIAMS] to pick up the money from INDIVIDUAL CC, and INDIVIDUAL CC said she didn't want Ahmad at her house.  HICKS stated that he was having someone come down there and pick "it" up. INDIVIDUAL CC asked who, Zook?  HICKS said no, he'll probably come himself – just get it ready for him and he will call her right back.

361.    On May 13, 2008, at approximately 6: 10 p.m., HICKS, who was using Target Phone 2 (call # 4740), received a call from INDIVIDUAL CC at 773-498-9437, a land-line subscribed to INDIVIDUAL CC at 5358 S. Hoyne Ave.[SEARCH SITE A]  INDIVIDUAL CC said that HICKS' friend Dan [COPRICH] is there and she wants to know if he can bring it to HICKS. HICKS said no, INDIVIDUAL U needs to get the six dollars [$600] from "Bird" and put INDIVIDUAL CC's nine [$900] with the six [$600].  INDIVIDUAL CC said that "she ain't got $900, she probably has $600 or $700.  HICKS said don't worry about it, give him what she got. HICKS said tell INDIVIDUAL U "I said try to piece up the rest, and I am gonna take it from there."  INDIVIDUAL CC asks are "you gonna come get this now?"  HICKS said yeah.

362.    On May 13, 2008, at approximately 6: 13 p.m., HICKS, who was using Target Phone 2 (call # 4740), received a call from INDIVIDUAL BB.  HICKS told INDIVIDUAL BB to get "the change from Old Girl" [INDIVIDUAL CC] and take that to Dale for him.  Based on this conversation, I believe that HICKS told INDIVIDUAL BB to pick up money from

INDIVIDUAL CC at 5358 S. Hoyne Ave. [SEARCH SITE A].

363.    IVORY WATSON's vehicle has been observed at this address as recently as May 19, 2008.

364.    **No-knock entry:** There is good cause to excuse the requirement that officers knock-and-announce before executing the search warrant. I make this request based on credible evidence that weapons are present at this address, and that multiple persons involved in narcotics transactions reside or conduct narcotics transactions at address. These reasons are as follows:

a.    As explained earlier, intercepted phone calls indicate that weapons may be present at 5358 S. Hoyne Ave. For example, on February 29, 2008, at approximately 10:54 p.m., MASUCA called HICKS on Target Phone 1 (call # 15703) and told him that he was just at "Old Girl's crib" [5358 S. Hoyne Ave, SEARCH SITE A] and INDIVIDUAL U "gave me your pipe" [gun].

b.    In addition, as also explained earlier, intercepted phone calls indicate that multiple individuals reside at 5358 S. Hoyne Ave., including IVORY WATSON, Individual CC, Individual G, Individual H, and that narcotics transactions are regularly being conducted therein. INDIVIDUAL CC warned HICKS in one phone call (call #14974) that these individuals [Individual G and Individual H] are "doing so much upstairs" that HICKS should be "scared to do anything in the house."

c.    Therefore, based upon all of the information set forth herein, my training and experience, and the training and experience of other law enforcement officers, I believe that having agents and officers knock and announce their presence prior to executing the search warrant at the 5358 S. Hoyne Ave. would (1) pose an unreasonable danger to agents and officers given the number of residents that are involved in narcotics trafficking at that location, and (2)

could possibly lead to the destruction of evidence if the multiple residents are alerted to the execution of the search.

### SEARCH SITE (B):    5437 S. HOYNE AVE., CHICAGO, ILLINOIS

365.    SEARCH SITE B is the premises commonly described as 5437 South Hoyne Avenue, Chicago, Illinois is a brown brick with white frame, single family, two story residence with a detached garage on the east side of Hoyne Avenue. The numbers "5437" appear in white numerals on the front of the residence.

366.    Based on the investigation to date, there is probable cause to believe that evidence of the violations alleged in this Affidavit (described in Attachment C-1) will be found at 5437 S. Hoyne Ave.   Based on public records, surveillance and intercepted phone calls, KEVIN MASUCA resides at 5437 S. Hoyne Ave.

367.    As explained above, MASUCA is HICKS' "second-in-command" and is HICKS' main runner. There have been several intercepted calls in which MASUCA discusses narcotics inventory and currency that he maintains at his "crib" [5437 S. Hoyne Ave]. For example, on April 8, 2008, at approximately 8:49 a.m., HICKS, who was using Target Phone 1 (call #21867), placed a call to MASUCA.  HICKS asked where MASUCA was at.  MASUCA said he was dropping her off now and going back to the crib to "grab that." [pickup the powder cocaine to be processed].  HICKS told MASUCA to "grab both of 'em", [two kilos] indicating that he was going to use both of them rather than "have to redo" [cook again]. HICKS said that "as they rack up from there", he could go on ahead.

368.    Based on intercepted calls, it is apparent that MASUCA keeps and uses a drug ledger, or similar records, at this residence as there have been intercepted calls in which MASUCA notes that he writes down his accounting of monies owed by customers.  For example, on February 11,

2008, at approximately 5:42 p.m., MASUCA, who was using Target Phone 4, called HICKS on

Target Phone 1 (call #13813) and told HICKS he had "6-9-15" [$6,915]. HICKS told MASUCA

to hold on so he could write it down. HICKS told MASUCA to "run the shorts down" to him

[tell him who owed money for purchases of narcotics made]. HICKS said "James short $225 for

2 on that order for them." MASUCA agreed and said he gave him 8, so that James owes a stack

and $225 [$1,225]. MASUCA said that "4-5's Cousin" [DESHAUN GERMANY] came and

gave him [MASUCA] $1,590, so he is $10 short. MASUCA said that "4-5's Uncle" came with

12 cents [$1,200] and HICKS said that was "3 dollars" [$300] off. MASUCA said that Greg

came with "a stack" [$1,000], and HICKS said Greg was $500 short. MASUCA said that "4-5's

Cousin" came again with 14 [$1,400], and HICKS said that was short "2 dollars" [$200].

MASUCA said "AG" [AHMAD WILLIAMS] and "Boss Hog" [JOSHUA MCELROY], and

HICKS replied "don't worry about them, just on the seven" and adds" don't count "DSki"

[VINCENT SLAUGHTER]. HICKS told MASUCA, "you remember 'DSki' and I'll remember

'Boss Hog.'" HICKS told MASUCA that "DSki" paid his bill [$1,300], but that he is $200 short.

HICKS asked MASUCA if he had one left, and MASUCA said "right." HICKS said that if he

adds "DSki", "Boss Hog", and Ahmad, that they are still short somewhere. HICKS said the

shorts come to about "2 stacks" [$2,000] and $125. HICKS said that they already have $6,000

and then that $9,000 and that is $15,000. MASUCA said he wrote down everything, and HICKS

told MASUCA that he doesn't blame him.

369. During several of the transactions outlined above, MASUCA has been observed exited

from or entering 5437 S. Hoyne.[SEARCH SITE B] For example, on March 13, 2008, at

approximately 4:33 p.m., at the mouth of the alley near 5437 S. Hoyne, surveillance agents

observed a hand-to-hand exchange of a bag between MASUCA and a runner for UBEX LOPEZ;

after the exchange, MASUCA walked back into the residence at 5437 S. Hoyne. (See also ¶ 43, above).

370.   In addition, as outlined above, several transactions have been surveilled taking place near 5437 S. Hoyne Ave. [SEARCH SITE B]  For example, On April 25, 2008, at approximately 2:50 p.m., (call # 24138) MASUCA, using Target Phone 4 called HICKS on Target Phone 1. MASUCA asked HICKS if he could give "one of me" [63 gram quantity] to AHMAD WILLIAMS.  HICKS told MASUCA yes and also said that WILLIAMS no longer needed to go through HICKS but could go right to MASUCA.  At approximately 2:51 p.m., a surveillance agent observed MASUCA standing outside of 5437 S. Hoyne talking on his cell phone.  A surveillance agent observed WILLIAMS approach MASUCA in front of 5437 S. Hoyne Ave. After meeting, the two walked towards the house and appeared to conduct some type of exchange.

371.   In the early morning hours of May 10, 2008, Chicago Police officers executed a consent search at 5437 S. Hoyne Ave. [SEARCH SITE B]  Later that morning, on May 10, 2008, at approximately 11:10 a.m., HICKS, who was using Target Phone 2, had a conversation with KEVIN MASUCA (call # 4282) during which HICKS told MASUCA to pack up the two "goddamnits" [guns], the narcotics, and the "change"[money proceeds] and that he was going to have his "baby's mamma" [INDIVIDUAL BB] come and pick up these items after work and that they [HICKS and INDIVIDUAL BB]  would store this at the "low low" [the "low key" residence HICKS maintains with INDIVIDUAL BB at 15231 Lincoln Ave,  Harvey, Illinois] [SEARCH SITE C].  Later that same day, at approximately 3:23 p.m., (call # 3051) MASUCA called HICKS on Target Phone 2 and told HICKS that he decided to let the police "run up" in his crib.[give consent to search].  HICKS stated you know you had "stash" in the closet.  MASUCA

states yeah, he knew, and that was the only thing he was worried about.  HICKS and MASUCA then discuss having the "stash," including two bangers [guns], picked up by HICKS "till it cool off."  Intercepted phone calls and surveillance later that day confirmed that INDIVIDUAL BB complied with HICKS' request to meet with MASUCA, make the pick up, and deliver the contraband to 15231 Lincoln, Harvey, Illinois [SEARCH SITE C].

372.    There is probable cause to believe that evidence of the violations alleged in this Affidavit, including drug ledgers remains at 5437 S. Hoyne Ave.  Intercepted phone calls establish that MASUCA continued to conduct narcotics transactions even after the search of his residence on May 9, 2008.  For example, on May 13, 2008, at approximately 8:32 p.m., MASUCA, who was using Target Phone 4, had a conversation with HICKS (call # 3328) during which HICKS asked "who was all in the red." [people who owe money for narcotics debts].  MASUCA said Dan [COPRICH] told him he gave HICKS "that", and HICKS said yeah, he got him.  MASUCA then asked HICK if Baby Dough [GLENN ISLAND] come on in, and HICK stated yeah, he came in.  MASUCA said that's all in the red.  MASUCA then said that's it, besides Boss Hogg [JOSHUA MCELROY].  MASUCA further stated oh yea, Dski [VINCENT STRAUGHTER] still owes him 2 dollars [$200].  HICKS responded that was "fine, he knew more than one way to scare that cat."  MASUCA said he's "trying to be outside chillin' and break that, not just stay in the crib."  Based on this conversation, I believe that MASUCA was reviewing a drug ledger, and as noted above, such ledgers are typically maintained by drug dealers at locations close to them, such as their residence.

373.    Target Phone 4 (which was being used by MASUCA) is subscribed to INDIVIDUAL Z at 5437 S. Hoyne Ave., Chicago, Illinois.  According to Chicago Police Department records, MASUCA was arrested for domestic battery in an incident in which INDIVIDUAL Z was listed

as the victim and which occurred at 5437 S. Hoyne Ave., Chicago, Illinois.

374.   **No-knock entry:**  There is good cause to excuse the requirement that officers knock-and-announce before executing the search warrant. I make this request based on credible evidence that MASUCA possesses weapons at this address, and that MASUCA is violent and may attempt to harm officers executing the warrant if given an opportunity to do so. These reasons are as follows:

a.   As explained earlier, intercepted phone calls indicate that MASUCA has kept weapons at this address. For example, On April 6, 2008, at approximately 1:09 a.m., HICKS, who was using Target Phone 1, called MASUCA on Target Phone 4 (call # 21422) and asked if MASUCA was in the crib and he replied that he was. HICKS said he might need MASUCA to bring that "goddamnit" [gun] and come to 53th and Ashland.

b.   Intercepted phone calls also indicate that MASUCA possesses firearms on his person. For example, on February 17, 2008, at approximately 4:31 p.m.(call # 14522), HICKS HICKS asked if MASCUA if was about to take INDIVIDUAL U his "strap" [gun] and MASUCA replied that he was. HICKS told him not to do this. HICKS said, "no, keep my shit, Zook." HICKS repeated, "no, keep my shit yourself, Zook." MASUCA replied, "allright, I got both then" [he had two guns belonging to HICKS].

c.   In addition, on February 29, 2008, at approximately 10:54 p.m., MASUCA called HICKS on Target Phone 1 (call # 15703) and told him that he was just at "Old Girl's crib" [5358 S. Hoyne Ave, SEARCH SITE A] and INDIVIDUAL U "gave me your pipe" [gun]. HICKS asked why. MASUCA said he didn't know why. MASUCA said that he [INDIVIDUAL U] asked if he [MASUCA] had one because MASUCA didn't come out with his own, so he told MASUCA to "take this." HICKS said allright.

d.   As established above, there is credible evidence to believe that MASUCA regularly keeps firearms at his residence or on his person, and that MASUCA is continuing to conduct narcotics transactions from his residence.  Based on my training and experience, drug traffickers commonly keep firearms to use as protection for themselves and their proceeds and narcotics at their residence.  Therefore, based upon all of the information set forth herein, my training and experience, and the training and experience of other law enforcement officers, I believe that having agents and officers knock and announce their presence prior to executing the search warrant at 5437 S. Hoyne Ave. would pose an unreasonable danger to agents and officers.

### SEARCH SITE (C):  15231 LINCOLN AVE., HARVEY, ILLINOIS

375.    SEARCH SITE C is the premises commonly described as 15231 Lincoln Avenue, Harvey, Illinois is a reddish brick, single family, one story residence with a detached garage on the east side of Lincoln Avenue. The numbers "15231" appear in black numerals on the front of the residence.

376.    There is probable cause to believe that evidence of the violations alleged in this Affidavit (described in Attachment C-1) will be found at 15231 Lincoln Ave., Harvey, Illinois. Based on surveillance information and intercepted calls, it appears that contraband is stored at this location, and it appears that HICKS may stay at this location on occasion.

377.    On February 28, 2008, surveillance agents observed HICKS being dropped off at this residence, get the mail out of the mailbox, and walk into the house.

378.    Based on the content of intercepted calls, HICKS is likely to have narcotics, firearms and other contraband and evidence of drug trafficking at this address.  As explained above, during the early morning hours of May 10, 2008, Chicago Police officers executed a consent search at 5437 S. Hoyne Ave. [SEARCH SITE B].  Later that morning, on May 10, 2008, there

was a series of calls between HICKS and INDIVIDUAL BB which indicate that HICKS arranged for INDIVIDUAL BB to transport contraband that had been held at that location to HICKS' residence in Harvey, Illinois. (See ¶ 74(a) – 74(f) above)  Intercepted phone calls and surveillance confirmed that INDIVIDUAL BB complied with HICKS' request to meet with MASUCA and make the pick up, and then delivered the items to this address.

a.    At approximately 7:05 p.m., a surveillance agent observed INDIVIDUAL BB exit the Gyros parking lot onto Seeley.  The agent observed INDIVIDUAL BB drive eastbound through the east / west alley between Seeley and Hoyne.  The agent observed the car then turn north at the "T-alley" and pull behind MASUCA's house.  At approximately 7:06 p.m., HICKS, who was using Target Phone 2, called MASUCA on Target Phone 4 (call # 3083).  HICKS told MASUCA to check his alley that there was someone back there with a yellow car.  MASUCA advised HICKS that he knew who that individual was, and said "he ain't nobody."  HICKS told MASUCA to go ahead then, she in back.

b.    Shortly thereafter, at approximately 7:10 p.m. on this same date, the surveillance agent observed INDIVIDUAL BB exit the neighborhood and drive eastbound on Garfield Boulevard through Damen.  At approximately 7:12 p.m., HICKS, who was using Target Phone 2, called MASUCA on Target PHONE 4 (call # 4354).  HICKS asked MASUCA if she is good, and MASUCA advised "yeah, she good."

c.    The surveillance agent continued to conduct mobile surveillance of INDIVIDUAL BB as she drove east on Garfield Boulevard to the Dan Ryan Expressway, and then south on the expressway to 147th Street where she exited and drove to the residence she shares with HICKS located at 15231 Lincoln Avenue in Harvey, Illinois. [SEARCH SITE C]

d.    At approximately 7:29 p.m., HICKS, who was using Target Phone 2, called

INDIVIDUAL BB (call # 4357).  HICKS asked INDIVIDUAL BB if she was home yet, and

INDIVIDUAL BB explained that she had just gotten off the expressway on 147th Street.  HICKS

again told her to obey the speed limit, and not to drive fast.  INDIVIDUAL BB agreed.  HICKS

then told her that if she felt like it she should go and buy front brakes too when she was finished.

INDIVIDUAL BB told HICKS that she could stop and get the brakes right now [she had to pass

the auto parts store on her way home] and HICKS told her no, no, you don't—"business is first,

go ahead."  INDIVIDUAL BB complained that if she went home first, her mother would leave

[and there would be no one to watch their child].  HICKS told INDIVIDUAL BB that she still

could not do that, "you can't never be deep like that" [she shouldn't drive around with narcotics

in the car].  At approximately 7:37 p.m., HICKS, who was using Target Phone 2, called

INDIVIDUAL BB (call # 4361).  HICKS asked INDIVIDUAL BB if she was home, and she

advised that she had made it home.  HICKS then asked INDIVIDUAL BB if she saw that second

drawer right there?  INDIVIDUAL BB explained that she was getting back in the car to go to

Murray's [auto parts store].  HICKS said okay—in my second drawer is, just make sure

everything is—I am going to handle it.  INDIVIDUAL BB said make sure what?  HICKS said

just got there, I'll be there.

    379.    **No-knock entry**:  There is good cause to excuse the requirement that officers knock-

and-announce before executing the search warrant.  I make this request based on credible

evidence that HICKS possesses weapons at this address, and that HICKS is violent and may

attempt to harm officers executing the warrant if given an opportunity to do so.  These reasons

are as follows:

        a.    As explained earlier, intercepted phone calls indicate that weapons may be present at

this address.  For example, as discussed more fully above, on May 10, 2008, HICKS requested

that MASUCA pack the two "goddamnits" [guns] for Individual BB to pick up and transport to this address.

b. In addition, based on surveillance information as well as intercepted calls, HICKS maintains fighting dogs at this address. As recently as May 20, 2008, four pit-bulls have been surveilled at this location [SEARCH SITE C]. In addition, on February 27, 2008, at approximately 6:05 p.m., COPRICH called HICKS on Target Phone 1 (call # 15348) and asked HICKS what he was doing. He replied, "feeding the mutts." HICKS and COPRICH then discuss getting shots for their dogs.

c. During the course of the investigation there have been several intercepted calls which indicate that HICKS possesses firearms. For example, on February 2, 2008, at approximately 1:07 p.m., HICKS, who was using Target Phone 1, placed a call to JAMAL WASHINGTON (call # 12417) during which WASHINGTON explained that a rival gang crew didn't "pull anything" because they knew that he, HICKS and "Zook" [MASUCA] "had some things" [guns]. In addition, on March 5, 2008, at approximately 5:19 p.m., HICKS, who was using Target Phone 1, called IVORY WATSON (call # 16224) and told WATSON to let him in the house so he could get his "pipe" [gun]. WATSON replied "what?" HICKS said "let me in so I can get my pistol."

d. On March 27, 2008, at approximately 11:01 a.m., IVORY WATSON called HICKS on Target Phone 1 (call # 19591) and told him that someone wanted "our pipe" [gun] and he got two of them.

e. Therefore, based upon all of the information set forth herein, my training and experience, and the training and experience of other law enforcement officers, I believe that having agents and officers knock and announce their presence prior to executing the search

warrant at 15231 Lincoln Avenue in Harvey, Illinois would pose an unreasonable danger to agents and officers.

## SEARCH SITE (D): 8024 S. HONORE ST., 1ST FLOOR, CHICAGO, ILLINOIS

380.    SEARCH SITE D is the premises commonly described as 8024 South Honore Street, Chicago, Illinois is a reddish/brown brick, multi-family, three-story residence with a detached garage on the west side of Honore Street. There are mailboxes on both sides on the entry way. The entry way has an outside door and an inside door. The outside door is locked. The unit to be searched is unit#1 on the first floor on the left side of the entry way with INDIVIDUAL L's name on the mailbox.

381.    Based on the following, 8024 S. Honore St., first floor is believed to be the current residence of DANIEL COPRICH.   On February 27, 2008, agents observed an older model Pontiac Grand Prix bearing license plate number 9492575 parked in front of the apartment building at 8022-8024 S. Honore, Chicago, Illinois.  This vehicle is registered to Dan Coprich, 4206 Applewood Lane, Matteson, Illinois.   In addition, on February 21, 2008, COPRICH had a conversation with HICKS on Target Phone 1 (call #14681) on telephone (773) 874-3210.  This telephone is registered to Individual L at 8024 S. Honore, First Floor, Chicago, Illinois.  On March 5, 2008, law enforcement agents conducted a traffic stop on COPRICH's vehicle following a surveilled narcotics transaction with HICKS.   COPRICH was driving a red Dodge Charger registered to INDIVIDUAL L.

382.    Based on the investigation to date, there is probable cause to believe that evidence of the violations alleged in this Affidavit (described in Attachment C-2) will be found at 8024 S. Honore, 1st Floor, Unit #1, Chicago, Illinois.  As outlined above, COPRICH is a distributor who purchases weight quantities of crack cocaine from HICKS and also arranges purchases of kilo

quantities of powder cocaine for HICKS. For example, on February 19, 2008, at approximately

1:36 p.m., COPRICH spoke with HICKS to express concerns about narcotics that COPRICH had

recently purchased from HICKS. (See ¶ 112 above). COPRICH said he thought HICKS was

"trying to kill my people" [COPRICH's customers] and that when he got that "lick" [narcotics],

he was wondering what HICKS put on the lick. In addition, COPRICH was intercepted in phone

calls on February 26, 2008 and February 27, 2008 with HICKS which indicate that COPRICH

was arranging transactions in which HICKS would acquire cocaine. (See ¶¶ 26 - 27 above).

Finally, based on intercepted phone calls between MASUCA and HICKS on May 13, 2008,

COPRICH had recently settled a drug debt with HICKS. (See ¶ 372)

383.    As recently as April 3, 2008, at approximately 12:45 a.m., surveillance agents

observed a blue Cadillac bearing temporary license plate 593J228 [SUBJECT VEHICLE B], a

car previously observed driven by COPRICH (See ¶ 121, 123 above) and registered to

COPRICH, parked in front of the residence at 8024 S. Honore, Chicago, Illinois. In addition, as

recently as May 19, 2008, at approximately 11:30 am, a vehicle which COPRICH has been

observed driving [Cutlass] was seen parked outside this location.

### SEARCH SITE (E): 6419 S. MAY ST., APT. #2, CHICAGO, ILLINOIS

384.    SEARCH SITE E is the premises commonly described as 6419 South May Street,

Chicago, Illinois is a red brick, multi-family, two-story residence with two apartments and a

detached garage on the east side of the street. The unit to be searched is the 2nd floor with the

door on the left. The first floor apartment has boarded up windows on both the front and back

sides of the building. The numbers "6419" appear in black numerals on the front of the

residence.

385.    Based on the investigation to date, there is probable cause to believe that evidence of

the violations alleged in this Affidavit (described in Attachment C-2) will be found at 6419 S.

May St., Apt. 2, Chicago, Illinois. [SEARCH SITE E]  This address is believed to be the current

residence of JOSHUA MCELROY a/k/a "BOSS HOG."  As of May 20, 2008, Illinois Secretary

of State records list 6419 S. May, Chicago, Illinois as MCELROYs address.  In addition, IDOC

records show that MCELROY was paroled to 6419 S. May, Apt. 2, from December 26, 2006

until October 15, 2007.  In addition, on October 10, 2007, MCELROY was arrested for, among

other things, unlawful possession of a firearm, manufacture and delivery of a controlled

substance, and possession of 30-500 grams of cannabis; arrest records from that date list 6419 S.

May, Apt. 2, as MCELROY's address.  Finally, as recently as February 27 and February 28,

2008, surveillance agents observed MCELROY enter a door leading to the stairway to the

second floor of 6419 S. May St..

386.    As outlined above, MCELROY is a distributor who regularly purchases "weight"

quantities of crack cocaine from HICKS.  For example, on April 26, 2008, at approximately

5:49 p.m., MCELROY called HICKS on Target Phone 2 (call # 2719).  HICKS asked "What's

up Boss Hog, you ready to come in?"  MCELROY said he was trying and asked what HICKS

could "do for 7 dollars [$700] though."  HICKS said he could give MCELROY a "zip" [ounce]

for that.  In addition, MCELROY was intercepted in phone calls with HICKS on February 19,

2008, February 27, 2008, March 5, 2008, March 7, 2008, March 25, 2008, and May 1, 2008

which indicate that MCELROY was purchasing crack cocaine from HICKS.  (See ¶¶ 220 - 229

above).  Finally, based on intercepted phone calls between MASUCA and HICKS on May 13,

2008, MCELROY still owed a drug debt to HICKS based on MASUCA's drug ledger.  (See ¶

372).

## SEARCH SITE (F):  8145 S. LOREL AVE., BURBANK, ILLINOIS

387.    SEARCH SITE F is the premises commonly described as 8145 South Lorel Avenue, Burbank, Illinois is a light brown brick, single family, two-story residence with a wooden deck porch on the front of the residence and a detached garage. The numbers 8145 appear in gold and black numerals on the front of the residence.

388.    Based on the investigation to date, there is probable cause to believe that evidence of the violations alleged in this Affidavit (as described in Attachment C-2) will be found at 8145 S. Lorel Ave., Burbank, Illinois. [SEARCH SITE F]  Based on surveillance and other law enforcement information, this is one of the current residences of UBEX LOPEZ a/k/a "LITTLE MAN." As outlined above, LOPEZ is one of HICKS suppliers.  For example, on January 28, 2008, at approximately 12:22 p.m., LOPEZ called HICKS on Target Phone 1 (call # 11479). During this call, LOPEZ used the code word "woody" [ready]. HICKS asked "what's the ticket?" [referring to the price for 2 kilograms of cocaine].  LOPEZ said he was by 22nd and Cal [meaning, he would charge $22,000.00 per kilogram of cocaine]. HICKS said in your face man. LOPEZ said that he felt bogus for getting HICKS "geeked up" and then not being able to come through. LOPEZ said that he would be going over there to see them at 3 p.m. and to round up what HICKS can because it is going to be once a week [meaning that LOPEZ would be able to supply kilograms to HICKS every week]. HICKS said okay.

389.    In another example, on March 26, 2008, at approximately 4:46 p.m., LOPEZ , who was using (773) 828-2160, called HICKS on Target Phone 1 (call # 19424) and told HICKS that he was "missing his beat" because he had been calling HICKS all morning telling him to "hit him back" [return his call].  LOPEZ stated that "his man" [powder cocaine supplier] had called to tell him he had "three hours laying around" [3 kilos of cocaine available], "talking about Michael Jordan" [for the price of $23,000].  LOPEZ  told HICKS that he thought someone else was going

to "jump on them," but that if HICKS wanted him [LOPEZ ] to put HICKS in, he could. HICKS told him "not for no Michael Jordan" and said that he "got some still."

390.    In addition, LOPEZ has been intercepted in phone calls with HICKS discussing narcotics transactions on numerous other occasions, including March 11, 2008; March 12, 2008; March 13, 2008; March 26, 2008; March 27, 2008; March 28, 2008; March 30, 2008; and March 31, 2008. (See ¶ 28 – 33, 41 - 42, 127 – 135, 136, 137 - 130)

391.    Sometime in or around December 30, 2007, LOPEZ's sister advised IDOC Parole agents that he had moved to 8145 S. Lorel Ave., Burbank, Illinois [SEARCH SITE F] to live with his father. As of May 20, 2008, IDOC lists 8145 S. Lorel Ave [SEARCH SITE F] as LOPEZ's residence

392.    Between April 9, 2008 and April 17, 2008, SUBJECT VEHICLE C, an SUV that LOPEZ had been seen driving on multiple occasions, was observed by surveillance agents in the driveway of the residence with the driver's side wheel removed. On April 18, 2008, a surveillance agent observed SUBJECT VEHICLE C in the driveway with both back wheels removed and with tools spread around the vehicle on the ground. On this date, the surveillance agent observed LOPEZ in the process of working on SUBJECT VEHICLE C.

393.    On April 11, 2008, an agent who was conducting surveillance at the SEARCH SITE F observed a female drive a different vehicle into the driveway of the residence. That vehicle is registered to Individual M at 7912 S. Nordica Ave., Burbank, Illinois. The agent observed LOPEZ and the female exit the vehicle and enter the residence. A short time later, the agent observed LOPEZ exit the residence and drive away.

394.    On April 19, 2008, at approximately 2:30 a.m., agents conducting surveillance observed SUBJECT VEHICLE C parked in the driveway of the S. Lorel Ave. residence. At this

time, the wheels were back on SUBJECT VEHICLE C and it appeared operable.

## SEARCH SITE (G):   6152 S. ALBANY AVE., CHICAGO, ILLINOIS

395.    SEARCH SITE G is the premises commonly described as 6152 South Albany Avenue, Chicago, Illinois is a dark brown brick, single family, two story residence subdivided into first floor and second floor apartments with a white iron gate/fence in the front of the property with a detached garage on the west side of Albany at the alley. The unit to be searched is the second floor apartment. The numbers 6152 appear in gold numerals on the front of the residence

396.    Based on the investigation to date, there is probable cause to believe that evidence of the violations alleged in this Affidavit (as described in Attachment C-2) will be found at 6152 S. Albany Ave., Chicago, Illinois. [SEARCH SITE G] This is the current residence of LATASHA WILLIAMS a/k/a "TASHA B." As outlined above, LATASHA WILLIAMS serves as one of HICKS' brokers and assists him processing cocaine into crack.   In addition, this residence is a location believed to be used for processing powder cocaine into crack cocaine. For example, on April 8, 2008, surveillance agents established that HICS and MASUCA were at LATASHA WILLIAMS' residence while she was at court.  On that same date, at approximately 10:46 a.m., HICKS, who was using Target Phone 1 (call #21895),  received a call from INDIVIDUAL BB. During the telephone call, HICKS can be heard speaking to someone off the phone saying "This shit is good, Damn, Whoo wee!" [HICKS is pleased with the quality of the cocaine being processed].

397.    Later that same day, on April 8, 2008, at approximately 4:07 p.m., HICKS, who was using Target Phone 1 (call #21943), received call from JAMAL WASHINGTON. WASHINGTON asked HICKS if "Bird" [IVORY WATSON] had called HICKS, and HICKS

said he got up with Bird.  WASHINGTON then asked HICKS if "he got his shit whipped up?" [WASHINGTON was asking if he had finished processing the cocaine into crack].  HICKS explained that he needed to wash his ass, and WASHINGTON said all right.  Shortly thereafter, at approximately 4:11 p.m., agents observed Ivory WATSON arrive on the block in his white Oldsmobile sedan, baring Illinois License plate X605927, and park on the east side of Albany opposite 6152 S. Albany.   At approximately 4:15 p.m., agents observed HICKS and LATASHA WILLIAMS exit 6152 S. Albany, and watched as HICKS walked to WATSON's car and got in the front passenger seat.  Agents also observed LATASHA WILLIAMS enter her Monte Carlo.  HICKS exited the building carrying a small grocery bag.

398.    In addition, later that same day, on April 8, 2008, at approximately 6:28 p.m., HICKS, who was using Target Phone 1 (call #22000), received call from LATASHA WILLIAMS.  WILLIAMS advised HICKS that her phone was off.   HICKS told her to open the door downstairs [to let MASUCA in].  At approximately 6:28 p.m., HICKS, who was using Target Phone 1 (call #22003), had a direct connect conversation with MASUCA.  HICKS called MASUCA and asked if he is good.  MASUCA responded that he is good [he had been let into the apartment and picked up the bag with the newly processed crack cocaine].

399.    Other occasions of this location [SEARCH SITE G] being used for processing crack cocaine are set forth above in ¶¶ 56 – 68, 316 - 326.

**PROBABLE CAUSE FOR REQUESTED SEIZURE WARRANTS FOR VEHICLES**

400.    As set forth in this Affidavit, I believe the facts establish probable cause that the defendants did commit a violation of Title 21, United States Code, Sections 846, and Title 18, United States Code, Section 2.

401.    This Affidavit is also made for the limited purpose of establishing probable cause in

support of seizure warrants to seize the following vehicles as property used to facilitate the

violations herein alleged, namely, violations of Title 21, United States Code, Section 846, and

Title 18, United States Code, Section 2, and property used or intended to be used in any manner

or part to commit or facilitate the commission of said violations:

      A **1998 Jaguar XK 8**, VIN: SAJGX2247WC027422, registered to ISAIAH
HICKS, 5358 S. Hoyne Ave., Chicago, Illinois (see ¶ 83 above);

      B **2000 Cadillac Deville**, VIN: 1G6KD54YXYU312523, registered to DANIEL
COPRICH, 4206 Applewood Lane, Chicago, Illinois (see ¶ 120 above);

      C **2002 Chevrolet Tahoe**, VIN 1GNEK13Z22R204336, registered to
INDIVIDUAL A and INDIVIDUAL B, 3512 W. Columbus Ave., Chicago, Illinois (see ¶
139 above);

(hereinafter VEHICLES A-C).

402.    As set forth in this Affidavit, there is probable cause to believe that upon conviction of

the defendants, VEHICLES A-C will be subject to forfeiture.

403.    Based on my experience, I know that motor vehicles, like VEHICLES A-C, are easily

transferred or hidden thereby making them difficult to locate. Moreover, I am aware that the

appearance of a motor vehicle can be altered or it can be concealed in a garage or storage area

making it difficult, if not impossible, to find for the purpose of forfeiture proceedings.

Additionally, motor vehicles can be transported outside the district further increasing the

potential unavailability of these motor vehicles for forfeiture in the event of conviction.

404.    Finally, I know that unless a motor vehicle is seized, it can be difficult to preserve the

value of the motor vehicle for forfeiture purposes, because financial obligations relating to the

vehicle, including insurance payments and loan obligations are not satisfied when an owner is

given prior notice that his property will likely be subject to forfeiture. In order to ensure that the

availability of VEHICLES A-C is preserved for forfeiture, Title 21, United States Code, Section

853(e) authorizes the entry of a restraining order or any other action necessary to preserve the property, and Title 21, United States Code, Section 853(f) states that, in the same manner as provided for a search warrant, a seizure warrant may be issued when the property would, in the event of conviction, be subject to forfeiture and a restraining order may not be sufficient to assure the availability of the property for forfeiture.

405.    Additionally, courts have long recognized the unique circumstances involved in searching and seizing vehicles due to their inherent mobility, and the United States Supreme Court has found that the warrantless seizures of motor vehicles do not violate the Fourth Amendment of the United States Constitution where there is probable cause to believe that the automobile is subject to forfeiture, because movable contraband may be spirited away.

406.    Based on the above, this Affidavit hereby seeks seizure warrants for VEHICLES A-C under Title 18, United States Code, Section 853(f), because a restraining order or any other action is not sufficient to assure the availability of VEHICLES A-C for forfeiture.

FURTHER AFFIANT SAYETH NOT.

Jeffrey P. Schoenburger #3342

Jeffrey Schoenburger
Special Agent, ATF


SUBSCRIBED AND SWORN TO BEFORE ME
THIS 26th DAY OF May 2008.

## Attachment C-1: Items To Be Seized

(a)    Records, notebooks, memoranda, receipts, ledgers, photographs, audio tapes, video tapes, phone bills, cellular phones (including any information stored therein), pagers (including any information stored therein), travel records and documents, lists and supplier or customer information relating to the purchase, sale, or distribution of narcotic controlled substances.

(b)    Books, records, lists, receipts, bank and savings and loan records of deposit, statements, and other bank records, letters of credit, money orders, cashiers' checks, passbooks, canceled checks, certificates of deposit, lease agreements, loan records, customer account information, income and expense summaries, cash disbursement journals, financial statements, state and federal income tax returns, information related to the receipt and other disposition of income and related financial information pertaining to the purchase, lease, sale or other disposition of real or personal property, including real estate, automobiles, jewelry, and furniture;

(c)    Indicia of ownership, occupancy or residency of the premises being searched, including utility and telephone bills, lease agreements, and mortgage records, loan documents, service, remodeling and repair contracts and keys;

(d)    United States currency, precious metals, jewelry and financial instruments, as well as books and records regarding the acquisition, use and disposition of such items of value;

(e)    Safe deposit box lease agreements and safe deposit box keys;

(f)    Photographs of participants in the drug trafficking organization, or of property acquired in the distribution of drugs or money laundering;

(g)    Any and all firearms and ammunition;

(h)    All controlled substances and drug paraphernalia used for packaging, cutting, weighting, and distributing controlled substances; and

(i)    Safes (both locked and unlocked) found in the Subject Premises and any of the above-mentioned items found in those safes.

## Attachment C-2: Items To Be Seized

(a)     Records, notebooks, memoranda, receipts, ledgers, photographs, audio tapes, video tapes, phone bills, cellular phones (including any information stored therein), pagers (including any information stored therein), travel records and documents, lists and supplier or customer information relating to the purchase, sale, or distribution of narcotic controlled substances.

(b)     Books, records, lists, receipts, bank and savings and loan records of deposit, statements, and other bank records, letters of credit, money orders, cashiers' checks, passbooks, canceled checks, certificates of deposit, lease agreements, loan records, customer account information, income and expense summaries, cash disbursement journals, financial statements, state and federal income tax returns, information related to the receipt and other disposition of income and related financial information pertaining to the purchase, lease, sale or other disposition of real or personal property, including real estate, automobiles, jewelry, and furniture;

(c)     Indicia of ownership, occupancy or residency of the premises being searched, including utility and telephone bills, lease agreements, and mortgage records, loan documents, service, remodeling and repair contracts and keys;

(d)     United States currency, precious metals, jewelry and financial instruments, as well as books and records regarding the acquisition, use and disposition of such items of value;

(e)     Safe deposit box lease agreements and safe deposit box keys;

(f)     Photographs of participants in the drug trafficking organization, or of property acquired in the distribution of drugs or money laundering;

(g)     Any and all firearms and ammunition; and

(h)     Safes (both locked and unlocked) found in the Subject Premises and any of the above-mentioned items found in those safes.